WRITERS GUILD OF AMERICA, WEST, INC., a corporation, et al., Plaintiffs,

v.

FEDERAL COMMUNICATIONS COMMISSION, et al., Defendants.

TANDEM PRODUCTIONS, INC., a corporation, Plaintiff,

v.

COLUMBIA BROADCASTING SYSTEM, INC., a corporation, et al., Defendants.

Nos. CV 75–3641–F, CV 75–3710–F.

United States District Court, C. D. California.

Nov. 4, 1976.

Munger, Tolles & Rickershauser by Ronald L. Olson, Harvey I. Saferstein, Allen M. Katz, Nancy Bekavac, Los Angeles, Cal., for plaintiffs Writers Guild of America, West, Inc., and others.

Beardsley, Hufstedler & Kemble by Seth Hufstedler, Dennis M. Perluss, John Sobieski, Jerome H. Craig, Burton J. Gindler, Evelyn Balderman, Los Angeles, Cal., for plaintiff Tandem Productions, Inc.

Donald A. Fareed, Asst. U. S. Atty., Los Angeles, Cal., David J. Anderson, Dennis G. Linder, Special Litigation Counsel, Dept. of Justice, Washington, D.C., Barbara O'Malley, Federal Communications Commission, Washington, D.C., for defendant F.C.C.

McCutchen, Black, Verleger & Shea by Philip K. Verleger, David A. Destino, Donna R. Black, Los Angeles, Cal., Columbia Broadcasting System, Inc. by Jack B. Purcell, John D. Appel, Deputy Gen. Counsel, New York City, for defendant Columbia Broadcasting System, Inc.

Schnader, Harrison, Segal & Lewis by Irving R. Segal, Eugene A. Spector, Philadelphia, Pa., Gibson, Dunn & Crutcher by John J. Hanson, Tom Lallas, Los Angeles, Cal., for defendant National Broadcasting Co., Inc.

Bergson, Borkland, Margolis & Adler by Daniel H. Margolis, William R. Robertson, Eric J. Branfman, McKenna, Wilkinson & Kittner by Thomas N. Frohock, Washington, D.C., Lillick, McHose & Charles by Kenneth E. Kulzick, Andrew W. Robertson, Los Angeles, Cal., for defendant American Broadcasting Companies, Inc.

Paul, Hastings & Janofsky by Oliver F. Green, Jr., David W. Steuber, Geoffrey L. Thomas, Los Angeles, Cal., for defendant National Association of Broadcasters.

Moore, Berson & Lifflander by Ellen Shaw Agress, New York City, for National Citizens Committee for Broadcasting & Action for Children's Television, amicus curiae.

Frank W. Lloyd, III, Washington, D.C., for Citizens Communications Center, amicus curiae.

Rachel Wolkin, Newtonville, Mass., for Action for Children's Television, amicus curiae.

Louis Nizer, New York City, Rosenfeld, Meyer & Susman by Allen E. Susman, Beverly Hills, Cal., for Motion Picture Association of America, Inc., amicus curiae.

## MEMORANDUM OPINION

FERGUSON, District Judge.

### INTRODUCTION

More than half a century ago, Secretary of Commerce Herbert Hoover warned that, "We cannot allow any single person or group to place themselves in a position where they can censor the material which shall be broadcast to the public, nor do I believe that the government should ever be placed in a position of censoring this material."[1] The plaintiffs in this case have exposed a joint agreement on the part of the three major television networks, the Feder-

---

1. *Hearings on H.R. 7357 Before the House Committee on the Merchant Marine and Fisheries,* 68th Cong., 1st Sess. 8 (1924).

al Communications Commission ("FCC"), and the National Association of Broadcasters ("NAB") to permit one group—the NAB Television Code Review Board—to act as a national board of censors for American television. The plaintiffs have evidenced a successful attempt by the FCC to pressure the networks and the NAB into adopting a programming policy they did not wish to adopt. The plaintiffs have proven that the FCC formulated and imposed new industry policy without giving the public its right to notice and its right to be heard.

The policy involved is well known. It has been called the "family hour," the "family viewing policy," the "9:00 rule," even the "prime time censorship rule." Specifically, the policy is that "Entertainment programming inappropriate for viewing by a general family audience should not be broadcast during the first hour of network entertainment programming in prime time and in the immediately preceding hour. In the occasional case when an entertainment program is deemed to be inappropriate for such an audience, advisories should be used to alert viewers." NAB, *The Television Code* 2–3 (18 ed. June, 1975).

Two different lawsuits have been filed to contest the means by which this policy was promoted by the FCC and adopted by the networks and the NAB. The defendants are the same in both cases: (1) The Federal Communications Commission and Commissioners Wiley, Hookes, Lee, Quello, Reid, Robinson and Washburn [the "government defendants"]; (2) American Broadcasting Companies, Inc. ("ABC"), CBS, Inc. ("CBS"), National Broadcasting Company, Inc. ("NBC"), and the National Association of Broadcasters [the "private defendants"]. The plaintiffs in CV 75–3641–F include the Writers Guild of America, West, Inc., Writers Guild of America, East, Inc., Directors Guild of America, Inc., Screen Actors Guild, Inc., Concept Plus II Productions, Four D Productions, Danny Arnold, Allan Burns, Samuel Denoff, Larry Gelbart, Susan Harris, Norman Lear, William Persby, Paul Witt, and Edwin Weinberger (hereinafter "Writers Guild"). The plaintiff in CV 75–

3710–F is Tandem Productions, Inc. ("Tandem"). Most of the plaintiffs are creators, writers, and producers for television programming. The shows in which they are involved include "All In The Family," "Phyllis," "The Mary Tyler Moore Show," "Barney Miller," "M*A*S*H," and "Fay."

The Writers Guild plaintiffs charge the government defendants with violations of the First Amendment, section 326 of the Federal Communications Act of 1934, and of the Administrative Procedure Act ("APA"). All of the Writers Guild plaintiffs allege that the private defendants have violated the First Amendment; all but Lear charge the defendants with a violation of the Sherman Antitrust Act. Tandem, the producer of "All In The Family," charges the defendants with the same violations except that it does not include an Administrative Procedure Act count. All plaintiffs seek declaratory relief, injunctive relief, and attorneys' fees. Tandem asks for damages as well.

Much of the energy associated with this case has been generated because the plaintiffs and defendants disagree about the wisdom of the family viewing policy. In the last analysis, however, this is not the family hour case. The desirability or undesirability of the family viewing policy is not the issue. Rather the question is who should have the right to decide what shall and shall not be broadcast and how and on what basis should these decisions be made. This court will not evaluate the family viewing policy except to say that individual broadcast licensees have the right and the duty to exercise independent judgment in deciding whether or not to follow that policy. This court has no authority to declare an end to the family hour. At the same time, however, neither the FCC nor the NAB has the right to compromise the independent judgments of individual station owner licensees. The court will formulate remedies designed to let those with the right and the duty to make programming decisions make them without improper interference from government or other broadcasters. If the family hour continues, it should continue because

broadcasters in their independent judgment decide that it is desirable policy, not because of government pressure or NAB regulation. If government intervenes in the future to control entertainment programming on television, it shall do so not in closed-door negotiating sessions but in conformity with legislatively mandated administrative procedures. If the government has any power to regulate such programming, it must be exercised by formal regulation supported by an appropriate administrative record, not by informal pressure accompanied by self-serving and unconvincing denials of responsibility. In short, the family hour may or may not be desirable. Censorship by government or privately created review boards cannot be tolerated.

The legal and factual issues raised by this case and discussed in this opinion are numerous and complicated. Section I of this opinion deals in detail with motions to dismiss which were made by the defendants several months ago. The court denied those motions—at that time only briefly describing its reasons. Section IA rejects the private defendants' contention that 47 U.S.C. § 405 dictates that the plaintiffs are required to file a petition for rehearing with the FCC before securing relief and the private defendants' alternative contention that 47 U.S.C. § 402(a) and 28 U.S.C. § 2342 confer exclusive jurisdiction over the subject matter of this lawsuit to the court of appeals. Section IB rejects the defendants' contention that the doctrine of exhaustion of remedies is applicable to this case. Section IC discusses the defendants' contention that the FCC has exclusive jurisdiction over the plaintiffs' claims. The contention is accepted with respect to section 326 claims in part IC1 and rejected with respect to the APA claims and First Amendment claims in parts IC2 and IC3. Section ID rejects the defendants' contention that the doctrine of primary jurisdiction has any role to play in this case.

Section II of the opinion contains the factual findings of the court entered after considering the weeks of trial testimony, hundreds of exhibits, and thousands of pages of deposition testimony. It has not been possible to discuss all of the evidence in the record which supports those conclusions. Still less has it been possible to discuss all of the contrary evidence and each of the defendants' comments with respect to the many items of evidence. Section II, however, does attempt to present the highlights and most significant evidence which has led the court to conclude that the Commission exerted improper pressure, that the networks improperly considered that pressure in making programming judgments, and that the defendants combined in an effort to compromise the independent judgments of broadcast licensees through the medium of the NAB. Accordingly, it first outlines the parties' general positions concerning the facts and the court's general conclusions; it then proceeds to enumerate, chronologically, the court's specific findings. It concludes with a discussion of three separate factual issues which do not lend themselves to chronological consideration.

Section III of the opinion discusses the legal liability issues. Section IIIA considers the liability of the private defendants. Section IIIA1 explains why broadcasters are free to adopt (or reject) the family viewing policy without violating the First Amendment. Section IIIA2 explains why broadcasters are free to adopt (or reject) programming policies even in circumstances where the source of the suggestion is governmental. Section IIIA3 explains that broadcasters who fail to exercise independent program judgments and instead become surrogates in the enforcement of government policy violate the First Amendment. Section IIIA4 explains why the defendants' agreement to compromise the independent programming judgments of individual licensees violates the First Amendment.

Section IIIB discusses the liability of the government defendants. Section IIIB1 explains that the government defendants are free to present programming suggestions, but are not free to issue threats in order to "persuade" broadcasters. Such threats, it is explained, involve *per se* violations of the

First Amendment. Moreover the section holds that the FCC cannot use the licensing process (in the absence of issuing valid regulations) to regulate "offensive" material. Section IIIB2 considers the requirements of the Administrative Procedure Act and indicates that the Commission, by using informal pressures which circumvented the public debate and scrutiny concomitant with rulemaking, violated its duties under the Act.

Section IV of the opinion deals with remedial issues. Section IVA discusses requested declaratory relief in connection with the networks' adoption of the family viewing policy in violation of the First Amendment; Tandem's request for a court order directing CBS to move "All In The Family" back into the family viewing period is rejected. Section IVB explains the extent to which similar declaratory relief is to be directed against the NAB, while section IVC discusses the necessity for a declaration forbidding the FCC from enforcing the family viewing policy. In section IVD the court rejects plaintiffs' request for a declaration that any programming suggestions emanating from the FCC would violate the APA and the First Amendment, but indicates that if the FCC attempts to force changes in industry policy, it must comply with APA procedures. Section IVE explains that damages may be awarded against the private defendants, but, as a result of the sovereign immunity doctrine, not against the government defendants. Finally, section IVF discusses plaintiffs' request for attorneys' fees and concludes that despite a strong balance of equities in their favor, judicial authority to make such awards has been limited, and no such relief can be granted.

## I. JURISDICTIONAL ISSUES

■ First, the defendants advance a series of arguments calculated to support the conclusion that the district court is an improper forum for this litigation. Two alternative forums are suggested, i. e., the FCC and the court of appeals. When one considers the nature of the issues tendered by the plaintiffs' complaints, the insubstantiality of the defendants' suggestions becomes apparent. The plaintiffs' complaints require the trier of fact to determine the character and extent of the involvement of the FCC (and/or government officials employed by the FCC) in the adoption of the family viewing policy by the networks and the NAB. The plaintiffs contend that the FCC and government officials employed by the FCC pressured broadcasters into adopting the family viewing policy; the FCC strenuously disagrees. Elementary principles of fairness require that this factual dispute should be decided by a trier of fact other than the FCC. *Amos Treat & Co. v. SEC,* 113 U.S.App.D.C. 100, 306 F.2d 260 (1962). Basic principles of judicial administration counsel that disputed factual questions are not decided by courts of appeal. *United Gas Pipe Line Co. v. FPC,* 86 U.S. App.D.C. 314, 181 F.2d 796, *cert. denied,* 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607 (1950). Thus it is appropriate to approach the defendants' suggestion that the law requires one of these two forums with a measure of skepticism. Closer scrutiny of the defendants' arguments reveals that the jurisdictional scheme created by the Congress is consistent with one's common sense expectations.

■ Federal district courts have original jurisdiction of civil actions arising under any Act of Congress regulating commerce (28 U.S.C. § 1337) and original jurisdiction of civil actions arising under the Constitution and laws of the United States if the prescribed $10,000 jurisdictional amount requirement[2] is satisfied (28 U.S.C. § 1331). These sections are clearly broad enough to encompass the claims of the plaintiffs.[3]

---

**2.** None of the defendants have questioned that more than $10,000 is at stake here, nor could they realistically do so. Tandem's complaint, for example, alleges that it has suffered damages of $10,000,000. *See also* section II ¶ 37.

**3.** Moreover, the most recent view in the Ninth Circuit is that the Administrative Procedure Act is a source of subject matter jurisdiction. *See Hazelwood Hospital v. Weinberger,* 542

The question presented, however, is whether or not Congress has in more specific statutory enactments created exceptions which apply to this case.

### A. *Exclusive Jurisdiction Under 47 U.S.C. §§ 405, 402(a), and 28 U.S.C. § 2342.*

The private defendants contend that Congress has created a statutory scheme which dictates that all complaints concerning the Commission's performance should be brought first to the Commission and then, if disagreement should persist, to the appropriate court of appeals.[4]

The basic sections are 47 U.S.C. § 405, 47 U.S.C. § 402(a), and 28 U.S.C. § 2342. Section 405[5] provides in part that after an action has been taken "in any proceeding" by the Commission, any person who was not a party to the proceedings (or any person who relies on a question of fact or law which the Commission has not had an op-

portunity to consider) must file a petition for rehearing with the Commission before seeking judicial review. Moreover the section provides that the petition for rehearing must be filed within thirty days of the date that public notice is given of the action in question.

Subject to exceptions not relevant here, 47 U.S.C. § 402(a)[6] provides that proceedings to challenge orders of the Commission shall be brought under the Administrative Orders Review Act.[7] Section two of that act, 28 U.S.C. § 2342[8] grants exclusive jurisdiction to the court of appeals to determine the validity of all final orders of the Commission made reviewable under section 402(a).

Thus from the private defendants' perspective the district court is an obviously improper forum. The route established by congressional direction is first to the FCC and then to the court of appeal. This route, fashioned as it is to take advantage of the

---

F.2d 757 (9 Cir. 1976); *Wirin v. Eide,* 543 F.2d 703 (9th Cir. 1976). *See also Rothman v. Hospital Service,* 510 F.2d 956 (9th Cir. 1975); *Brandt v. Hickel,* 427 F.2d 53 (9th Cir. 1970); *Washington v. Udall,* 417 F.2d 1310 (9th Cir. 1969). *But see Nguyen Da Yen v. Kissinger,* 528 F.2d 1194 (9th Cir. 1975).

4. The contention that the totality of the Federal Communications Act is designed to create exclusive jurisdiction is considered in section IC. This section considers the narrower question of whether these three statutory provisions are as all embracing as the defendants contend.

5. "After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(d)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for rehearing only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(d)(1) of this title, in its discretion, to grant such a rehearing if sufficient reason therefor be made to appear. A petition for rehearing must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report,

or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for rehearing shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. . . ."

6. "Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 19A of Title 5."

7. § 402(a) provides that the procedure to be followed is that set out in Public Law 901, 5 U.S.C. § 1031, *et seq.* Those sections referred to were superseded by the Administrative Orders Review Act, 28 U.S.C. §§ 2341–51.

8. "The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47 . . . .."

Commission's expertise and to foster a unified approach to the development of communications law is proffered as the established, routine, and exclusive method of challenging orders, decisions, reports, and other actions of the Commission.[9]

Established and routine it is.[10] Exclusive it is not.[11] The very terms of the statutes reveal that the petition for rehearing requirement is confined to challenges of actions taken in "proceedings" of the Commission and that the exclusive jurisdiction of the court of appeals is reserved only for the review of "final orders" of the Commission.

Thus two threshold jurisdictional questions are presented: (1) Did the government actions criticized in the plaintiffs' complaint take place in "proceedings" within the meaning of 47 U.S.C. § 405? (2) Are the government actions in question "orders" within the meaning of 47 U.S.C. § 402(a) or 28 U.S.C. § 2342?

1. *Proceedings.*

At least, it must be recognized that the activities challenged by the plaintiffs cannot be characterized as the typical proceedings contemplated by statute. The statute contemplates an action of the Commission in the form of a written pronouncement accompanied by public notice. *See* 47 C.F.R. §§ 1.4(b), 1.104(b), 1.106(f); *Microwave Communications, Inc. v. FCC,* 169 U.S.App.D.C. 154, 515 F.2d 385 (1974). Such pronouncements serve to generate the kind of record with which a court of appeal is equipped to deal. Here, however, the

plaintiffs do not complain of any formal action of the Commission.

Indeed an important issue presented by the plaintiffs' allegations is whether or not the Commission has acted at all. The Commission, itself, takes the position that it has not taken any action other than a Report to Congress which recommended that no Commission action be taken. Instead the Commission suggests that the plaintiffs are questioning the informal expressions of view and public speeches of one member of a Commission which cannot act without a quorum. *See WIBC, Inc. v. FCC,* 104 U.S. App.D.C. 126, 259 F.2d 941, *cert. denied,* 358 U.S. 920, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958).

Needless to say, the Commission has not issued a public notice of actions which it denies ever taking. The plaintiffs, of course, do not accept the Commission's position. They charge continuing, pervasive, extra-legal involvement of the government in broadcaster affairs in actions taken behind closed doors without any regular agency proceeding. Although the plaintiffs and the Commission do not agree as to whether or not the Commission has acted, they are in accord on the proposition that no "proceedings" within the meaning of section 405 have taken place.

The private defendants, however, maintain that if plaintiffs have been adversely affected by any Commission action, they are required to seek rehearing as a condition precedent to judicial review. There is no case authority to support this sweeping construction of section 405, a construction which would appear to read the term "proceeding" out of the statute.[12] The defend-

---

9. Challenges of FCC actions which are not themselves orders produce orders which become reviewable in the court of appeals.

10. Fortunately FCC ventures of the character involved here are neither established nor routine.

11. *But see* section IC1.

12. This does not require rejection of the assumption that if the FCC actions complained of had taken place in proceedings within the meaning of section 405, the exclusive statutory mechanisms for reviewing Commission actions would have to be followed (at least with re-

spect to the plaintiffs' claim against the Commission. Compare section IC). If the plaintiffs in such a situation did not afford the Commission an opportunity to pass on any of their claims before going to the court of appeals or had raised some of them afresh on review in the court of appeals after going to the Commission, the court of appeals would ordinarily refuse to entertain them. *See, e. g., Democratic National Committee v. FCC,* 148 U.S.App. D.C. 383, 460 F.2d 891, 911, *cert. denied,* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972); *Hansen v. FCC,* 134 U.S.App.D.C. 100, 413 F.2d 374, 376 (1969); *cf. Unemployment Compensa-*

ants' reliance on *Citizens Communications Center v. FCC*, 145 U.S.App.D.C. 32, 447 F.2d 1201 (1971) and *Yale Broadcasting Co. v. FCC*, 155 U.S.App.D.C. 390, 478 F.2d 594, *cert. denied*, 414 U.S. 914, 94 S.Ct. 211, 38 L.Ed.2d 152 (1973), is misplaced.

Neither case defined, or needed to define "proceedings," because petitions for reconsideration had already been filed. In both cases, the Commission (far from denying its actions) had, without affording an opportunity for public input, formally issued an authoritative statement of policy which arguably set new industry guidelines. Because the Commission has not attempted *formal* regulations [13] in this case, any definition of "proceedings" which might have been produced in *Citizens Center* or *Yale* could not be decisive here.

In *Citizens Communications Center*, the plaintiff brought an action in the United States District Court for the District of Columbia in which it asked for an injunction which would have restrained the Commission from promulgating a policy or rule changing the ground rules applicable to comparative broadcast license renewal pro-

ceedings unless it first complied with the requirements of section four of the APA, 5 U.S.C. § 553.[14] The district court dismissed the suit for lack of jurisdiction. Subsequent to the dismissal, as the plaintiff had feared, the Commission issued a policy statement without resort to the procedures outlined in section four. *See* Policy Statement on Comparative Hearings Involving Regular Renewal Applicants, 22 F.C.C.2d 424 (1970).

The Center attacked this Policy Statement on two fronts. It first filed an appeal from the district court's decision. Second, it filed a petition for rehearing with the Commission and subsequently filed an appeal *inter alia* from the Commission's memorandum opinion and order denying reconsideration of its Policy Statement. The Center's two appeals were consolidated (and those two appeals in turn were consolidated with those of other parties). On appeal, the Commission argued that the issues presented by the Policy Statement were not yet ripe for adjudication. The court rejected this contention, noting in part that the "Policy Statement has been administratively considered and reconsidered by the Com-

*tion Commission v. Aragan*, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946).

These well established principles go to the question of what kinds of questions can be raised in the appellate courts on review of Commission actions. They have nothing to do with the question of what constitutes proceedings under section 405 and speak only to the question of what principles apply if proceedings have taken place. Also apparently inapplicable at first glance is the plaintiffs' suggestion that section 405 merely incorporates the general principles of the doctrine of exhaustion of remedies and that resort to the Commission would not be required here even if the actions of the Commission had been taken in proceedings within the meaning of the section. To be sure, appellate courts on review of FCC orders have recognized their discretion to excuse a party's failure to raise a point in the Commission proceedings. *Washington Utilities and Transportation Commission v. FCC*, 513 F.2d 1142, 1168 n.36 (9th Cir.), *cert. denied sub nom. Nat'l Ass'n of Regulatory Commr's v. FCC*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975); *Great Falls Community TV Cable Co. v. FCC*, 416 F.2d 238, 239 (9th Cir. 1969). But such cases speak to the proper relationship between

the appellate courts and the Commission, not to the relationship between the district courts and the Commission. It is not necessary to decide here whether or in what circumstances the Commission could ever be called to account for an action taken in an FCC proceeding by means of an original action in the district court (other than pursuant to the special provisions of 28 U.S.C. § 2347) since the plaintiffs do not seek to review actions taken in proceedings. *See generally* 5 U.S.C. § 703; L. Jaffe, *Judicial Review of Administrative Agencies* 425–26 (1965).

**13.** Again the Commission's only formal action here has been to issue a report which refused to engage in negotiation. The plaintiffs do not indict the Commission's professed decision to do nothing, *i. e.*, to take no formal action. They complain of the Commission's informal action.

**14.** The section requires public notice and opportunity for public input before the Commission imposes new industry policy and further requires the Commission to produce a concise statement of the basis and purpose of the new policy.

mission. The issues before us are 'purely legal.'" 447 F.2d at 1205.

The private defendants attach significance to this brief comment. They lift it from its context and suggest it demonstrates the necessity for filing petitions for reconsideration of all FCC actions. Such a rule of law might be appropriate if it were confined to formal FCC actions. If a party were to complain of an official pronouncement of the Commission, even absent adherence to the procedural requirements for rulemaking, a requirement of a reconsideration petition could further orderly adjudication.[15]

■ But such a rule, had it been announced, would have little bearing on the question of whether section 405 applies to actions of the Commission which have not only been unaccompanied by public notice but which the Commission has denied taking. In fact, however, the court in *Citizens Center* did not speak to the question of whether or not section 405 usurps the jurisdiction of the district court to afford immediate injunctive relief when the FCC has improperly but formally acted without complying with the procedural requirements of section four of the APA. Indeed the court did not even address the question of whether or not injunctive relief was appropriately refused by the district court in the circumstance there presented, one in which it was conceded that no FCC action of any kind had yet taken place. The Center's appeal from the dismissal in federal court was simply declared to be moot by the court of appeals. Here the plaintiffs allege that the FCC informally regulated without agency proceedings and without public notice. Neither the court of appeals' position in *Citizens Center* nor the district court's holding requires that a petition for reconsideration be filed.

Similarly unconvincing is the private defendants' reliance on *Yale Broadcasting Co.*

*v. FCC, supra,* 478 F.2d 594. There the Commission, acting sua sponte, issued a Public Notice which discussed the responsibility of licensees to review the lyrics of records before their broadcast. The notice was prompted by a number of complaints which had been sent to the Commission concerning the playing of records containing lyrics which allegedly "permitted" the use of illegal drugs. *See* 28 F.C.C.2d 409 (1971). Numerous parties filed petitions for reconsideration, and the Commission disposed of those petitions in a memorandum opinion and order which sought to clarify and modify the Public Notice. *See* 31 F.C.C.2d 377 (1971). The parties' appeal questioned the propriety of both Commission actions. *See* 478 F.2d at 595 n.1.

The private defendants regard *Yale Broadcasting* as "analogous to the present controversy." But quite unlike this case the plaintiffs in *Yale* sought to attack an FCC written pronouncement publicly identified as such and publicly noticed. As in *Citizens Communications Center,* the issues were "'purely legal.'" 447 F.2d at 1205. Here again the very existence of FCC action gives rise to a serious factual question and no public notice has been issued. *See Microwave Communications, Inc. v. FCC, supra,* 515 F.2d 385. The court of appeals in *Yale* did not address the question of whether or not the Public Notice was an action taken in a "proceeding" within the meaning of section 405. Since petitions for reconsideration had been filed anyway, there was no occasion to decide whether they were required. Even if it had adopted an expansive interpretation of that term, such an interpretation would lend no support to the defendants' attempt to read the word "proceeding" out of section 405. No proceeding within the meaning of section 405 is involved here, and thus no petition for reconsideration is required by that section.

---

**15.** On the other hand, the desire for orderly adjudication can be accomplished by reliance on the doctrine of exhaustion of remedies, leaving the district courts free to afford necessary relief when exceptions to that doctrine are involved. It may be that section 405 merely codifies the exhaustion doctrine with its attendant exceptions. *But see* note 12, *supra.*

## 2. *Orders.*

■ This lawsuit is not within the exclusive jurisdiction of the court of appeals. The actions complained of are not "orders" of the Commission within the meaning of 47 U.S.C. § 402(a) or 28 U.S.C. § 2342. Preliminarily, it should be recognized that the term "order" in the Administrative Orders Review Act is not the equivalent of that term in the Administrative Procedure Act. Section two of the APA defines "order" to include "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency *in a matter other than rule making* but including licensing . . .." 5 U.S.C. § 551(6) (emphasis added). If the term "order" as used in the Administrative Procedure Act were grafted onto the term "order" in the Administrative Orders Review Act, the court of appeals would not have exclusive jurisdiction to consider agency rules and regulations. In order to avoid this unwelcome result the courts in interpreting the Review Act have given the term "order" a more flexible meaning. For example, the District of Columbia Court of Appeals in *Gage v. United States Atomic Energy Commission,* 156 U.S.App.D.C. 231, 479 F.2d 1214, 1218 (1973), dealt with the problem by stating that the language of the Review Act "make[s] no distinction between orders which promulgate rules and orders in adjudicative proceedings." Accordingly, the courts have considered petitions to review FCC orders promulgating rules and regulations to fall within the scope of 47 U.S.C. § 402(a). *See, e. g., United States v. Storer Broadcasting,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1941); *Mt. Mansfield Television, Inc. v. FCC,* 442 F.2d 470 (2d Cir. 1971); *California Citizens Band Association v. United States,* 375 F.2d 43 (9th Cir.), *cert. denied,* 389 U.S. 844, 88 S.Ct. 96, 19 L.Ed.2d 112 (1967).

■ Nonetheless, although the term "order" in the Administrative Orders Review Act has been interpreted in a manner broader than that used in the Administrative Procedure Act, it never has been interpreted to include all agency actions. At the very least the term "order" implies a formal agency mandate issued at the culmination of some regular agency proceeding. An examination of the related statutes confirms that view.

For example, 47 U.S.C. § 408 provides that "all orders of the Commission, other than orders for the payment of money, shall take effect within such reasonable time, not less than thirty days after *service* of the order . . .." (emphasis added). 28 U.S.C. § 2344 requires that upon "the *entry* of a final order reviewable under this chapter, the agency shall promptly give *notice* thereof by service or publication in accordance with its rules." Moreover the same section indicates that the petition to review filed in the court of appeals "shall contain a concise statement of . . . the nature of the *proceedings* as to which review is sought . . .." (emphasis added). *See also* 47 U.S.C. § 405. Clearly the statutory scheme envisions a written order entered on the FCC docket with appropriate notice to the parties. *Cf. FPC v. Metropolitan Edison Co.,* 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 (1938). Indeed 47 U.S.C. § 154(j) specifically requires that, "Every . . . official act of the Commission shall be entered of record, and its proceedings shall be public upon the request of any party interested." Here the plaintiffs complain of informal actions of the Commission not entered of record, not served upon the parties, and taken wholly outside agency proceedings. Nothing in the language of the relevant statutes even remotely suggests that these activities are "final orders" of the Commission within the meaning of section 2342.

Nor does the case law suggest a different result. The leading case is *United Gas Pipe Line v. FPC, supra,* 86 U.S.App.D.C. 314, 181 F.2d 796. There the court of appeals was asked to review an order of the Federal Power Commission. Recognizing the fact that 15 U.S.C. § 717r(b) granted a party aggrieved by an "order" of the Federal

**1080**

Power Commission the right to seek review in the court of appeals, and without denying the possibility that the petitioner was an aggrieved party, the court of appeals denied review. The court stated that review in the court of appeals presupposed the need for "a record fully encompassing the issues." 181 F.2d at 799. In the absence of such a record, appellate courts were recognized to have "no intelligible basis for decision" and were without "authority to directly review the Commission's action." *Id.* And although the *United* requirement of an actual hearing has been questioned by many courts (*see, e. g., Deutsche Lufthansa Aktiengesellschaft v. CAB,* 156 U.S.App.D.C. 191, 479 F.2d 912, 915–16 (1973)), the requirement of the need of a record for review has survived. Indeed, "It is the availability of a record for review and not the holding of a quasi judicial hearing which is now the jurisdictional touchstone." *Id.* at 916. Thus in cases where the record is unchallenged, where the issues are legal and not factual, and where notice has been provided to the parties the court of appeals has held that it has jurisdiction despite the absence of an administrative hearing. *Id.* at 915–16. Here, however, there is no "record"; there are material issues of fact; no notice has been given. None of the indicia of appellate jurisdiction is present.

■ Even if section 2342 were somehow deemed to confer jurisdiction upon the court of appeals as to the alleged actions of the FCC, that jurisdiction would not embrace the entirety of this action. The First Amendment claims of the plaintiffs do not necessitate a demonstration of FCC action. A demonstration of FCC action would be one way of meeting the First Amendment state action requirement, it is not the only way. For example, the plaintiffs contend that Chairman Wiley, acting under color of his office, improperly interfered with programming decisions of the broadcasters.

These allegations are sufficient to meet the state action requirement whether or not his actions were approved by other Commissioners and whether or not his actions might be deemed "agency action" for purposes of the Administrative Procedure Act or final orders of an administrative agency for purposes of the Administrative Orders Review Act.

■ Moreover nothing in section 2342 could conceivably be deemed to cede jurisdiction to the court of appeals over the plaintiffs' action against the private defendants. Since the statute is specifically and exclusively designed to establish a review procedure for agency orders, there is no method by which the plaintiffs could join the private parties as defendants in a review proceeding before the court of appeals. To be sure, there is a procedure by which interested parties may intervene (28 U.S.C. § 2348), but the court of appeals under section 2342 has no power to hear a case by private plaintiffs against private defendants and no authority under 28 U.S.C. § 2349(a) to do anything more than enter a "judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency." *Id.* The initial power to adjudicate such disputes between private litigants and to enter appropriate relief is reserved to the district courts.[16]

### B. *Exhaustion of Remedies.*

The defendants contend that even if 47 U.S.C. § 405 and 28 U.S.C. § 2342 are not applicable to the circumstances of this case, the general doctrine of exhaustion of remedies should be applied to force the plaintiffs to file their complaints with the Commission. Specifically they point: (1) to procedures which permit the Commission on the motion of a party to "issue a declaratory order to terminate a controversy or remove uncertainty" (5 U.S.C. § 554(e); 47 C.F.R.

---

**16.** Of course, attacks on Commission orders often are vehicles for attacks on broadcaster activity. *See, e. g., Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), but an indirect attack could not afford complete relief. For example, Tandem's claim for damages could not be considered by the Commission or the court of appeals. See section IC3.

§ 1.2); (2) to procedures which permit persons to petition for "issuance, amendment or repeal of a rule or regulation" (47 C.F.R. § 1.401); (3) to procedures which permit persons to file informal requests for Commission action (47 C.F.R. § 1.41). Thus the defendants invoke "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938); *McKart v. United States*, 395 U.S. 185, 193–94, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); *FCC v. Schreiber*, 381 U.S. 279, 296–97, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

The FCC, for example, states that "in total disregard of principles of exhaustion of remedies, plaintiffs, to date, have never attempted to bring their complaint to the attention of the Commission in the normal administrative mode, prior to instituting this suit." Essentially the argument boils down to this: The plaintiffs, who allege that the Commission and its staff sought through extra-legal channels to impose an unconstitutional scheme of censorship in direct defiance of established procedures, statutory commands, and constitutional limitations, must continue to suffer irreparable injury while going through the ritualistic exercise of asking the Commission to admit guilt which it strenuously denies.

▉ Ironically, the Commission's papers on file with this court (the very papers which argue for exhaustion of remedies) demonstrate that it has predetermined the issues adversely to the plaintiffs. It forcefully argues in its papers that there has been no agency action of any kind and no violation of section 326 or of the First Amendment by the Commission or any of its members. Exhaustion of remedies is not required when the administrative agency involved is biased (*Gibson v. Berryhill*, 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973); *Steele v. Louisville & Nashville R. R. Co.*, 323 U.S. 192, 206, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Fitzgerald v. Hampton*, 152 U.S.App.D.C. 1, 467 F.2d 755, 768–69 (1972); *Amos Treat & Co. v. SEC, supra*, 306 F.2d at 266–67;[17] or where exhaustion would be futile. *Houghton v. Shafer*, 392 U.S. 639, 640, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); *Natural Resources Defense Council, Inc. v. Train*, 166 U.S.App.D.C. 312, 510 F.2d 692, 703 (1974); *Wolff v. Selective Service Local Board No. 16*, 372 F.2d 817, 825 (2d Cir. 1967); *Western International Hotels v. Tahoe Regional Planning Agency*, 387 F.Supp. 429, 433–34 (D.Nev.1975).[18]

---

17. The defendants' reliance on *SEC v. R. A. Holman & Co.*, 116 U.S.App.D.C. 279, 323 F.2d 284, *cert. denied*, 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963) is misplaced. As the court pointed out in *Fitzgerald, supra*, 467 F.2d at 768 n.64, the distinguishing characteristic of the *Holman* case is that the allegations of participation were contested. Moreover the *Holman* court was concerned with the prospect that staying an administrative process while a court "engaged in an extended inquiry into the claimed disqualification of members of the administrative body could lead to a breakdown in the administrative process . . . ." 323 F.2d at 287. Concern over the problems of delaying administrative hearings also controlled the court's decision in *Davis v. Secretary, Department of Health, Education & Welfare*, 262 F.Supp. 124 (D.Md.), *aff'd*, 386 F.2d 429 (4th Cir. 1967). Here the FCC has announced that it intends at the moment to take no further action in this area but will rely on "self regulation." Moreover, the involvement of Chairman Wiley is uncontested. *Cf. Berkshire Employees Association v. NLRB*, 121 F.2d

235, 238–39 (3d Cir. 1941). Here the Commission and its members themselves are on trial. As in *Amos* "[T]he asserted infirmity is fundamental." 306 F.2d at 265. Here as in *Amos* the court must be concerned that a "hearing of such importance and vast potential consequences must be attended, not only with every element of fairness but with the very appearance of complete fairness." *Id.* at 267. Such a hearing could not be afforded by the Commission.

18. The optimism about the willingness of the Commission to change its mind displayed in *Morrisseau v. Mt. Mansfield Television, Inc.*, 380 F.Supp. 512 (D.Vt.1974) is explainable and distinguishable. Since that case was based on a Communications Act claim, the question of whether or not the plaintiff had adequate remedies with the Commission was irrelevant. Adequate or not, they were all he had. *Id.* at 515. See discussion in section IC1, *infra*. Moreover, in *Morrisseau*, the Commissioners themselves were not on trial. Notions about the power of the Secretary of Transportation to make judg-

The private defendants suggest, however, that the apparent futility of the remedy before the FCC is belied by the availability of the court of appeal review procedure. The suggestion of the private defendants is twofold: first, that the court of appeals could force the FCC to give the plaintiffs' claim appropriate consideration; second, that even if remedies with the FCC were inadequate, the court of appeals would afford adequate consideration to the plaintiffs' claims. The parties' first point overlooks the underlying cause of the remedy's inadequacy. The inadequacy results not from any venality on the part of the Commission but rather because the Commission is understandably biased. Vigorous advocates inevitably are. The court of appeals cannot be expected to transform admittedly interested parties into impartial observers.[19]

■ The parties' second point puts the cart before the horse. Wherever this lawsuit should start, and whatever its outcome in the initial forum, it can proceed at least to the court of appeals. *Compare* 28 U.S.C. § 2342 *with* 28 U.S.C. § 1291. The question is what kind of record the court of appeals will review. For the reasons stated previously, a record with findings of fact entered by the FCC would be fatally defective. The effectiveness of any remedy in the court of appeals presupposes that material issues of fact first be presented to an impartial trier of fact.[20]

■ Finally, even if the problems of bias and futility were not involved, exhaustion would not be required because that doctrine is inapplicable when an agency has taken an action beyond its jurisdiction and thereby imposed an immediate burden on the exercise of important rights. As Professor Davis observes, "No court requires exhaustion when exhaustion will involve irreparable injury and when the agency is palpably without jurisdiction." 3 K. Davis, *Administrative Law Treatise* § 20.01, at 56 (1958). *See, e. g., Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); *Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772 (1919); *Dragna v. Landon*, 209 F.2d 26 (9th Cir. 1953); *Ashland Oil Co. v. Federal Energy Administration*, 389 F.Supp. 1119 (N.D.Cal. 1975); *A. E. Staley Manufacturing Co. v. United States*, 310 F.Supp. 485 (D.Minn. 1970).

This does not mean, of course, that orderly administrative procedures may be bypassed automatically merely because the plaintiff claims that a particular administrative action is unconstitutional or otherwise in excess of its statutory powers. *See, e. g., Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *Aircraft & Diesel Equipment Corp. v.*

ments rather than assessments about the adequacy of remedies were also at work in *D. C. Federation of Civic Associations v. Volpe*, 148 U.S.App.D.C. 207, 459 F.2d 1231, *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). Thus these cases are relevant only to the defendants' attack on the Communications Act claims. See section IC1, *infra*.

19. *Hortonville Joint School District No. 1 v. Hortonville Education Association*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976) is not to the contrary: (1) this is not a case involving the special problem of a public employer dealing with employees; (2) the personal stake in the decision present here was not present there; (3) the nature of the involvement of the Commission and the Chairman here is of an entirely different dimension; (4) the key question involved here is one of fact and not policy; (5) the showing required to show bias or futility for purposes of exhaustion of remedies is not necessarily coextensive with the showing required for a due process violation.

20. Indeed 28 U.S.C. § 2347 provides that the court of appeals can entertain petitions to review agency orders only "when the agency has held a hearing" or "when . . . no genuine issue of material fact is presented . . . ." Moreover, in a case such as this, the court of appeals would be required to "transfer the proceedings to a district court for the district in which the petitioner resides or has its principal office for a hearing and determination as if the proceeding were originally initiated in the district court . . . ." *Id.* This court finds it difficult to accept the idea that any principle of law, let alone the doctrine of exhaustion of remedies, requires the plaintiffs to go to the FCC and the court of appeals so that they finally can be told that they must return to the forum they selected in the first place.

*Hirsch,* 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947); *Myers v. Bethlehem Shipbuilding Corp., supra,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638; *Boire v. Miami Herald Publishing Co.,* 343 F.2d 17 (5th Cir.), *cert. denied,* 382 U.S. 824, 86 S.Ct. 56, 15 L.Ed.2d 70 (1965).[21]

■ The case law though marked by overgeneralization can be reconciled as Davis observes by the application of three factors: "[E]xtent of injury from pursuit of administrative remedy, degree of apparent clarity or doubt about administrative jurisdiction, and involvement of specialized administrative understanding in the question of jurisdiction." 3 K. Davis, *supra,* § 20.03 at 69. In fact, the Ninth Circuit Court of Appeals has specifically adopted Professor Davis' formulation commending it as one that "is as complete and workable as can be stated." *Lone Star Cement Corp. v. FTC,* 339 F.2d 505, 510 (1964).

■ First, as to the extent of injury, the actions complained of place a continuing and irreparable burden on First Amendment rights. As the plaintiffs put it, "Today's censorship is not caused by tomorrow's tolerance." There is no reason to believe that swift agency relief is likely. Even more important there is no doubt that the Commission is palpably without jurisdiction to interfere with broadcaster decisionmaking in the manner complained of. The FCC does not even purport to possess the right to do what the plaintiffs contend they have done. The FCC simply insists that it has not interfered with broadcaster decisionmaking. Resolving the conflict requires impartial adjudication, not specialized understanding. In short, each of the

operative factors points to one conclusion: exhaustion is not necessary.

The defendants point to the fact that the Commission has in a myriad of cases considered constitutional questions about broadcaster conduct and Commission conduct. To the extent that agreement is directed to the judicially created doctrine of exhaustion, it is irrelevant. The point is not that the Commission under the exhaustion doctrine cannot hear constitutional questions. The point is that in the absence of an exclusive statutory mechanism the courts have equity power to enjoin ultra vires Commission actions that threaten irreparable injury. To the extent that argument is directed to the proposition that remedies with the Commission are exclusive, it is discussed in section IC1, *infra.*

■ The private defendants further imply that even if exhaustion of remedies with respect to the plaintiffs' claims against the government defendants were not required, exhaustion of remedies should be imposed as to the plaintiffs' claims against the broadcasters. Assuming *arguendo* that the doctrine of exhaustion applies to the plaintiffs' constitutional claims against the private defendants, there is no adequate remedy to exhaust. The plaintiffs' primary claims against the broadcasters depend upon the same factual premises as their claims against the FCC. To the extent that the plaintiffs' remedies against the FCC are inadequate, they are equally inadequate against the broadcasters.

As the Supreme Court emphasized in *McKart v. United States, supra,* 395 U.S. at 193, 89 S.Ct. at 1662, the doctrine of exhaustion of remedies is "like most judicial doctrines subject to numerous exceptions."

---

**21.** In fact, the existence of serious constitutional issues may be a factor encouraging exhaustion in circumstances where the necessity of deciding such issues may be obviated by an administrative grant of relief on non-constitutional grounds. *See, e. g., Aircraft & Diesel Equipment Corp. v. Hirsch, supra,* 331 U.S. at 772, 67 S.Ct. 1493; *Montana Chapter of Association of Civilian Technicians, Inc. v. Young,* 514 F.2d 1165, 1167–68 (9th Cir. 1975); *Sohm v. Fowler,* 124 U.S.App.D.C. 382, 365 F.2d at 915, 918 (1966). But the cases recognizing this

principle also recognize that "the presence of constitutional questions, coupled with a sufficient showing of inadequacy of prescribed administrative relief and of threatened or impending irreparable injury flowing from delay incident to following the prescribed procedure, has been held sufficient to dispense with exhausting the administrative process before instituting judicial intervention." *Aircraft & Diesel Corp. v. Hirsch, supra,* 331 U.S. at 773, 67 S.Ct. at 1503.

It comes "into effect only if the remedy . . . is adequate to protect the asserted claim." L. Jaffe, *Judicial Control of Administrative Agencies* 426 (1965). Here, since the remedy is inadequate, the doctrine does not come into effect.

## C. *Exclusive Jurisdiction: Revisited.*

The defendants (government and private) take the argument one step further. Running through their briefs is the notion that whether or not the traditional exceptions to the doctrine of exhaustion of remedies apply (*i. e.,* independent of whether or not there is an adequate remedy), the plaintiffs are statutorily required to exhaust remedies with the FCC. Essentially the position is that even if sections 47 U.S.C. § 405, 47 U.S.C. § 402(a) and 28 U.S.C. § 2342 have not by their terms evidenced a congressional intention to make the FCC the exclusive fact finder for any matter involving the television industry, the comprehensive character of the statutory scheme and the case law interpreting that scheme has. Thus the argument goes not to timing, but to power. In this connection it is necessary to distinguish between the three causes of action now at issue.[22]

### 1. *Section 326 Claim.*

The plaintiffs attempt to state a private cause of action against the Commission and its commissioners under section 326 of the Federal Communications Act of 1934. Courts which have treated private claims against broadcasters founded upon the Communications Act have uniformly concluded that the Act does not give rise to a private cause of action in the federal courts. *Daly v. Columbia Broadcasting System, Inc.,* 309 F.2d 83, 86 (7th Cir. 1962); *Massachusetts Universalist Convention v. Hil-*

dreth *& Rogers Co.,* 183 F.2d 497, 500 (1st Cir. 1950); *McIntire v. Wm. Penn Broadcasting Co.,* 151 F.2d 597, 600 (3d Cir. 1945); *Post v. Payton,* 323 F.Supp. 799 (E.D.N.Y. 1971); *Ackerman v. Columbia Broadcasting System, Inc.,* 301 F.Supp. 628, 631 (S.D.N.Y. 1969); *Gordon v. National Broadcasting Co.,* 287 F.Supp. 452, 455 (S.D.N.Y.1968).[23]

The parties have not cited any case in which a plaintiff has attempted to state a section 326 private cause of action, but the cases which have disputed the existence of a private cause of action under various sections of the Act have not based their analysis on the specific sections but on an analysis of the Act as a whole. Thus the Supreme Court stated in *Scripps-Howard Radio v. FCC,* 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942), "The Communications Act of 1934 did not create new private rights. The purpose of the Act was to protect the public interest in communications." In this area, the Commission is the "primary and exclusive forum" (*Ackerman v. Columbia Broadcasting System, Inc., supra,* 301 F.Supp. at 631) to initiate complaints based upon the Act. The point, therefore, is not that the plaintiffs must exhaust administrative remedies before coming to this court. The point is that the Act countenances no private cause of action whether or not administrative remedies have been exhausted. *Daly v. Columbia Broadcasting, supra,* 309 F.2d at 86; *Morrisseau v. Mt. Mansfield Television, Inc., supra,* 380 F.Supp. at 515.

This does not mean, however, that abuses of the Commission are immune from scrutiny. As discussed *supra,* (see section IA), the court of appeals has the power to scrutinize final orders of the Commission. As discussed *infra,* the Administrative Pro-

---

**22.** Most of the plaintiffs assert an antitrust cause of action against the private defendants. The issues presented by that portion of the plaintiffs' complaint are not at issue in this stage of the proceedings.

**23.** In an early case, *Weiss v. Los Angeles Broadcasting Co.,* 163 F.2d 313 (9th Cir. 1947), *cert. denied,* 333 U.S. 876, 68 S.Ct. 895, 92

L.Ed. 1152 (1948), the Ninth Circuit seemed to assume that a private cause of action could lie under the Act even though the facts of the particular case did not involve a violation. Since the court found no cause of action on the facts presented, its assumptions did not amount to a holding and have since been undermined by the later cases.

cedure Act[24] and the First Amendment give rise to private causes of action against the Commission in the federal courts.

## 2. *Administrative Procedure Act Claim.*

Section 10(a) of the APA, 5 U.S.C. § 702, provides that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The Commission insists that judicial review is confined to the court of appeals and supports that view by reference to section 10(b) of the Act, 5 U.S.C. § 703, "The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute . . . ." Conveniently the Commission does not refer to the qualifying language of the section which reads, "*or, in the absence or inadequacy thereof,* any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction." (emphasis added). As discussed in section IA, the Administrative Orders Review Act and 47 U.S.C. § 402(a) confer exclusive jurisdiction upon the court of appeals to review final orders of the Commission. The Commission apparently is arguing that if Commission activities do not amount to a final order, they cannot be considered agency action. Indeed the Commission at one point specifically contends that, "If the family hour were to be considered a rule or *other final agency action* under the APA, then exclusive judicial review would lie in the Court of Appeals." (emphasis added and capitals deleted). This construction of the Administrative Procedure Act is at odds with its language, its legislative history and the case law interpreting it.

[19] Section two of the APA, 5 U.S.C. § 551(13), defines agency action in sweeping terms. It includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." Indeed both the House and Senate committees in recommending the bill observed that the definition of agency action was specifically designed "to assure the complete coverage of every form of agency power, proceeding, action, or inaction." S.Rep.No.752, 79th Cong., 1st Sess. 12 (1945); H.Rep.No.1980, 79th Cong., 2d Sess. 21 (1946), U.S.Code Cong.Serv.1946, p. 1195. To accept the Commission's suggestion that only "final orders" are reviewable in the courts would directly fly in the face of the purpose of the APA stated again by both the House and Senate committees responsible for the legislation; *i. e.,* the act is "designed to afford a remedy for every legal wrong." S.Rep.No.752, 79th Cong., 1st Sess. 7 (1945); H.Rep.No.1980, 79th Cong., 2d Sess. 17 (1946).

Thus the Supreme Court stated in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) that

> The Administrative Procedure Act provides specifically not only for review of "[a]gency action made reviewable by statute" but also for review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704. The legislative material elucidating that seminal act manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's "generous review provisions" must be given a "hospitable" interpretation.

Even more specifically in *Bucks County Cable TV, Inc. v. United States,* 299 F.Supp. 1325, 1333 (E.D.Pa.1969), *rev'd on other grounds,* 427 F.2d 438 (3d Cir.), *cert. denied,*

---

**24.** The APA permits courts to consider not only procedural violations but substantive violations not otherwise reviewable. The action, however, is created by the APA, not by the Communications Act. Thus section 326 violations by the Commission in "proceedings" are reviewable in the court of appeals or subject to a rehearing petition. Actions taken outside proceedings are reviewable in the district court unless the exhaustion doctrine is deemed to apply. See section IC2, *infra.*

400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 61 (1970) the court ruled:

> [T]he Administrative Procedure Act supplements the special statutory review procedures for final orders of the various agencies. Its review provisions utilize traditional equity actions for agency action not amounting to a final order, but which nonetheless directly affects plaintiff's rights.

See also Utah Fuel Co. v. National Bituminous Coal Commission, 306 U.S. 56, 59–60, 59 S.Ct. 409, 83 L.Ed. 483 (1939); Deering Milliken, Inc. v. Johnston, 295 F.2d 856, 865 (4th Cir. 1961); Jefferson Standard Broadcasting Co. v. FCC, 297 F.Supp. 784, 787–89 (W.D.N.C.1969); 3 K. Davis, supra, § 23.03 at 304; L. Jaffe, Judicial Control of Administrative Action 358–59 (1965).

The Commission, of course, is correct when it asserts that the actions of a single commissioner do not amount to agency action within the meaning of the APA. The Commission's contentions in that regard are discussed in section II ¶ 35. But to the extent the Commission attempts to suggest that the term "agency action" is synonymous with final orders, its position is rejected.[25]

### 3. First Amendment Claims.

The defendants' position that the FCC has exclusive jurisdiction to entertain the plaintiffs' constitutional claims presents an entirely different order of question. Although the parties are in dispute as to whether or not the First Amendment gives rise to a private cause of action for damages and whether or not the First Amendment affords a basis for declaratory or injunctive relief under the circumstances of this case, no one doubts that in an appropriate case that the First Amendment will support a private cause of action for declaratory and injunctive relief. "The inherent

federal judicial power to enjoin threatened or continued violation of constitutional rights is beyond question." Ackerman v. Columbia Broadcasting System, Inc., supra, 301 F.Supp. at 633, citing Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Most courts presented with constitutional claims against broadcasters have been willing to consider them on the merits without reference to the doctrine of exhaustion of remedies. See Massachusetts Universalist Convention v. Hildreth & Rogers Co., supra, 183 F.2d at 501; McIntire v. Wm. Penn Broadcasting Co., supra, 151 F.2d at 601; Post v. Payton, supra, 323 F.Supp. at 803–04; Ackerman v. Columbia Broadcasting System, Inc., supra, 301 F.Supp. at 633–34. But see Maguire v. Post Newsweek Stations, 24 P&F Radio Reg.2d 2094 (D.C. Cir. 1972).

The question of whether or not the courts should resort to the exhaustion doctrine (or the doctrine of primary jurisdiction discussed in section ID infra) when considering a plaintiff's constitutional claim is ordinarily academic. Since most courts have ruled that broadcaster action is not per se the equivalent of government action for First Amendment purposes,[26] the question of whether or not the plaintiffs have exhausted claims dependent on this very theory has ordinarily been bereft of practical significance. See, e. g., Massachusetts Universalist Convention v. Hildreth & Rogers Co., supra, 183 F.2d at 501; McIntire v. Wm. Penn Broadcasting Co., supra, 151 F.2d at 601; Post v. Payton, supra, 323 F.Supp. at 803. Nonetheless most courts which have proceeded to decide the constitutional merits without invoking the exhaustion doctrine have so proceeded while simultaneously referring Communications Act claims to the Commission. Since these courts do not require exhaustion as even a preliminary step to judicial consideration of their claim, a fortiori they do not believe

---

**25.** The government defendants do not raise the question of whether the APA provides subject matter jurisdiction over individual commissioners sued in their official capacity. They could not appropriately do so. See Crowther v. Seaborg, 312 F.Supp. 1205 (D.Col.1970).

**26.** As is discussed in section III, the question has been left open by the Supreme Court. It has not been ruled on by the Ninth Circuit, and there is no need to decide the question in this case.

that the FCC possesses exclusive jurisdiction to decide such claims. They obviously assume that the Communications Act did not *sub silentio* divest the courts of their traditional power to decide constitutional issues. But the defendants apparently believe that those cases which have assumed jurisdiction over constitutional claims and decided them on the merits have gone too far. They suggest that the proper approach was followed by the court in *Maguire v. Post Newsweek Stations, supra,* 24 P&F Radio Reg.2d 2094 and imply that that case holds that exhaustion of remedies must be pursued with respect to constitutional claims involving the broadcasting industry whether or not those remedies are adequate.

In *Maguire,* a group of parents brought an action in the district court seeking declaratory and injunctive relief against broadcasting of the television program "Wild, Wild West" before 9:00 p. m. The parents sought to assert the Fifth Amendment rights of their children to be free from mental harm thought to be caused by exposure to the violence depicted in the program. The district court dismissed the suit *inter alia* for failure to exhaust administrative remedies, and the District of Columbia Court of Appeals affirmed in a brief per curiam opinion that was not officially reported. The opinion noted that the Commission had regular procedures for examining viewer complaints about television programming and that a petition for rulemaking on the subject of television violence was then before the Commission. Accordingly, the court required exhaustion of administrative remedies. But *Maguire* in no wise can be said to stand for the proposition that "if there is any power or authority to consider the issues raised in the complaint, it resides with the FCC." Rather it stands for what it says: "[T]he mere existence of a putatively valid statutory or constitutional claim [does not justify] bypassing orderly administrative procedures." 24 P&F Radio

Reg.2d at 2095. Here the plaintiffs' position does not depend upon the notion that the mere existence of a constitutional claim justifies bypassing remedies with the FCC. Rather they insist that the Communications Act does not divest the courts of the power to hear First Amendment claims and that the remedies which the defendant would have them exhaust are palpably inadequate in the circumstances of this case. Thus it is unnecessary to decide here whether the approach taken in *Maguire* is appropriate. It is sufficient to observe that *Maguire* did not consider a case in which administrative remedies were obviously inadequate.

The private defendants' reliance upon *Allen B. Dumont Laboratories v. Carroll,* 184 F.2d 153 (3d Cir. 1950), *cert. denied,* 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951), is even less well taken. That case ruled that an attempt by the State of Pennsylvania through its State Board of Censors to regulate movies shown on Pennsylvania television was invalid because the field of television regulation had been preempted by Congress and was no longer open to the states. Moreover the district court ruled as an alternative basis for decision that the regulation was unconstitutional on commerce grounds. 86 F.Supp. 813, 816 (E.D.Pa.1949). All of this was done without referring anything to the FCC. If the defendants' position was correct, the *Dumont* courts should have declared an absence of judicial jurisdiction and referred the case to the FCC. Instead *Dumont* can be appropriately cited in support of the contention that the courts retain the power to free broadcasters from illegal restraints upon their freedom to decide what shall and shall not be broadcast.

This does not mean that the FCC could be sued in the district courts with respect to orders which an aggrieved party claims are in violation of the First Amendment. As discussed previously, the power of review of the Commission's final orders is confined to the court of appeals.[27] Since an agency

---

27. Although the question is not presented here, presumably a district court action against an FCC *official* for participating in an unconstitutional *order* made in formal proceedings of the

Commission would flounder not on jurisdictional grounds or on state action grounds but rather on the ground of official immunity.

action not amounting to a final order is already reviewable (in appropriate circumstances) in the district courts under the Administrative Procedure Act (see section IC2), it would hardly make sense to hold that a First Amendment cause of action has somehow been barred.. Nor does the holding that broadcasters or other individuals may be sued in district courts for First Amendment violations open a pandora's box. If *Maguire* is correct, the doctrine of exhaustion of remedies will apply in most cases. Even if *Maguire* were wrong, First Amendment defenses[28] would keep the floodgates closed just as easily as any sweeping new theory asserting lack of power in the federal judiciary.

Nor is the question merely one of judicial versus administrative power. If the defendants were correct in their assumption that the FCC possessed exclusive power to deal with questions affecting the broadcasting industry, there would be no way for plaintiffs injured by violations of their First Amendment rights to receive compensation for their losses, inasmuch as that agency has no power to award damages for losses. The defendants respond by contending that there is no such thing as a First Amendment cause of action for damages, and, therefore, maintain that Tandem's claim for damages is without any legal foundation. Since the argument also is related to the question of whether or not the FCC has exclusive jurisdiction, it will be treated here.[29]

The starting point, of course, is *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). There the Supreme Court held that the Fourth Amendment would support a private cause of action for damages. The

defendants rely upon the handful of cases which have attempted to confine *Bivens* to its Fourth Amendment context. *See, e. g., Archuleta v. Callaway,* 385 F.Supp. 384, 388 (D.Colo.1974); *Moore v. Schlesinger,* 384 F.Supp. 163, 165 (D.Colo.1974); *Smothers v. Columbia Broadcasting System, Inc.,* 351 F.Supp. 622, 625–26 (C.D.Cal.1972) (dictum); *Davidson v. Kane,* 337 F.Supp. 922, 924 (E.D.Va.1972).

In *Bivens,* the primary issue of concern to the Court was whether or not the Fourth Amendment created personal federal rights independent of those created by state law. The Court concluded that "[T]he Fourth Amendment operates as a limitation upon the exercise of federal power regardless of whether the State in whose jurisdiction that power is exercised would prohibit or penalize the identical act if engaged in by a private citizen." 403 U.S. at 392, 91 S.Ct. at 2002. Having determined that the Fourth Amendment creates personal federal rights, it was not difficult to conclude that the remedy of damages was available. As the Court put it, "That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Id.* at 395, 91 S.Ct. at 2004.

Similarly there can be no doubt that the First Amendment creates personal federal rights. As the Supreme Court stated in *Schneider v. Irvington,* 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939), "This court has characterized the freedom of speech and that of the press as fundamental personal rights and liberties. The phrase is not an empty one and was not

---

**28.** If broadcaster action is not considered to be the equivalent of state action, the First Amendment defense would be no state action. If it were considered to be state action, the First Amendment defense would be that the action was not an abridgement of freedom of speech. See section IIIA1. Either defense could be raised on a motion to dismiss for failure to state a claim and could be handled just as expeditiously as a motion to dismiss for lack of subject matter jurisdiction.

**29.** The question treated here is whether or not the First Amendment ever gives rise to a cause of action for damages. Section IVE examines the question of whether Tandem's showing entitles it to compensation for whatever injuries it has suffered. No proceedings have yet been held to determine the amount of Tandem's damages.

lightly used." Since damages are the ordinary remedy for the invasion of personal interests in liberty and since the First Amendment creates personal interests in liberty, it follows that the First Amendment creates a private cause of action for damages. Indeed most cases which have treated the question have recognized that in light of *Bivens* there is "no principled basis for limiting the availability of damages to cases involving interests protected by the fourth amendment." Note, "Damage Remedies Against Municipalities for Constitutional Violations," 89 *Harv.L.Rev.* 922, 934 (1976); *Paton v. La Prade,* 524 F.2d 862 (3d Cir. 1975); *States Marine Lines, Inc. v. Shultz,* 498 F.2d 1146 (4th Cir. 1974); *United States ex rel. Moore v. Koelzer,* 457 F.2d 892 (3d Cir. 1972); *Bethea v. Reid,* 445 F.2d 1163 (3d Cir. 1971), *cert. denied,* 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1972); *Patmore v. Carlson,* 392 F.Supp. 737 (E.D. Ill.1975); *Revis v. Laird,* 391 F.Supp. 1133 (E.D.Cal.1975); *Gardels v. Murphy,* 377 F.Supp. 1389 (N.D.Ill.1974); *Butler v. United States,* 365 F.Supp. 1035 (D.Hawaii 1973); *Scheunemann v. United States,* 358 F.Supp. 875 (N.D.Ill.1973). *See Hostrap v. Board of Junior College District No. 515,* 523 F.2d 569 (7th Cir. 1975).

The defendants insist, however, that in this case, unlike *Bivens,* there are "special factors counseling hesitation." 403 U.S. at 396, 91 S.Ct. 1999. Specifically they argue that in the cases extending *Bivens* the federal employees "interfered, almost physically, with the plaintiff in a direct and personal manner." Aside from the fact that this imaginative distinction cannot begin to account for the facts of all the cases (*see, e. g., Paton v. La Prade, supra,* 524 F.2d 862) (FBI mail surveillance gives rise to First Amendment claim), *United States ex rel. Moore v. Koelzer, supra,* 457 F.2d 892 (use of false testimony and falsification of document offered in evidence against plaintiff in prior criminal prosecution)), there is nothing in the cases or in policy to suggest that such a distinction has ever been thought to be or should have been thought to be dispositive. Instead the cases here properly understood *Bivens* to amount to

nothing less than a "sweeping approbation of constitutionally-based causes of action." *Brault v. Town of Milton,* 527 F.2d 730, 734 (2d Cir.), *vacated on other grounds, id.* at 736 (1975) (en banc).

The preceding, of course, does not establish that the plaintiffs are entitled to collect damages in this case. Rather it serves to illustrate that the proper forum for deciding whether or not damages should be awarded is the district court. The FCC has no power to award damages and this court cannot assume that the Congress has by subtle implication denied aggrieved plaintiffs the right to collect damages for First Amendment violations. If the use of the damage remedy would threaten defendants with crushing liability, the appropriate response would be to intelligently limit the remedy (*see, e. g., Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)), not to abrogate it altogether.

 Therefore the court concludes that the FCC is the exclusive forum for alleged violations of the Federal Communications Act. It is not the exclusive forum for alleged violations of the APA or the First Amendment.

### D. *Primary Jurisdiction.*

Alternatively the defendants invoke the doctrine of primary jurisdiction. That doctrine, like the doctrine of exhaustion of remedies, " 'is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.' " *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643, 1987 (1976), *quoting United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

 The doctrine of primary jurisdiction, however, is to be distinguished from the doctrine of exhaustion of remedies. If a plaintiff's claim should have been initially tendered to an administrative agency, the doctrine of exhaustion of remedies applies. If, on the other hand, a plaintiff's claim is cognizable in the courts as an original mat-

ter, but raises issues the resolution of which requires the special expertise of an administrative agency, the doctrine of primary jurisdiction applies. In the latter case, the judicial process is suspended pending referral of the issues to the administrative body for its views. *United States v. Western Pacific R.R. Co., supra,* 352 U.S. at 64, 77 S.Ct. 161; *General American Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 433, 60 S.Ct. 325, 84 L.Ed. 361 (1940).

The classic summary of the doctrine of primary jurisdiction is contained in *Far East Conference v. United States,* 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952):

> [I]n cases raising *issues of fact not within the conventional experience of judges* or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure. (emphasis added).

■ Essentially, then, the doctrine is designed to secure uniformity of decisionmaking with respect to regulated industries (*Texas & Pacific Ry. Co. v. Abiline Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907)) and to exploit the expertise of administrative agencies in factual areas ordinarily not considered by the courts. *Nader v. Allegheny Airlines, Inc., supra,* 96 S.Ct. at 1987; *United States v. Radio Corporation of America,* 358 U.S. 334, 346–52, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); *United States v. Western Pacific R.R. Co., supra,* 352 U.S. at 64, 77 S.Ct. 161.

■ The defendants insist that the FCC's recognized expertise in balancing the delicate First Amendment considerations involved in the television industry (*see, e. g., CBS v. Democratic National Committee, supra,* 412 U.S. at 102, 93 S.Ct. 2080) mandates an initial determination by the Commission. This argument ignores the nature of the factual questions involved and the position already taken by the Commission. As discussed previously, nothing would be served by having the FCC determine the factual questions surrounding the adoption of the family viewing policy. The degree of FCC involvement, the extent to which it permeates the family viewing policy with state action sufficient to involve the First Amendment, and the remedies appropriate if a violation has occurred, are all topics peculiarly unsuited to impartial FCC scrutiny; indeed, the FCC possesses no special expertise in discerning state action or in fashioning remedies. On the other hand, the competence of the federal courts to define constitutional rights and to fashion remedies for their protection is a basic premise of common law jurisprudence. *See Bivens v. Six Unknown Federal Narcotics Agents, supra,* 403 U.S. at 395–96, 408–09, 91 S.Ct. 1999 (Harlan, J., concurring); Note, "Damage Remedies Against Municipalities for Constitutional Violations," 89 *Harv.L. Rev.* 922, 933–34 n.64 (1976). In fact, the defendants are conspicuously silent on the matter of which factual questions the FCC should preliminarily decide. Moreover the First Amendment legal questions raised either involve no special FCC expertise (*e. g.,* state action and remedies) or are not in controversy (*e. g.,* the lack of FCC power to censor protected material). They are simply not the kind of questions which need "be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme . . .." *United States v. Western Pacific R.R. Co., supra,* 352 U.S. at 65, 77 S.Ct. at 166.

■ Moreover, as discussed previously, the Commission's beliefs as to the merits of the plaintiffs' claims are not shrouded in secret. The courts have long made clear

that resort to the doctrine of primary jurisdiction is unwarranted when the agency has "made its position clear on the issue sought to be referred to the agency," (*Agar Food Products Co. v. Chicago River and Indian R.R. Co.*, 358 F.Supp. 1312, 1313 (N.D.Ill. 1973) or "has clarified the factors underlying it" (*United States v. Western Pacific R.R. Co., supra*, 352 U.S. at 69, 77 S.Ct. at 168). Moreover the FCC is a party to the action and, therefore, is available to present its views. *Cf. Rosado v. Wyman*, 397 U.S. 397, 407, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The private defendants cite a number of cases involving the Commission in which the courts are said to have "honored the FCC's primary jurisdiction over all forms of interstate communication, deferring to the agency's expertise prior to initiating the judicial process." *See Ambassador, Inc. v. United States*, 325 U.S. 317, 324, 65 S.Ct. 1151, 1155, 89 L.Ed. 1637 (1945); *MCI Communications Corp. v. Atlantic Telephone & Telegraph Co.*, 496 F.2d 214, 219–20 (3d Cir. 1974); *Maguire v. Post Newsweek Stations, supra*, 24 P&F Radio Reg.2d at 2095; *Daly v. Columbia Broadcasting System, Inc., supra*, 309 F.2d at 85–86; *Massachusetts Universalist Convention v. Hildreth & Rogers Co., supra*, 183 F.2d at 500; *Ackerman v. Columbia Broadcasting System, Inc., supra*, 301 F.Supp. at 631; *Gordon v. National Broadcasting Co., supra*, 287 F.Supp. at 455. To the extent that they support the defendants' position at all, four of those cases (*Daly, Hildreth, Ackerman,* and *Gordon*) merely hold that the Federal Communications Act creates no private cause of action and that the Commission is charged with the responsibility of enforcing the Act's provisions. One of them (*MCI*) holds that a district court erred in failing to apply the primary jurisdiction doctrine in

circumstances where a pending proceeding before the Commission would clarify the scope of a prior Commission ruling's application to a telephone company. Another (*Ambassador*) recognized the Commission's expertise in assessing the reasonableness of telephone rate regulations. The defendants' strongest case (*Maguire,* discussed *supra*) simply applied the doctrine of exhaustion of remedies to plaintiffs' due process claims in circumstances where the Commission's "established procedure for consideration of viewer complaints about television programming" (24 P&F Radio Reg.2d at 2095) were thought to provide an appropriate forum to consider "all of their statutory and constitutional arguments . . . ." *Id.*[30] Each and every one of the cases relied upon by the defendants have three things in common: (1) they did not require the Commission to adjudicate facts surrounding a charge of serious misconduct involving the Commission's chairman and the Commission itself; (2) they did not call upon the Commission to formulate a theory of governmental action under the First Amendment or to fashion appropriate remedies thereto; (3) they were not matters upon which the Commission had already clearly spoken.[31] In short, although the Commission's expertise with respect to First Amendment issues intertwined with the Communications Act is unquestioned (*e. g.,* fairness questions and equal time questions), the cases cited by the defendants, in the final analysis (to the extent that they deal with the primary jurisdiction doctrine at all)[32] merely hold that questions within the special expertise of the Commission should be referred thereto. In fact, *Hildreth, Ackerman,* and *Gordon* all seem to assume that the doctrine of primary jurisdiction has no role to play with

---

30. The *McGuire* case has also been followed in an unreported district court decision also based on a plaintiff's complaint of excessively violent programming by broadcasters. *Polite Society, Inc. v. WLS, Inc.*, No. 74–Civ. 3777 (N.D.Ill. 1975).

31. Of course, even if the Commission has clearly spoken on claims arising under the Federal Communications Act, there is no private cause of action.

32. Several of the cases holding that Communications Act claims should be referred to the Commission assume or declare the existence of federal jurisdiction but find no cause of action. Under the doctrine of primary jurisdiction a court proceeds on the assumption that a cause of action exists, but refers questions to the relevant administrative agency.

respect to constitutional claims against broadcasters even when those claims are intertwined with Communications Act issues routinely a part of the Commission's work. If the doctrine of primary jurisdiction had no role to play there, it surely has no role to play here.

A mechanical application of cases applying the primary jurisdiction doctrine to the special and unique facts of this case would depart from the counsel that, "No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. Western Pacific R.R. Co., supra*, 352 U.S. at 64, 77 S.Ct. at 165. Here the reasons for the existence of the doctrine are not present and no useful purpose would be served by referring the case (or issues unspecified by the defendants) to the Commission.

## II. FACTUAL FINDINGS

The parties, of course, characterize the factual circumstances leading up to the adoption of the family viewing policy quite differently. None of the defendants are prepared to accept the plaintiffs' position that Chairman Wiley and the Commission staff, acting on behalf of the Commission, pressured the networks and the NAB into adopting the family viewing policy thereby causing injury to the plaintiffs. The government defendants maintain that Chairman Wiley merely made suggestions and they deny that he threatened anyone:

Q. Mr. Wiley, did you at any time tell anyone that if industry self regulation was not forthcoming the Com-

mission would take some kind of regulatory action?

A. I did not.

Q. Did you ever threaten any network or any representative with FCC regulation in the area of violence or sex on television?

A. No, I didn't. And, frankly, that would have violated every precept I had about the responsible role between Government and industry.[33]

Indeed Chairman Wiley is unwilling to concede that his "suggestions" were proffered with his endorsement: "I didn't tell them that these were the steps they ought to take. I told them: 'Here are some thoughts I have.' Perhaps they had others." And, "No, I didn't say that these suggestions should be adopted. I said, 'Here are some thoughts I have. Perhaps you have others. Could we discuss these, and could we discuss others.'"

Moreover, the government defendants deny that Chairman Wiley's activities, whatever their character, were anything more than a "personal initiative." They contend that his "personal" activities "cannot in any way be construed as agency action by, or on behalf of the Commission."

The private defendants, on the other hand, equivocate as to the proper characterization of the Chairman's advocacy or lack of it.[34] In their post trial brief, they suggest that the record evinces "the total lack of coercion or pressure on the networks by the FCC and its Chairman . . .." Instead they write that "[T]he Chairman's role was merely to suggest . . .." At oral argument, however, the private defendants conceded that the Chairman had clearly done more than offer suggestions. How much more they were unable to say.

---

**33.** Chairman Wiley further testified that, "I think, your Honor, that I made suggestions to these people and made it very clear that these were only suggestions for them to consider, and that they had to make this basic judgment. That's my whole concept here, you know, that the government can't be ordering these people around." Again Chairman Wiley stated that, "I don't think I pushed hard for any of these

things consistent with my philosophy. I made these suggestions in the nature of discussions. I don't think I pushed hard, in your words, on any of them because I don't think that would have been appropriate."

**34.** The private defendants, however, do seem to assume that the Chairman's actions were taken on behalf of the FCC.

Whatever differences there may be between the government defendants and the private defendants as to the nature of the Chairman's conduct, they are united in their approach to characterizing its results. They contend that the adoption of the family viewing policy was not caused by Chairman Wiley. In fact, they maintain that Wiley's proposals were rejected. Instead the private defendants suggest that the adoption of the policy is best viewed as "a continuation of the industry's response to public concern over televised violence and other offensive material." The family viewing policy, they claim, is "a direct outgrowth of the work of [CBS President] Arthur Taylor, and not the result of pressure or suggestions by Chairman Wiley."

The defendants point to a letter written by Arthur Taylor to Wayne Kearl, then Chairman of the NAB Television Code Review Board as the key causal event. In that letter, Taylor proposed that the NAB Code be amended to reflect the principle that, "[P]rogramming in the first hour of the network prime-time schedule should be suitable for family viewing." David Adams, the Vice Chairman of NBC, perhaps best expressed the defendants' position:

> The crucial turning points in my mind in this whole development of the family viewing concept took place on two days. One was December 30th when Arthur Taylor simultaneous with the hand delivery of a December 30th letter to Wayne Kearl, chairman of the Code Review Board, and the release, the public release of that letter on the same date proposed a Code amendment
>
> . . . . .
>
> That started in motion a train of events leading to the Code amendment. From that time on, from December 30th on, in my opinion, the suggestions of Chairman Wiley and the discussions of the FCC staff representatives dropped out of the picture and became relatively academic . . ..

In my mind, the next crucial date, so far as NBC was concerned, was the meeting in Chairman Wiley's office on January 9th. Not because of anything Chairman Wiley or the FCC staff said, or did at that meeting, but because CBS confirmed that the concept it was advancing did not contemplate any external private or other authority making prejudgments on the suitability of programs for family viewing.

> So far as NBC was concerned that removed any inhibition we had against a code amendment.
>
> From that point forward, this phenomenon became a matter of drafting, of mechanics, of arrangements of meetings, of timetables, and a certain amount of competitive skirmishing for public and trade credit in the press.

Counsel for NAB, however, would stress that the phenomenon, even at that point, had not become a mere matter of drafting. Instead, the NAB contends that whatever taint might be attached to the adoption of the family viewing policy by the networks was purged when the Code amendment was adopted by the "independent men and women" of the NAB Television Board of Directors. Even assuming that improper pressure might have been significant at earlier stages of the process, the defendants (led by the NAB) maintain that the Television Board's approval was wholly uninfluenced by the Chairman or the Commission. For example, Chairman Wiley expressed the view that, "The National Association of Broadcasters, which of any group is closer to the people, it's the licensees that live in those various communities and they are the people who adopted it. They adopted it without any pressure from me, without any discussion from me with them."

Despite these various nuances, however, none of the defendants concede that Commission pressure, at any stage, was a vital factor. Rather they suppose as Arthur Taylor testified, "I wasn't worried nor was anyone worried about what the FCC did. The FCC does not have jurisdiction in this area."

Such post hoc rationalizations, however, cannot be squared with the evidence accumulated by the plaintiffs. They especially

are difficult to reconcile with the writings of the defendants made at the time of the decisionmaking process. Based on the totality of the evidence accumulated in this case the court finds that Chairman Wiley, acting on behalf of the Commission (and with the approval of the Commissioners) in response to congressional committee pressure launched a campaign primarily designed to alter the content of entertainment programming in the early evening hours. The evidence discloses, as former Commissioner Johnson put it, that the government activities involved amounted to "a virtually unprecedented orchestration of regulatory tools by the FCC." The evidence confirms his conclusion that "What you have before you in this case is really unprecedented in my experience in terms of the totality of the force brought to bear on the industry . . . ." The court finds that Chairman Wiley in the course of his campaign threatened the industry with regulatory action if it did not adopt the essence of his scheduling proposals. On some occasions, when the persuasive demands of the situation so dictated, he would withdraw his threats or assume a low profile. But the Commission's pressure in this case was persistent, pronounced, and unmistakable. Chairman Wiley's actions were the direct cause of the implementation of the family viewing policy: were it not for the pressure he exerted, it would not have been adopted by any of the networks nor by the NAB. The threat of regulatory action was not only a substantial factor leading to its adoption but a crucial, necessary, and indispensable cause.

This is not to say that other factors did not contribute to the policy's acceptance. Taylor, for example, was in part genuinely concerned with the level of violence on television. Other prominent CBS officials, however, believed that the problem was exaggerated and that the network had already taken positive steps to deal with it. To be sure, there had been a public outcry surrounding the broadcasting of several shows particularly the showing of the movie "Born Innocent." But most of the leading network officials were satisfied that individual networks could handle and were handling the problem. In the absence of government threats, no drastic changes would have been made. Even Taylor would not have locked CBS into a public commitment to the family viewing policy unless it were clear that the rest of the industry would be bound by it. While it is doubtful that Taylor could have persuaded his own network to commit itself publicly to the family viewing policy in the absence of Wiley's offensive, it is clear beyond doubt that the rest of the industry could not have been "persuaded" without Wiley's pressure.

Taylor feared that if CBS publicly committed itself to such a policy that the commitment would work to CBS's competitive disadvantage in the absence of a binding enforcement mechanism applicable to the industry at large. Past experience in children's programming had led him to the conviction that broadcasters, more interested in dollars than in the public interest, would use violence as a tool to hike program ratings if they were left free to program in their own discretion. CBS was thus prepared to delegate its program discretion to the NAB, but only if its major competitors could be persuaded to do so as well. FCC pressure was necessary to achieve this objective.

The evidence supporting these conclusions is contained in the massive record before this court. Further findings are discussed in detail below.

1. The depiction of violence on television has been a continuing source of congressional and public concern for more than two decades.[35] Broadcasters had responded to

---

**35.** *See, e. g., Hearings on Violence on Television Before the Subcomm. on Communications of the Senate Comm. on Commerce, 93d Cong., 2d Sess. (1974); Hearings in Review of Policy Matters of Federal Communications Commission and Inquiry into Crime and Violence on Television and a Proposed Study Thereof by the Surgeon General Before the Subcomm. on Communications of the Senate Comm. on Commerce, 91st Cong., 1st Sess., ser. 91, pt. 6 (1969); Hearings for the Investigation of Juvenile Delinquency in the United States Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary,*

these concerns in a variety of ways. Attempts were made to reduce gratuitous violence, to schedule particularly violent programs in later hours of the evening, and to use advisories alerting audiences to the presence of disturbing material. These policies were employed as factors in the decisionmaking process rather than as hard and fast rules. They were serious considerations in broadcaster decisionmaking, but were by no means uniformly followed. Many of the broadcasters provided evidence of the fact that broadcasters have used violence as an easy way to raise ratings. As James E. Duffy, President of the ABC Television Network confessed in a speech given October 23, 1974, "[T]he race for audience ratings too often blinds us to our basic responsibilities. And in serving ourselves, we often do great disservice to our viewers. . . . Yes, a program like 'Born Innocent' should be shown. But, no, it should not be shown at such an early hour . . . when children more often than not control the dial."

2. Although the FCC had been urged on a number of occasions to initiate regulatory efforts with respect to sex and violence on television, its response had been to hope, as former Commissioner Johnson testified, "that the problem would go away and that the issue raised by Congress one year would be forgotten the next, as sometimes happens." For example, in May, 1974 Chairman Wiley wrote Senator Pastore that any FCC proceeding with respect to televised violence at that time would be premature. Referring to the fact that an important study on violence funded by the National Institute of National Health was still in the preliminary stages, the Chairman concluded that:

> Upon the reaching of a meaningful stage in the violence profile study, the Commission could then, in coordination with other agencies, decide how best to proceed.

. . . I am sure you can understand why the Commission believes that the time is not now. When it arrives you can be confident that the Commission will act responsively to this important concern which we share with you and the Committee.

3. The patience of congressional committees, however, had worn thin. Only a few weeks after the Commission's considered conclusion that "the time is not now" the House Appropriations Committee demanded action:

> This is the fifth consecutive year the Committee has included language in its report expressing concern with the effects of violence and questionable programming on children. It appears that the Commission has taken little or no action in response to those expressions.
>
> The Committee feels that this issue needs resolution. Therefore the Commission is directed to submit a report to the Committee by December 31, 1974, outlining specific positive actions taken or planned by the Commission to protect children from excessive programming of violence and obscenity.
>
> . . . The Committee is reluctant to take punitive action to require the Commission to heed the views of the Congress, and to carry out its responsibilities, but if this is what is required to achieve the desired objectives, such action may be considered. The Committee hopes the Commission will move promptly to resolve the administrative, jurisdictional, and constitutional problems associated with this issue. H.R.Rep.No.1139, 93d Cong., 2d Sess. 15 (1974).

The Senate Appropriations Committee followed suit:

> The Committee also joins with the House in urging the Commission to proceed as vigorously and as rapidly as possible—

88th Cong., 2d Sess., pt. 16 (1964); *Hearings for the Investigation of Juvenile Delinquency in the United States Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary*, 87th Cong., 1st & 2d Sess., pt. 10 (1961–62); *Hearings for the Inves-* *tigation of Juvenile Delinquency in the United States Before the Subcomm. to Investigate Juvenile Delinquency of the Senate Comm. on the Judiciary*, 84th Cong., 1st Sess. (1955) and 83d Cong., 2d Sess. (1954).

within Constitutional limitations—to determine what is its power in the area of program violence and obscenity, particularly as to their effect on children. Agreeing with the House, the Committee feels that this situation requires resolution and urges the Commission to submit the same report to it which was requested by the House by December 31, 1974. S.Rep.No.1056, 93d Cong., 2d Sess. 10 (1974).

4. Chairman Wiley's reluctance to enter into the field had not been caused by a lack of concern for the problem as a private citizen and parent. Instead it stemmed from a deep belief that constitutional, statutory and prudential considerations dictated that government had no proper role to play. Nonetheless in response to the political pressure created by the House Report,[36] Wiley instructed his staff to begin working to determine "how the Commission can set about to comply with the House Committee's request."

5. The basic proposals of the staff were presented in a meeting with the Chairman on October 4, 1974, but some preliminary moves were made prior to that date. Sometime in August 1974, acting at the request of Chairman Wiley, Lawrence Secrest, Legal and Administrative Assistant to the Chairman, requested the NAB to strengthen its position on televised violence by reinstating language which had earlier existed in the Code. The proposal, which had been reduced to writing, was delivered by Secrest to John Summers, the NAB general counsel, and was considered by the NAB Television Code Review Board (hereinafter "Code Board") at their October 1–2 meeting in San Antonio, and was rejected. At that same Code Board meeting, the question of violence on television was discussed in some detail. The topic, of course, had been the subject of numerous discussions over the years at board meetings.[37]

The private defendants attach special significance to the fact that at this October meeting, Code Board member Wallace Jorgenson brought a briefcase loaded with letters complaining about television programming and dramatically threw them onto the meeting table. They emphasize that this action predated Wiley's efforts and set in motion the process by which the Code would eventually be amended. The impression the defendants seek to convey is that the Jorgenson activity set in motion a process which would have produced a Code amendment even in the absence of FCC intervention. But Jorgenson proposed no specific amendment and had been principally concerned with the problem of vulgar language. Moreover the response of the network representatives had been cool to his presentation: he wrote his superior that "[S]omebody is going to have to get to the Bob Woods, Jack Schneiders, Arthur Taylors, et cetera, at all three networks. Until we can do that we will only be treating the problem cosmetically."

The Jorgenson foray can best be understood as a part of a continuing dialogue about the question of television programming which was neither calculated to produce nor capable of producing (in the absence of FCC intervention) network support of, or adherence to, a policy such as family viewing.

7. On October 4, 1974, the FCC staff presented three proposals to Chairman Wiley which they hoped might serve as appropriate Commission responses to the congressional directives. The staff proposals included a variety of administrative responses, including notices of inquiry, notices of proposed rulemaking and policy statements. The goal of pressuring broadcasters into regulatory efforts was manifest throughout the proposals. For example, the document submitted by the Office of Plans and Policy opined that the "emphasis of [the] Policy

---

36. The House Report was dated June 21, 1974. The staff instruction was issued June 25, 1974 even before the Senate Report of August 1, 1974.

37. The specifics of these discussions are not in the record; the fact of their existence is. The many changes in the Code on the question give some indication of the matters considered by the Board.

Statement should be 'jaw-boning' and self-regulatory efforts to eliminate gratuitous violence and 'indecent' programming during those times when children are most likely to view television." Moreover, the staff recommended that the Commission speak in terms of the public interest in order to provide a color of legal authority for its views. For example, the Office of Plans and Policy recommended that with respect to obscenity,[38] "the Statement would view the issue in its public interest rather than strict legal context thereby permitting a broader application of policy."

Essentially the theory was that since the FCC was required to determine whether relicensing of a station was in the "public interest" it could identify in advance those matters which it considered to be outside the public interest. Thus Commission statements clothed in the language of "public interest" would warn broadcasters of consequences in the relicensing process. Moreover although the Commission could not directly censor programming content, it could achieve the same result by "public interest" jawboning. Finally, it is clear that NAB regulation in some form was viewed as an important component. The Broadcast Bureau recommended that the Commission's Policy Statement should indicate that "increased enforcement of the industry codes concerning violence and children's programming" was necessary and

should warn that "Should the self-regulation efforts prove to be unsuccessful, the Commission may have to investigate rules which reach the outer constitutional limits and encompass a more active rule in program content."

8. Chairman Wiley was convinced that formal Commission action was unwise policy. Moreover he believed that the staff proposals for formal Commission action presented severe First Amendment and section 326 problems.[39] Instead of moving ahead with formal proceedings, he decided to do something "more quick and more dramatic."[40] Despite grave reservations about the viability of formal Commission actions, Wiley permitted the staff to continue working on proposed notices of rulemaking and inquiry. This work continued well into November.[41] Its continuation served two purposes. First, it preserved an option in the event of network recalcitrance. Equally important, since the industry press was aware of the continued work and reported it to an audience which included broadcaster executives, the fact of continued FCC staff work enhanced the threat of unwelcome Commission action. The statement by the government defendants that the work continued because of a desire to avoid discouraging certain staff members supplies no believable alternative explanation.

9. Six days after the October 4 meeting Wiley took the first in a series of steps

**38.** A similar approach with respect to violence was specifically urged in connection with a later draft Notice of Inquiry and Notice of Proposed Rulemaking.

**39.** Wiley testified at his deposition that, "It seemed to me that the proposals that the staff had put up were all either unconstitutional or basically illegal . . . .. I just didn't think we could do any of them."

**40.** The phrase was used by Werner K. Hartenberger, then Chief of Plans and Policy of the FCC in reporting to FCC consultant Barry Cole. The response of Cole is illuminating: "Oh, like with respect to children's television." The reference was to an earlier FCC enterprise which began with a speech by the Chairman in Atlanta with respect to children's television and culminated in a NAB Code amendment on the subject. Thereafter the Commission "chose not to adopt *per se* rules . . . [in view of

the fact that] [t]he standards adopted by the [NAB and INTV] are comparable to the standards which we would have considered adopting by rule in absence of industry reform." *Children's Television Report and Policy Statement,* 50 F.C.C.2d 1, 13 (1974).

**41.** On November 20, 1974, Paul Putney, Assistant Chief for Law of the Broadcast Bureau, sent a memo to seven key staff members discussing the necessity for the final draft of the final proposal to be ready on November 25, 1974 so that the full Commission could consider it on December 11 and adopt it on December 18. That memo envisioned that a notice of rule making and notice of inquiry together with a declaratory ruling on the subject of indecent language would be a part of the Report to Congress.

designed to bring Commission pressure to bear on the industry. In a speech delivered to the Illinois Broadcasters Association, he focused on "the question of violence and obscenity on television—particularly as to the effect of such presentations on our children." The speech reminded broadcasters of their "public accountability" and "special" responsibilities as licensees. It stated that "[I]f self-regulation does not work, governmental action to protect the public may be required—whether you like it or whether I like it" and stressed that the issue involved was on the "front-burner of a rather 'well-heated' Chairman's desk at the FCC." Specifically it called for "intelligent scheduling, appropriate warnings, and, perhaps, even some kind of industry-administered rating program . . .." In the process, it referred to a speech delivered in Atlanta by Wiley proposing a reduction in children's commercials, and it applauded industry code amendments which had followed that speech, stating that "I am frankly optimistic that the combined effect of government encouragement and enlightened self-regulation will bring about constructive change in this very important aspect of public service."

10. The import of the speech was unmistakable and the industry press was quick to say so. *Broadcasting,* the major industry journal in its October 21, 1974 issue stated that:

> Chairman Wiley, who is loathe to delve into the area of program content under any conditions, appeared in his Illinois speech to be embarking on the same course that proved successful in connection with children's television programming. A tough speech in Atlanta in May resulted several months later in the bind of self-regulation . . ..

After referring to the questionable ability of the Commission to regulate in this area, a problem which the Chairman had conceded, the article continued: "However, Chairman Wiley apparently has not quit on jawboning. He is understood to be planning to confer with senior network officials on the matter."

11. The witnesses uniformly testified that network executives and FCC officials religiously read the trade press. Stories concerning the subject matter of this case during 1974–75 were read by each of the principals.

12. In order to heighten the pressure already generated by his Chicago speech, the Chairman arranged for a meeting with the three Washington based vice presidents of the networks. As Eugene Cowen wrote in a memo to Everett Erlick, Senior Vice President of ABC,

> Dick Wiley asked for a meeting with Kenney [Peter Kenney, NBC Vice President in Washington], Jencks [Richard Jencks, CBS Vice President in Washington] and me on Thursday afternoon "on the subject of violence, in advance of meetings I would like to have with the heads of ABC, CBS, and NBC." I am enclosing two speeches. Wiley referred to his Chicago speech in reference to "What I have been saying on the subject." He also said he "liked what Jim Duffy said in Jim's October 23 speech . . .."[42]

Thus the Chairman was not content to rest with "suggestions." A series of personal lobbying efforts were initiated.

13. On November 7, 1974, Chairman Wiley and members of the FCC staff met with the Washington vice presidents of CBS, NBC and ABC. At that meeting, Wiley proposed that each network issue a statement of policy on violence and obscenity, that the policies include cautionary warnings, and that programs requiring warnings be scheduled later in the evening. He further hoped, as Cowen stated in a November 8 memo, that "the NAB Code would be amended with exhortatory language urging members to follow the suggestions . . .." Jencks' memo of November 8 to Taylor discusses the scheduling proposal:

> Chairman Wiley also asked consideration of an agreement that programs bearing

---

**42.** See ¶ 1.

such a warning would not be scheduled before a certain time which, for discussion purposes, he identified as 9 p. m. local time, although in the discussion he conceded that time zone difficulties might make the selection of such a time impracticable.[43]

At this point, the specifics of the Wiley proposals were negotiable and subject to discussion. But if anything was clear at this point, it was that the FCC had decided that the networks were required to do *something* about violence and sex related material on television,[44] and that "something" would have to involve a visible and substantive commitment to its reduction. As Jencks mentioned in his memo, the Chairman gave the "*clear indication that, if the networks were unable to agree to an approach upon these general lines, he would urge the Commission to take alternative action which, however, he did not specify.*" (emphasis added).

This is not to say that Wiley had somehow changed his mind about the constitutionality of formal Commission action. He explicitly reaffirmed his doubts about its propriety. Rather Wiley left the impression that, as Jencks put it at the Affiliates Advisory Board meeting in La Costa on November 14, "Chairman Wiley is in a bind in that he feels he has to deliver to satisfy Congress." Clearly Chairman Wiley's initiative was perceived as something more than the suggestions of a concerned parent.

14. On November 22, the Chairman and members of the FCC staff met for two hours with the presidents of the networks and other network executives in the Chairman's office in Washington. Most of the highlights of the meeting are well summarized by Adams of NBC in a November 25 memorandum to NBC President Herbert Schlosser.

Wiley opened the meeting by referring to the fact that there was a serious problem with " 'undue violence' and 'fairly explicit' sexual material" on television and that complaints from a variety of sources had been received by the Commission. He indicated that, "The Commission was reluctant, for legal and policy reasons, to try to lay down specific program rules, but *something had to be done . . ..*" (emphasis added). The Chairman was concerned with the lack of public visibility of network standards with respect to sex and violence and concerned about their substantive inadequacy as well. He "mentioned an effort on his part to get the NAB Code standards on this subject strengthened, and said this had been rejected, with network representatives—particularly ABC's—opposing such a move. None of the network people at the meeting knew what he was talking about." [45] Wiley proposed a joint network statement on the subject of sex and violence and suggested that the Code might want to express a new position in this area.[46]

Once again the Chairman stressed the importance of scheduling shows which might be harmful or disturbing to children in the late evening hours and the necessity for providing warnings for particularly sensitive material whenever shown. Each of the network representatives said they had been "following a selective practice of

---

43. Cowen's memo reported that, "Wiley said he would be satisfied with a time criterion using the Eastern Time Zone and our usual practices relative to other time zones."

44. The Chairman, for example, referred to the French practice of a white dot on the screen serving as a warning device. This idea was mentioned as a discussion point—a true suggestion. As Jencks said at the Affiliates Advisory Board meeting in La Costa on November 14, "Wiley is not pushing the dot, only throwing it up for consideration."

45. The reference apparently was to the initiative of Secrest in connection with the October 1–2 meeting of the Code Board.

46. The latter point is not contained in the Adams memo (although it might be implied from the reference to Wiley's mention of a prior attempt to amend the Code, i. e., the Chairman was favorable to Code action) but the point was confirmed by Wiley at the trial and in his deposition. Wiley's testimony on both occasions, however, stressed that the Code concept was put forward as a suggestion, and not a demand.

warnings in appropriate cases, and that they generally scheduled the early evening hours with programs suitable to all-family audiences."

Although the Adams memorandum does not speak to the point, the trial and deposition testimony is relatively uniform that at least the NBC and ABC representatives had conveyed the impression that to the extent there was a problem they had developed and implemented policies to cope with it. This approach somewhat exasperated the Chairman (who sat at the head of the table with his staff members, pursuant to his directions, flanked behind him). He asked, "Are you saying there is no problem?" Before representatives of NBC or ABC could answer, Taylor responded by saying, "Well, Dick, we at CBS think there is a problem, and we intend to do something about it." And as Cole (an FCC consultant who was present at the meeting) describes it:

> He then indicated, either right at that point or shortly thereafter, that not only did they intend to do something about it and thought there was a problem, but, in fact, they were already in the process of doing something about it—something was already under way.

But Taylor made it clear that he felt that an industry-wide solution was necessary to deal with the problem. As Adams put it, "He claimed that there were occasions when CBS rejected a program, to find it turning up on 'other stations,' to its competitive disadvantage." As Taylor later explained at trial his thinking had been influenced by a prior experience with children's programming. CBS had changed its programming to make it more socially beneficial for children and discovered "to our horror that the programming that everyone else had complained about so bitterly and

which we had changed ended up on the independent stations . . .. [T]he kids stopped watching our prosocial programming and watched the stuff we took off . . .. [W]hat we did was to damage CBS and the public . . .." Taylor's perception was that a network change without industry-wide enforcement would damage CBS financially without benefiting the public.[47]

Chairman Wiley made it clear that he too was aiming for industry-wide acceptance of the scheduling proposal. His view was that in the early prime time hours parents all over the country should be assured that there would not be any programming "upsetting or disturbing to their children." They could, therefore, permit their children to watch television during a specified time period free from the fear that offensive material would be presented. To advance this concept, he offered to contact the Independent Television Association and the Public Broadcasting System, i.e., he would use the power and prestige of his office to bring about industry-wide compliance. Nor did the Chairman confine his comments to approving the goal of industry-wide compliance and offering to help bring it about. As Adams recorded:

> This opening led Chairman Wiley, later in the meeting, to make some not very veiled threats, as a response to Taylor's point: that perhaps the FCC could deal with the 'separate station problem' by including in the license renewal forms, new questions on stations' policies regarding the acceptance and scheduling of programs with sex and violence. We asked what the Commission would do with the information it obtained, since it was dedicated not to intrude on programming, and could not comprehend the Chairman's response. He said the Commission might

---

47. Even with the prospect of an NAB Code amendment Taylor indicated that "The opposition within CBS was that it was going to cost a great deal of money and take a great deal of risk. But the fact of the matter is that if the trend continues in American television to increasing brutality and violence, your Honor, men of good will, men and women of good conscience, won't have a place in this industry

any more. That was my prime motivation for [sending] that letter to Wayne Kearl . . .. We've been fighting and struggling against those who say 'Oh, my God, it's going to cost us such a great deal of money.'"

Ironically, in recent weeks, Taylor has been dismissed, Swafford has resigned, and Jencks has retired. *See Broadcasting* 5, 21 (Oct. 18, 1976).

also consider issuing a general policy statement, along the lines of the one on children's programming/advertising, outlining what it expected of licensees in guarding against sex and violence, particularly when there were significant numbers of children in the audience.

Thus the Chairman threatened action which he himself believed to be unconstitutional. He did not press the suggestion of putting questions on the license renewal forms when immediate and deep hostility was evident, but the message was clear. Something had to be done or the FCC would be forced to take some kind of action—the issuing of a policy statement perhaps being the most likely first step. Moreover, the character of the proposals was clear. As Jencks wrote in a December 9 memorandum, "FCC Chairman Wiley's early November meeting with the three network Washington Vice Presidents was followed by a meeting on November 22 with Messrs. Taylor, Schneider and other network chief executives at which he reiterated his request for the 'voluntary' adoption by the networks of a plan to place admonitions on programming not suitable for certain viewers and to follow the policy of scheduling such programming in late evening time periods."[48]

The meeting was closed with the understanding that each network would send the FCC a statement of its current standards and that a meeting between FCC staff and Broadcast Standards heads would take place to be followed by a later resumption of the meeting among those who had participated in this "Summit" meeting.[49]

15. On November 29, 1974, former Commissioner Nicholas Johnson wrote in his capacity as Chairman of the National Citizens' Committee for Broadcasting to Chairman Wiley. He asked that the Chairman "afford the National Citizens Committee for Broadcasting or other representatives of the public the right to observe any further negotiations between the Commission and the television networks with respect to so-called 'sex and violence' in programming." The Chairman's response was straightforward. He wrote: "I do not believe that any useful purpose would be served by opening these meetings to outside groups such as your own." The Chairman preferred closed door negotiating sessions with selected industry leaders, sessions which excluded the creative community, the independent television stations, representatives of public interest groups, and the public at large.

16. Within three days of the meeting in the Chairman's office, ABC forwarded two policy statements to the FCC which represented its existing policies. They did not address the Chairman's specific proposals.

The activities at NBC and CBS were more complicated. David Adams at NBC was assigned the task of drafting the NBC statement. A long meeting was held to discuss a draft on November 26 among NBC executives. The principal issue which developed from the meeting was whether to include this sentence in the NBC statement:

> Program series of a theme or nature that would be unsuitable for young children are avoided at the opening of the network evening schedule, and if an individual or special program containing material that parents might consider unsuitable for their children is scheduled in such period, the system of warnings described below will be followed with regard to that program.

The scheduling aspect of the proposed sentence represented then existing NBC

---

**48.** Wiley confirmed as did Cole that the specific proposal was for 9:00 as the cutoff point across the country, although the Adams memo refers to the proposal as being 9:00 or 10:00. Adams in his deposition testimony recalls the emphasis being on the 9:00 hour.

**49.** The FCC principals referred to the November 22 meeting as the "Summit," the November 7 meeting as the "mini Summit," and the staff meetings with Broadcast Standard heads as the "Foothill" meetings. Plaintiffs' counsel quipped that the latter term was apparently adopted on the theory that the foothills lie somewhere between the molehills and the summit.

policy. It was slightly different from the Wiley proposal in that the opening show could be less than an hour in length. Nonetheless, there was a reluctance to express a public commitment to this continuing practice largely because such a statement would limit NBC's future programming flexibility. NBC had been doing satisfactorily in the ratings by using "family" programming in its opening show. But if public moods shifted it wanted to retain the ability to change. A public commitment might lock it into a financially disadvantageous policy. As Adams put it in his deposition, "Committing to it in perpetuity is the concern."

The pressure of the Wiley campaign, however, led NBC executives to change their position. The key evidence on the point comes from a November 27 Adams memo to Schlosser:

> The section on scheduling . . . concludes with a sentence in parenthesis. Without that sentence it is the minimal statement we could make and I believe would be regarded as saying nothing. With the sentence, I believe it reflects what we are prepared and plan to do and although it might be less than expected, it will be responsive. *If the future discussions with Chairman Wiley result in a common approach by all networks along these lines starting next season, I believe we will be better served than driving the matter to regulatory action.* I would therefore vote for inclusion of the sentence in parenthesis. (emphasis added).

As Adams explained in his deposition, the regulatory action he referred to was FCC action. Indeed Adams later specifically communicated a concern to the Chairman of the NBC Affiliates Board of Delegates that there could be direct future effects on stations in connection with renewal form revisions and FCC policy statements. As he testified in his deposition:

> [S]ince a reference was made at the November 22 meeting to the possibility of adding questions in the renewal form and the possibility [of] an FCC policy statement on stations' policies in connection with scheduling or treating of programs

containing elements of sex and violence, to the extent that might happen that would have an effect on stations.

This did not mean that Adams conceded that FCC action could not be controlled in the long run but rather that the "time and trouble" would be better avoided.

The thinking of Adams is crucial. As Schlosser stated in his deposition, Adams was the "most experienced person in the company in this field" and "was more or less in charge of what we were doing . . . ." This does not mean that Adams was a sole decisionmaker. Rather as Adams testified in his deposition, final decisions "were usually made in group discussion from which a consensus emerged." But Adams' thinking in this area dominated NBC.

Adams' belief that the company would be better served by adopting an industry-wide approach to scheduling than by "driving the matter to self regulation" was shared by Schlosser and apparently by the other NBC executives. Nonetheless it was decided in the short run not to include the scheduling commitment in the statement sent to the FCC. As Adams observed, the decision was "made by discussion, consensus : . . and a conclusion was reached in which I concurred that *as a tactical matter* it was not necessary or advisable at this stage in a first submission to include that sentence . . . ." Schlosser in his deposition amplified the point:

> The language that precedes that sentence which refers to the fact that we take into account the suitability of the program for the time period in which it is scheduled really subsumes anything that would follow it. We also felt that for tactical reasons, because we had not submitted anything to the Chairman, this was the first document that we were sending, and because the conversation had always been on the basis that this would be an industry-wide commitment, and because we expected there would be a follow up meeting, we all concluded . . . we could at a later time discuss

scheduling in more detail and at this point in our first submission, we concluded that it would be better not to include the sentence, which would be a formal change of the Code of NBC's practices.[50]

The mechanics were to be worked out, negotiations were to follow, but the crucial decision had been made. NBC would support industry-wide compliance with a form of the Wiley scheduling proposal.

Ironically Wiley did not and could not know that he had succeeded in the NBC camp. The policy statement submitted by NBC to Wiley on December 2 contained no such commitment. He was frustrated by this fact and in a series of communications by him and/or members of his staff he attempted to get NBC to commit themselves publicly at least to what they were already doing. These persuasive efforts, he did not realize, were unnecessary. NBC was bargaining for industry-wide compliance; it was no longer pondering its basic course of action. The question was now one of tactics. Wiley's threats of FCC action had succeeded.

17. The FCC staff met in New York with NBC executives having program standards responsibilities in the morning of December 10, with CBS in the afternoon of the same day, and with ABC on December 11. The meetings served a number of purposes. The FCC sought to clarify its position, to achieve an understanding of how the networks would apply a new scheduling policy to specific programs, and to learn more about the program practices of each of the networks. Gene Mater, Assistant to John A. Schneider, President of CBS Broadcast Group, summarized the FCC position in a December 10 memo:

Basically, here is what they want:

Some sort of policy statement of principles issued by the three networks, in which we would, in effect, recognize our "responsibility" with regard to children. We would state that, in implementation of this responsibility, all programming before 9 PM (New York Time) would be of a type that parents could generally rely on as being suitable for viewing by the young audience. This responsibility factor would presumably apply to the problems of violence, sex and language.

Recognizing that there might be occasional exceptions to this approach, we would also agree to some type of warning notice or disclaimer, both audio and visual, to be carried at the beginning of any program aired earlier than 9 PM that might be considered questionable . . . .. The disclaimer would be standardized for the entire industry. The idea of a visual dot or triangle has been discarded.

Mater also commented on the point of how industry-wide compliance might be achieved:[51]

Regarding the independent stations, the FCC is inclined to issue a policy statement which would draw them into the same procedure the networks would use.[52] As to whether this initiative for this entire move would come from the networks or NAB, the feelings seem to be that a statement from the networks would be preferred although the NAB action would certainly be acceptable.

The FCC proposals at these meetings were also described by Paul Putney, Assistant Chief for Law in the Broadcast Bureau of the FCC, in a memorandum to the Chairman:

President of Program Practices of the CBS Television networks, said that (as Cole phrased it) "in order to get at the independents in the sense of having the rule applicable to the independents as well, that the NAB Code would be the mechanism that would have to be used."

**50.** Again the sentence represented existing NBC policy but was not part of its formal Code which was available to members of the public upon request.

**51.** Cole (the former consultant to the FCC) testified that one of the CBS representatives at the meeting said in the context of a discussion of industry-wide enforcement that, "Under no circumstances would we agree to anything which would put us under a competitive disadvantage." And Thomas Swafford, the Vice

**52.** Thus the FCC again indicated its willingness to take formal regulatory action to achieve its objectives in this area.

1. A joint policy statement by the three networks emphasizing their commitment to protect children;

2. Scheduling after 9:00 p.m. series programs which (in the judgment of the network) would be inappropriate for young children [9:00 p.m. local time was stated to be first choice, but the possibility was recognized that this may have to be 9:00 p.m. at point of origination];

3. Warnings (audio, video and in printed schedules) would be given for any material broadcast before 9:00 p.m. local time which (in the judgment of the network) was unsuitable for young children;

4. Programs broadcast at any time which would receive a warning under current standards because of the likelihood of offense to a significant segment of the audience would continue to receive such warnings; and

5. The pre 9:00 p.m. children's warnings would be a standardized symbol and text while other warnings would be specifically tailored to state the reason for the warning.

In commenting on the NBC meeting, Putney noted that "No argument was advanced that led us to think we might be headed in the wrong direction," but philosophical and practical reservations were voiced by NBC representatives. The CBS staff members reflected an "attitude quite differen[t] from that expressed by Arthur Taylor in his meeting with you on November 22." Not only were constitutional and philosophical problems raised about FCC involvement in the area, but reservations were discussed about the propriety of the discussions themselves. Discussions with ABC revealed that they had the "most serious programming problem if they adopt a policy along the lines of our proposals."

The impact of the FCC proposals on each of the networks' schedules was discussed in quite specific terms. Wiley had instructed the staff not to comment on specific shows, *i. e.,* not to express their own views on the suitability of various programs for early prime time viewing. Nonetheless, since the networks were encouraged to discuss the impact of the proposals on their own and their competitors' schedules, some expressions by the staff members were made in the give and take of discussion. These comments by FCC staff members were not perceived, however, as FCC directives but merely personal views of the staff members. This, of course, is to be contrasted with the proposals themselves. The proposals were viewed as FCC sponsored. It was clear that the details were open to discussion and negotiation. But the basic message remained clear: something had to be done to minimize the depiction of sex and violence as well as the use of objectionable language on television in the early evening hours.

18. On December 17, the FCC staff members who had met with the network executives in New York met with Chairman Wiley in his office to discuss the status of the campaign in the light of the December 10–11 meetings. Although Putney had described the FCC presentation at those meetings "as unified and (in our opinion) effective," there were by this time grounds for concern. The FCC personnel did not know that NBC had already decided to go along and certainly nothing said at the December meetings gave them any encouragement. The bright hope was thought to be Arthur Taylor, but the objections raised by CBS representatives Swafford, Mater, Kirschner, and Goldberg indicated that Taylor would have to overcome internal obstacles at CBS if CBS was to provide a constructive response. The scheduling difficulties presented to ABC by the proposals made it apparent that in the absence of movement from the other networks, ABC was unlikely to respond positively to the initiative.

The question was what, if anything, Wiley should do to generate a response. Essentially the group decided that the initiative had been made, that any further move by them would appear heavy handed, that each of the networks was aware of the approaching December 31 deadline for the FCC reports to Congress, and that no "reminder" of the urgency of the situation was

necessary. The only thing the FCC could do was wait.

On the other hand, it was apparent that the December 31 deadline was unrealistic, particularly as Cole testified in view of the time delays involved in going through the NAB Code structure. The likelihood was that it would be difficult to report anything definite to Congress by December 31. Wiley had met with Taylor the previous day in his office. When asked whether the NAB was referred to at the meeting, Wiley responded, "No, I don't think he got very specific with me, very frankly." At some point, however, Wiley and his staff got the impression that Taylor needed time and that the Code was a live possibility. Wiley, therefore, decided to ask for and ultimately did receive an extension of the deadline for the report to Congress from December 31, 1974 to February 15, 1975.

19. During the FCC staff meeting of December 17, Les Brown, a reporter for the New York Times, contacted the Chairman and interviewed him over the telephone. In the course of that interview, the Chairman indicated in response to questions that public hearings on the question of sex and violence were always a possibility and conceded that the networks would not like that possibility. The next day a Les Brown column appeared in the *New York Times* headlined "Head of F.C.C. Weighing Hearing on T.V. Violence." The article stated that Wiley "made no secret of the fact that he might use the prospect of hearings as negotiating leverage to spur the networks into adopting policies on their own to protect the young from adult-oriented programs." The Chairman was quite concerned about the article, first, because he thought it imported a threatening tone to his remarks which he did not believe had been present [53] and second, because it would appear as though he were deliberately using the press at this late hour to put additional public pressure on the networks.

20. On the same day that the Brown article appeared,[54] Wiley had telephone conversations with Erlick and Taylor in which he told them he had been misquoted. He placed a call with Schlosser, on the same day, could not get through, and after a series of missed returned calls talked to him on December 20.

The first telephone conversation was with Taylor.[55] According to Meade, a CBS vice president, Taylor in essence told Wiley, "We are not going to send you this letter right now.[56] We are working on something much more important and we need a lot of support. We don't want to muddy the waters with this. We don't want you in the act. Be patient and bide your time." Moreover, Meade continued:

> He admonished Mr. Wiley to—, I don't like to be rude, but to keep his mouth shut in terms of throwing his weight around, that he was having this jawboning and so forth . . . and the essence of what Taylor said is, "You are making it much more difficult for us,

---

**53.** This point was corroborated by Putney's deposition testimony and Cole's live testimony. Both heard Wiley's end of the conversation. Brown did not testify and his article was received as an exhibit exclusively as evidence of the fact that the statements in the article were made, were read by the defendants, and were discussed by them.

**54.** Cole's testimony as to the date of the Taylor conversation is persuasive and is not inconsistent with the testimony of the others whose recollections are less acute.

**55.** The testimony conflicts as to who initiated the conversation. Meade who heard Taylor's end of the conversation states that Taylor called Wiley. Wiley firmly insists that, after reading the Brown article, he decided to call

these networks to explain his position and that he called Taylor. Taylor does not remember which was the case. Cole testified that Wiley talked with his staff after the conversation with Taylor and before conversations with Erlick and Schlosser. The meeting was to discuss whether to contact Brown and press for a retraction. It was decided that whatever story might emanate from Brown could well add fuel to the fire and that the best response to the situation might be to contact the other two networks. Cole's testimony suggests that after receiving an outraged call from Taylor Wiley decided to call the other two networks.

**56.** This reference is apparently to the set of principles CBS had agreed to send to Wiley.

because it has to be an industry-regulated thing. We cannot have the government breathing down our neck, and, furthermore, if you continue in your present tone, you are going to make it impossible to get anything through the Code . . . ."[57]

Meade indicates that the Les Brown article came up in the conversation and "that was one of the things that Taylor lambasted Wiley with over the telephone, because it looked to us as though that was a direct conversation between Les Brown and Wiley." Taylor told Meade (who could not hear Wiley's end of the conversation) that Wiley "apologized for his activities and Taylor said to me that he thought that maybe he laid back a little bit."

Both Wiley and Taylor confirm that Wiley disavowed the Brown article and asserted that he had been misquoted; both confirm that Taylor was concerned that a CBS response at this point would appear to be a direct response to the threats contained in the Les Brown article.

21. On December 20, Wiley and Schlosser finally were able to reach each other on the telephone. Schlosser prepared a memo for the file on December 24. The memo summarized the "principal points" Wiley made. In pertinent part, the memo paraphrases the Chairman's position as follows:

> The Les Brown article in the New York Times on the sex and violence issue was not correct. Wiley did not intend to threaten the networks with public hearings. He would rather work with us to achieve a result. However, there would

be a notice of inquiry leading to some kind of policy statement if some kind of agreement cannot be reached with the networks. If the networks and the Commission "agree to disagree" then he, Wiley, would go to the "court of public opinion." He referred me to his speech before the "Dr. Parker group."[58]

The episode richly illustrates the general approach taken by the Chairman throughout. He did not want to "threaten" anyone. At the same time, he wanted the networks to know that if something constructive in the eyes of Congress, the FCC, and the public were not done, the FCC would be compelled to take some sort of action. He felt that FCC action of any type at the very least raised serious constitutional questions and would strongly prefer as a matter of policy that the FCC do nothing. But if the networks were to be so unwise as not to act, the Commission (probably but not necessarily with his support) would be forced by the circumstances (which he had created) to take action. Thus Wiley could offer "suggestions" initially caring little about the specifics of the response[59] but requiring that something constructive with public visibility be accomplished. On some occasions, he viewed himself not as personally threatening anyone but rather as offering advice as a friend concerning the consequences which would follow if constructive action were not taken. On other occasions in the heat of the campaign, he would deliberately threaten. Sometimes he would repudiate "threats." The bottom line, however, remained the same, in substance if not in tone—"Do

---

**57.** Meade's testimony thus indicates that Taylor had informed Wiley of his intention to go to the Code at least by December 18.

**58.** The Chairman's speech before the "Dr. Parker group" concerned *license renewal policy* with respect to minority involvement in broadcasting.

**59.** It was always clear, however, that violent and adult related material had to be reduced in the early evening hours. As Wiley told a subcommittee of the Committee on Appropriations, "What I attempted to do was focus the industry's attention on this problem, that the American people are concerned about the ris-

ing tide of violence and excessive sex on television, particularly during early evening hours when children are in the audience, and that *something has to be done." Hearings on Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations for 1976 Before a Subcomm. of the Committee on Appropriations of the House of Representatives*, 94th Cong., 1st Sess., pt. 6, 405 (1976) [hereinafter referred to as *Appropriations Hearings*]. Testimony such as this belies the defendants' contention that the industry rejected all of Wiley's proposals. The thrust of his policy was adopted. *See also* note 76.

something to curb 'offensive' material or we, the FCC, will be forced to take action."

Thus the Chairman called Schlosser to reassure him that the Brown article which pictured him as threatening the networks was inaccurate. Before the conversation had ended, ironically, he had delivered in substance the same threats he had called to disavow. The difference was that he had delivered them as a friend, not as a foe.[60]

22. During this same December period, CBS was groping for an appropriate response to Wiley's "initiative." At the November 22 meeting, CBS had agreed to send Wiley a statement of principles which it followed. No such statement existed, and the network's first attempt was to produce one. The process was frustrating because nothing but platitudes were produced. This was why CBS had no written set of procedures. Its mode had been to rely on the experience and judgment of its personnel in program practices. The kinds of judgments which needed to be made on a day to day basis were so diverse and variable, and were so related to questions of aesthetics that discursive law-like standards were impractical. Taylor was convinced that since judgments in this area resisted definition, an outside enforcement body was needed to police the industry—to keep it honest.

Early in the drafting process, proposed letters were addressed to "Dear Dick or "Dear Chairman Wiley." A draft of December 11 stated that: "We are also exploring various avenues of approach, including the possibility of suggesting to the NAB Television Code Review Board the inclusion of additional provisions relating to these matters." By December 17, the third draft addressed to "Dear Chairman Wiley" stated "[T]he CBS representative on the NAB Television Code Authority has been instructed to urge the adoption of the principles embodied above as part of the Television Code." Drafts four and five are apparently unavailable[61] but draft six which is dated the next day, December 18, reflects a basic tactical change. That draft was not addressed to the Chairman. Instead CBS had decided, however tentatively, to write to Wayne Kearl, Chairman of the NAB Television Code Review Board.

It is at least symbolic and perhaps much more than that that the first known draft addressed to Kearl is dated December 18, the same day the Les Brown article appeared, and the same day Taylor berated Wiley for jawboning and breathing down the necks of the networks. Taylor, to repeat his own characterization, was "outraged" by the Les Brown article. He was particularly concerned that any move by CBS in its wake would be interpreted generally as a knuckling under to FCC power. It is understandable that a corporate executive known as a "financial wizard" who was finally prepared to take a financially risky step in part in response to what he viewed as *moral* imperatives would not want to have his actions characterized as a mere expedient ploy.[62] Taylor was concerned

60. This approach was the most persuasive one to take under the circumstances. No such threat in substance was delivered to Taylor because the Chairman recognized that the CBS executive would have been further angered. No similar threat was made to Erlick because the flow of conversation did not lead to it. The whole situation suggests that Wiley's remarks to Schlosser were impromptu. He told different things to different people at different times because he himself was torn by a difficult problem. As a result, he tended instinctively to act in the most persuasive way. When it was appropriate from a persuasive standpoint to "cool it," he did. When it appeared the networks would not act, he took center stage. When it appeared that they would, he moved to the wings.

61. There were apparently nine numbered drafts. No drafts numbered four and five were discovered in CBS's search of its files. Tandem's counsel suggested that an undated, unnumbered draft (plaintiffs' exhibit 208) might be draft four or five. It is more likely that that draft was not part of the numbered series, was written earlier than draft three, but offered some language which was helpful in rewording the third numbered draft. In any event, plaintiffs' exhibit 208 is addressed to Chairman Wiley and because it is undated does not help to fix the time when the decision was made to write to Wayne Kearl instead of Wiley.

62. This is not to say that concern for government reaction in the absence of broadcaster action was not a substantial factor in Taylor's thinking. See ¶ 23.

that any additional Wiley pressure at this point would backfire. It was felt that it would hinder Taylor's persuasive attempts not only in the industry at large but within CBS itself.[63] Clearly from a public relations standpoint, it would be better for CBS and the industry if actions it took were perceived as soul searching responses to the problem of how best to provide quality entertainment on television. The existence of the FCC pressure would not be ignored by any industry executive with political antennae. There was no need, however, for additional emphasis. Instead if Wiley and the FCC could be taken out of the foreground, FCC pressure could continue to influence but not in so blatant a fashion as to make the industry look subservient and irresponsible.[64]

The Les Brown article threatened to create an industry image of subservience to the FCC and, thereby, reduce the possibility of the kind of action Taylor wanted. It is unclear whether it was the Brown article which caused executives at CBS to stop drafting letters to Wiley and start writing them to Kearl. The coincidence of the activity on the December 18 date, however, is striking.[65] The Brown article made it clear that if CBS clothed its response to the situation in the form of a letter to Wiley

the action would appear to be a response to Wiley instead of the situation. A letter directed to Kearl, on the other hand, made CBS's action *appear* to be an exercise in industry self-regulation.

Between December 17 and 19, seven consecutive drafts were prepared. CBS, at that time, did not know that the December 31 deadline for the FCC report to Congress would be extended, but did know that the Commission was scheduled to meet on Friday, December 20, to consider its action.[66] By December 19 the ninth and final draft[67] was completed. The timing and intensive character of the drafting activity belies any suggestion that the CBS response was not prepared under the gun.[68]

23. Although the Taylor letter was not presented to Kearl until December 30, the actual decision to send it was made before Christmas. Meade was in charge of the CBS staff work on the proposal "to see whether or not the Code idea was a feasible way of implementing this idea. And we were discussing it night and day at the time." He interrogated the principal CBS executives involved and "[a]long the line somewhere I told Taylor that all votes were in, and it was feasible. We should go with it."

---

**63.** The two were, of course, related. Support for the action within CBS depended (as a necessary, albeit not sufficient condition) upon industry-wide acceptance. Such acceptance was critical if Taylor were not to once again face financial losses of the magnitude associated with the initiative he had sponsored in children's programming.

**64.** Taylor, of course, does not concede that the FCC pressure had any effect.

**65.** Taylor's recollection, which is hazy, is that the decision to stop writing to Wiley and to write to Kearl were unconnected and that different drafting of materials was going on at various levels of the company. This recollection is difficult to reconcile with the fact that numbered and dated drafts start out addressed to Wiley and end up at drafts six through nine addressed to Kearl. Perhaps some people were still writing unnumbered drafts to Wiley at the time drafts were being written to Kearl (*i. e.*, they had not gotten the word) but the consecutive numbering of the drafts suggests a coordi-

nated process at the decisionmaking level of the company.

**66.** Wiley decided on December 17 to ask for an extension and received informal word sometime on the 18th or 19th that an extension of time was agreeable. On December 19 a letter was sent from Wiley's office to Senator Pastore formalizing the Commission's intention to delay the report.

**67.** Two references to the Code Authority were changed to read "the Code Board" in the letter as finally sent, but for all intents and purposes the ninth draft was final.

**68.** That conclusion, of course, is not inconsistent with the idea that Taylor, as opposed to other CBS executives, favored the proposal in*dependent* of FCC pressure. Moreover Taylor's commitment to do what he thought was right did not preclude a desire on his part to act when it would be most politically advantageous.

On December 19, Meade wrote a memo to Taylor: "Attached is the latest, and I hope final, draft of the Code letter . . . . Swafford . . . believes that the best tactic would be for him and Mr. Jencks to carry the draft to San Antonio Monday, December 30."[69] The next day, Taylor wrote back, "This is Fine—Let's Get Everything Ready To Roll." On December 23, a meeting of CBS executives was held to consider the letter to Kearl. William Paley, Chairman of the Board of CBS, Inc., was present at the meeting and Taylor explained that a draft policy had been adopted and presented for his consideration. In explaining the proposal to Paley it was emphasized that Wiley had responded to congressional directives to report back to Congress by December 31 and

> That his response had been to initiate this series of meetings with the networks, urging them to undertake self-regulation on the subject and that . . . the policy adopted, which was being explained to Mr. Paley, *was calculated to meet those concerns, to satisfy the public that we had done something, and along the way to satisfy the Congress and the FCC that we were being good citizens.*

The rationale for the proposal was thus presented not in terms of moral imperatives but rather in terms of corporate response to public, congressional, and agency pressure.

Similar justifications were presented to Kearl by Swafford and Jencks when they finally delivered the letter to him in San Antonio.[70] As Jencks testified in his deposition:

> Well, none of us know whether, if at all, there might be anything issued from the FCC, although there had been these

threats and those repeated in the article of Les Brown's that you were questioning me about.

> I am sure that in talking to Mr. Kearl we couldn't help but point out that in our judgment, industry self-regulation was a better alternative than some threatened and as-yet-undefined and legally questionable, perhaps, but possible, federal intervention.

Taylor, at the December 23 meeting, in explaining the proposal to Paley referred not to his own feeling that the depiction of televised violence had gone too far but rather, as Jencks testified, "to the interest of Congress in that; the interest of Chairman Wiley in it." When the court finds that advocates as skilled as these attempted to justify their proposals in terms of avoiding federal regulation, it is hard to accept the idea that the fear of federal regulation was not a powerful factor at large in the minds of most broadcasters during the period in question. Swafford's deposition testimony as to Taylor's state of mind is revealing:

> Q. Prior to January 7th, did any of the CBS executives express to you an opinion that if the networks and the NAB did not act, that there would be government regulation?
>
> A. Yes. Taylor said that.
>
> Q. When did he say that?
>
> A. I don't recall an exact moment at an exact meeting but it was his firm conviction that, as he read Congress, as he read Wiley's reaction to Congress reacting to public clamor, as he read that he felt there would be some kind of government action.[71]

---

**69.** Although Swafford had concurred with the idea, Meade had in fact originated the "tactic."

**70.** Kearl remarked that the dramatic act of flying to Texas to deliver the proposal rather than to rely on the mails was "good theatre."

**71.** Taylor also referred to public concern with respect to the question and personally may have been more concerned with the possibility of congressional action. Taylor conceded at the trial that in a telephone meeting of the CBS

Television Network Affiliates Board of Directors on January 3, 1975 he had made the statement that if the industry did not show concern for children in the early evening hours, action "likely would be taken in the form of Congressional legislation." Taylor recalls the minutes are in error when they fail to report that he also gave other more "important" reasons but also affirms that "I was concerned and continue to be concerned about Congressional action in this area."

24. On December 30, the same day that Swafford and Jencks delivered the letter to Kearl, NBC issued a press release which stated that its current schedule "reflects the policy of opening its prime time programming with series suitable for family viewing . . . .. NBC intends to continue this policy, whether or not the NAB Code is amended to include a provision along these lines." [72] The timing of the NBC release was, of course, dictated by the CBS initiative. Adams in a December 30 memorandum to ten NBC executives observed, "[T]he timing of the statement was prompted by the fact that this morning CBS representatives delivered to the Chairman of the Code Review Board a letter from Arthur Taylor . . . .."

Thus, as of December 30, NBC was committed to a family viewing policy in its opening program but not in the opening hour of prime time. CBS was committed to a family viewing policy if, but only if, the NAB adopted a Code amendment.

On January 2 or 3, NBC issued another release, dated January 6, in which it announced that it "plan[ned] to devote the first hour of its prime time network schedule to programming suitable for general family viewing." Adams, in describing the process leading to the change from the first *program* to the first *hour* testified that, "I think I recommended to Mr. Schlosser, who was in California, over the phone and suggested to Mr. Goodman that it was now time for us to take the additional step of going beyond a policy of the first program to a policy of the first hour . . . .. CBS had proposed that as a matter of code amendment and I thought the tactical reasons for deferring were no longer valid." Thus the NBC press releases announced a decision already secretly made [73] and timed to meet the tactical demands of public relations skirmishing.

Interestingly CBS was prepared to give the other networks whatever public relations advantages it could. The company made a conscious decision, as Meade expressed it in a memo to Paley and Taylor, "to avoid publicity, to avoid taking a front position, to eschew credit," and to refuse "to comment on the substance of our letter to the Code Board." This low profile was not struck out of any sense of corporate beneficence to its competitors. Rather it was designed to minimize the possibility that inter-corporate jealousy would block adoption of the proposed NAB amendment. As Meade put it, "We are very happy with this absence of public attention (and controversy), since the main objective is to gain Code provisions that all three networks will live by, thus eliminating competitive advantage."

25. On January 7, the Code Board, pursuant to a request of CBS, met in special session to consider the CBS proposal. Kearl started the meeting by calling on Swafford, CBS's representative on the Board, to speak to the proposal. The address given by Swafford attempted to justify the proposal not in terms of the desirability of protecting children from televised violence or in terms of the intrinsic desirability of curbing abuses. Instead the speech spoke to the dangers of government censorship. The speech outlined past government censorship attempts and argued that the danger of censorship was particularly acute because the liberals who would ordinarily oppose censorship efforts, were on the bandwagon to combat the presence of violence in the media. Swafford contended that this unusual coalition of liberals and conservatives read in the light of history "tell us that it's imperative that our industry take positive and immediate action." Specifically Swafford told the Board that:

---

72. In this respect, NBC policy differed from CBS. CBS had conditioned its adoption of the family viewing policy on NAB approval, although CBS later decided in internal meetings (after ABC and NBC had announced support of family viewing) to support family viewing whether or not the NAB adopted the policy.

73. The decision discussed in ¶ 16 apparently related to the first program, rather than the first hour, but Adams' testimony suggests that NBC at that early point was prepared to go further for the same reasons. The question became one of timing and tactics, not policy.

A Senator has told the Chairman of the Federal Communications Commission in so many words: "Forget about the First Amendment; we'll let the courts worry about that."

During the conversation we at CBS had last month with members of the FCC staff, they told us quite bluntly that when they say to members of Congress that the Commission does not have the power to censor program content, they're asked: "What do you need? Tell us what you need, and we'll give it to you."

After the Swafford speech, the meeting progressed with discussion from various members of the Board. At some later point, however, Grover Cobb, now deceased, but then the Senior Executive Vice President for Government Relations of the NAB, arrived at the meeting to give a report from Chairman Wiley. Cobb in part stated, according to Al Schneider, ABC's representative to the Code Board, that the Chairman applauded the actions of CBS and NBC and anticipated a similar statement from ABC. Cobb reported that the Chairman wanted the NAB to act as the machinery or the mechanism to oversee compliance with the newly announced network policies since statutory restrictions inhibited him from doing so. Thus, from the very outset of the official NAB deliberations, FCC involvement and encouragement of NAB adoption and enforcement of the family viewing policy was in evidence.

At the meeting, NBC and ABC network representatives made comments which raised a number of questions about the necessity for Code action. Three local station representatives led by Bob Rich of the NBC affiliate in Duluth questioned whether or not "we would appear to be knuckling under to government pressure." Only Jorgenson spoke strongly in favor of some form of action. The meeting ultimately "disintegrated" into a shouting match over the potential application of the family viewing policy. In one particularly inelegant display of competitive fervor, the ABC representative upon learning that CBS did not know how the proposed policy would apply to "All In The Family" retorted, "Well, if you are not going to move the goddamn program, we are not going to move the goddamn 'Rookies.'"

Swafford sensed that passage of the CBS proposal was not at hand and succeeded in engineering a delaying resolution. It directed the Program Standards Committee "to review and to make recommendations affecting (1) principles relating to the scheduling of programs in early evening prime-time periods and (2) the use of suitable advisory legends as to the nature of program content." It was "agreed" that the resolution "[did] not commit the Program Standards Committee to recommend any specific action," but committed it only to presenting a report to the Television Code Review Board during the NAB convention in April, 1975.

26. On January 8, 1975, ABC announced that "the first hour of each night of its prime time network entertainment schedule will be devoted to programming suitable for general family audiences starting with the new television season in the Fall of 1975." There is no question but that the timing of this announcement was influenced by the imminence of the January 9 meeting. That point was conceded by Rule in his deposition. But Rule qualified the admission by stating that "[T]he meeting itself did not dictate the conclusions. It merely dictated the timing of the announcement."

Yet the ABC officials are remarkably unable to describe in any detail the conversations which led the company to adopt the policy. But few contemporaneous writings have been produced, and the officials themselves have come forward with only occasional bits and pieces concerning the company's deliberations. They apparently ask the court to believe that ABC's adoption of this policy was part of an evolutionary process in which ABC over a period of years had studied the question of what to do about violence and adult material on television and suddenly free of pressure from the FCC decided one day in January of 1975 to adopt the family viewing policy.

Erlick described the process in a more realistic fashion:

This discussion had been evolving over a period of five, six, seven, eight weeks since the early Wiley meetings, and I think we were all slowly coming to the conclusion that this was going to be the way it was. It was simply a way of crystallizing it.

Although the ABC officials do not recall that FCC pressure played a significant role in their decisionmaking, the court finds it difficult to conclude otherwise. Among the factors pointing to the potent influence of the FCC are the testimony of Commissioner Johnson as to the amount of pressure generated by the Wiley initiative, the continuous interaction between FCC and ABC representatives, the timing of the announcement, the fact that ABC (according to most of the witnesses who considered the issue) had the most to lose by joining the venture (in terms of scheduling changes required), and the failure of ABC officials to offer any convincing counter explanation. Most important, however, is that the January 8 announcement itself recognizes that the fear of government action was a substantial factor in ABC's thinking:

*We wish to emphasize the necessity to preserve the basic rights of freedom of expression under the Constitution and under the Communications Act.* Government action in the area of program content must be both cautious and carefully limited lest we do permanent damage to the principles of free expression which are so fundamental in our society. All *Americans recognize, we are sure, that these are sensitive and fragile concepts. Accordingly, ABC strongly supports the concept of industry self-regulation.*[74]

This is not to suggest that fear of government action was the only factor in ABC's decision. Public relations seems to have played an important role. NBC and CBS had already declared their approval of the family viewing principle. ABC was reluctant to stand alone. One of the significant risks of going it alone, however, was the risk of government retaliation. ABC was unwilling to bear that burden. There is, moreover, precious little evidence to support the notion that ABC's decision had anything to do with a concern for programming in the public interest. Reflecting the programming approach which dominated the industry, ABC approached the question from the perspective of a "responsible" businessman, not from the perspective of an independent trustee making programming decisions in the public interest. While other considerations also appear to have played a role in ABC decisionmaking, the court nevertheless can only conclude from the evidence before it that here as in the case of CBS and NBC, FCC pressure was a substantial factor in ABC's adoption of the family hour policy.

27. On January 9, 1975, Chairman Wiley and his staff met again with the same network executives who had attended the November 22 meeting. In addition, however, Vincent Wasilewski, the President of the NAB, and Grover Cobb were in attendance on the invitation of the Chairman. Taylor had attempted to have the meeting cancelled on the ground that it was unnecessary, but Wiley was anxious to facilitate an expeditious adoption of the family viewing policy, to clarify certain features about it, and to encourage that the policy be extended to the first two hours of prime time.

With respect to the timing of the NAB actions, Wiley asked Cobb and Wasilewski if there were any way to secure NAB Code Board approval prior to the NAB convention in April. In doing so, he referred to the Commission's obligation to report to Congress in the middle of February and, as Cole recalls it, said in substance that "the more that he could report back in terms of the developments from . . . the Chairman's point of view, the better." Wasilewski had no difficulty in characterizing Wiley's conduct:

Q. Did you consider Chairman Wiley to be jaw-boning in the area of sex and violence the early evening hours and family viewing?

---

74. Similar statements were made by Rule in later justifications of the policy.

A. Yes.

Q. And that was jaw-boning both as to the networks and to the NAB.

A. Yes, that would be my characterization.

Wasilewski and Cobb agreed to investigate the possibility of expediting NAB action.

Second, Wiley, at a point near the end of the meeting, argued, as Adams recalls it, that "[I]f there were to be a provision with regard to the first hour of network entertainment scheduling, it didn't make much sense not to have the preceding hour also considered as subject to the same policy." Cole testified that the parties agreed to consider the position.[75]

The FCC did, however, receive some more definite commitments from the networks at the meeting. The networks agreed that their policies did not mean that "anything goes" after 9:00 and that programming suitable for family viewing necessarily meant programming suitable for young children.[76] CBS affirmed that its proposal did not envision prescreening by the NAB.[77]

Once again the necessity for an industry-wide policy was discussed. Taylor, according to Jencks' testimony, advocated the view that "[S]ome independent authority, namely the Code authority, ought to be an arbiter or ought to be able to pronounce what the correct interpretation of the Family Viewing provision was in case any network departed from the correct interpretation." In short, the networks would agree to delegate their decisionmaking as to what was and was not proper programming to the Code Board in order to prevent deviations from the rule. Adams recalls that once the prescreening issue had been cleared up, he had no objections to an NAB amendment, but at the meeting itself he argued that broadcasters ought to indepen-

75. Cole's memory has consistently been remarkable and although sympathetic (in some cases unduly sympathetic) to the FCC, he has been an honest witness. Adams has a vague recollection, however, that the networks at that point agreed that Wiley was correct in recommending that the additional hour be included. Perhaps Adams' recollection relates to the fact that the networks agreed that any network programming prior to the 8–9 period under the prime time access rules would adhere to the family viewing policy. Adams' recollection may also be influenced by the fact that he personally had agreed that the preceding hour was to be included if the policy were to make sense. An Adams memo of January 10 supported the idea that the preceding hour should be included if an NAB amendment were to be adopted. It, of course, was an easy step for the networks to take. If they were going to be bound by the policy, it was easy for them to see why their competitors should also be bound.

76. Wiley argued at trial and the parties persist in the contention that because he had not advocated a "family" viewing policy, the networks had not really adopted his proposal. That argument confuses labels with substance. Wiley had never argued that the early evening hours should be programmed with material for children only (e. g., a cartoon hour). Nor did the networks mean that in having a family hour that material unsuitable for children would be presented. Each of the policies envisioned programming appropriate for adults and children in the early evening hours. To the extent there is a difference, it relates only to a focus upon attended rather than unattended children

watching television. That difference was never pressed by Wiley; it hardly justifies the conclusion that the Chairman's scheduling proposal was rejected. Its basic thrust was adopted. See note 59. The family viewing policy pledges that during the early prime time hours, material inappropriate for children will not be broadcast. That is what Wiley sought with his scheduling initiative. One significant difference between the proposal as adopted and that advocated by Wiley was that the 9:00 time period was not fixed uniformly across the country. Instead since the midwest received programming originating from New York, the policy applied there to the hours between 6:00 p.m. and 8:00 p.m. Wiley had early recognized that this might be necessary and was always willing to accept it as a compromise. See ¶ 13. Another difference was that no joint network statement of principles was ever produced. That too, was negotiable, however, and the NAB route had been suggested as a desirable approach by the Commission from the outset. See ¶¶ 9, 13.

77. This point was crucial to industry-wide acceptance. NBC particularly was unalterably opposed to prescreening. On the other hand, since the NAB might determine after the showing of a first show in a series that the concept of the series itself was inappropriate for general family viewing, the effect of the determination is difficult to distinguish from prescreening. Syndication efforts, for example, would be made more difficult.

dently decide on their programming and that it might be better to wait to see how the policy operated in practice before resorting to the Code. Adams, of course, believed that industry-wide acceptance was desirable, but he was not yet prepared to accept NAB enforcement. He was not vigorously opposed to something in the Code, however, provided that broadcasters retained the ultimate decisionmaking power.

Chairman Wiley, of course, made clear that the adoption of the family viewing policy in the Code would be (as Cole put it) "a good first step" and in response to a request from one of the network representatives agreed (as he had in the November 22 meeting) to contact INTV and PBS representatives.

28. The Wiley request that the NAB adoption process be expedited bore fruit within the week. On January 15, the NAB Television Board of Directors met in Palm Springs. Wasilewski had been asked if the T.V. Board could approve the family viewing policy without prior recommendation from the Code Board. Wasilewski observed that the T.V. Board simply would not rush into acceptance of the policy, but he did resolve to see what could be done to expedite the process. Spurred by Wasilewski and some effective lobbying by CBS's T.V. Board representative Jencks and by the FCC staff, the T.V. Board passed a resolution which provided in part that:

The Television Board of Directors of the NAB commends the three television networks for their individual actions with respect to programming in the initial hour of network prime time. At the same time, mindful of the keen interest in the subject, the Board recommends that the Television Code Review Board direct its Program Standards Committee to expedite as much as possible its review and recommendations affecting (1) principles relating to the scheduling of programs in early evening prime time periods, and (2) the use of suitable advisory legends as to the nature of program content.

. . . . .

The Board requests the Television Code Review Board to meet on or before, February 15, 1975, to consider these recommendations.

The influence of Wiley could not have been more apparent. The "request" that the Code Board meet in February rather than in April was specifically calculated to elicit Code Board action prior to the Commission's report to Congress.[78] Moreover the motivation for positive action to curb the broadcasting of "offensive" material was equally apparent. As Jencks recounted, "My recollection is that Mr. Wasilewski did generally support the view that this was an instance in which industry self-regulation through the NAB would, in his opinion, avert possible government action." Moreover it was FCC action that Wasilewski was referring to although Jencks does not recall "whether anybody ever set forth to predict in so many words just what the FCC might do beyond a hearing or notice of inquiry, or whatever." Wasilewski told the Board that he had assured Wiley that he would inform the Chairman of the results of the meeting and did so immediately after it concluded.[79] Although the principals do not recall the meetings,[80] calendars reveal that Wiley and Secrest met with NAB officials frequently

---

**78.** As John Summers, the general counsel of the NAB put it, "Obviously . . . the resolution, as I read it, was designed to ensure that the Code Board did something one way or the other, before that report was submitted to Congress . . . .. I don't recall anybody, specifically . . . saying that. I suspect that was understood by everybody."

**79.** The defendants make much of the fact that the FCC staff and Wiley did not personally contact the non-network members of the Code Board or T.V. Board. Such contact was unnecessary since Wiley's message was delivered through his contacts with the networks and with NAB officials, through press reports, and through his public speeches. The representatives of the Boards were not hermetically sealed off from the rest of civilization.

**80.** The recollection of Secrest of matters relevant to this litigation has been consistently poor.

to discuss the political realities of effecting a Code amendment.

29. On January 28, the Program Standards Committee of the Code Board met to consider the role of the NAB with respect to the family viewing policy. The Committee was composed of three network representatives, Swafford (CBS), Schneider (ABC), and Hermino Traviesas (NBC) together with Rich, the representative from the Duluth NBC affiliate. The Committee could not agree to do anything more than pass this resolution:

> Because several constructive proposals were proffered as to the approach to be taken by the Television Code Review Board in response to the NAB Television Board of Directors' resolution, the Program Standards Committee recommends that the same be presented to the full Television Code Review Board for its review and resolution.

That innocuous resolution masked a bitter set of differences.[81] CBS, of course, was very much in favor of NAB Code enforcement. Both NBC and ABC were opposed to NAB enforcement but were willing to support some type of NAB statement of principle. ABC favored a resolution which would have provided in part that during "the first hour of network entertainment programming in prime time and in the immediately preceding hour, broadcasters devote their schedules to programming suitable for general family audiences." The principles declared in the resolution would not be enforced under the NAB Code but instead the NAB would "use its leadership to further the objectives of this policy in encouraging industry-wide adherence."

NBC proposed that language be placed in a "Supplement" to the Code: "Entertainment programming inappropriate for viewing by family audiences should not be broadcast during early evening time periods, including the first hour of network prime-time programming." The NBC proposal similarly eschewed NAB enforcement, "[T]he suitability of programming to time periods . . . are matters for judgment solely by the broadcaster on a case-by-case basis." Thus both ABC and NBC were unwilling to delegate their authority to make programming decisions to outside authority. Schneider put it crisply, "I don't want [Code Authority Director] Stockton Helffrich programming our network."

Swafford responded by pointing out that "[A]ll of us had surrendered that kind of authority to the Code authority in subscribing to the Code." The discussion evolved, as had the January 7 Code Board meeting, into a battle over specifics. Schneider pressed Swafford to tell what CBS planned to do with "All In The Family." Once again Schneider warned that if CBS did not move "All In The Family," ABC would not move the "Rookies." As Swafford points out, by this point the two shows had become "shorthand for sex and violence." They had become symbols of broadcaster good faith in applying the family viewing concept. But in keeping with CBS's strategy, Swafford refused to discuss the application of the policy.[82]

Rich emerged at the meeting as a critic of each of the network policies. He announced that he was dead set against government intrusion. He criticized the fact that the proposal as applied in the midwest would be applicable from 6–8 p.m. instead of 7–9 p.m. (because of the feed-in from New York) and did not see how the networks could justify a protective policy which did not apply to one-third of the nation's children. Essentially he asked, as Schneider's notes record, "Why not tell Wiley no?" The answer, as Schneider's notes also reveal, came from Swafford, "Commis-

81. Swafford described the exchanges at the meetings as "almost vicious." "The only thing we could agree on at today's meeting of the Program Standards Committee of the Television Code Review Board was that we could not agree."

82. CBS believed that discussion concerning the specifics of the policy as applied could only lead to competitive wrangling which would hamper adoption of the policy. Thus it was deliberately left abstract and vague.

sion would regulate if we did not come up with something." [83]

30. On February 4, 1975, the Code Board met in the NAB Building in Washington, D.C. to consider the role of the association with respect to the family viewing policy. Each of the members of the Board was acutely aware of the imminence of the FCC's responsibility to report to Congress. As Wasilewski conceded, the report of the FCC was a "catalyst for us to take positive action in a reasonable vein prior to [its issuance.]" Accordingly, quite unlike the bitterness and divisiveness which dominated the Program Standards Committee meeting, the Code Board meeting was marked in Wasilewski's judgment by "a dedication of purpose . . . on the part of everybody concerned to reach a satisfactory solution between and among" the nine members of the Board.

Nonetheless, the substantive differences between ABC and NBC, on the one hand, and CBS, on the other, had not been resolved between January 28 and February 4. ABC and NBC continued to oppose Code enforcement. Schneider, the ABC representative, had been instructed by ABC management to try to get the ABC proposal accepted at the Board meeting. Traviesas, the NBC representative, came to the meeting with a statement, prepared by Adams, which again reiterated NBC's position that the interpretation of the family viewing proposal should be made by the individual broadcaster, not by the NAB.

CBS was unyielding, however, in its resolve for NAB enforcement, and it appeared that a majority of the Board favored the CBS approach. To be sure either NBC or ABC could have killed the proposal, since as a political matter, the NAB Board would be reluctant to adopt an amendment with which one of the three networks would be unwilling to abide. But neither NBC nor ABC was willing to kill the CBS proposal.[84] Instead both ABC and NBC voted for a proposal which ceded far more power to the NAB than they thought was appropriate.[85]

The FCC and CBS had successfully maneuvered the two networks into a position where blockage of the proposal had become unthinkable. To block the proposal two weeks before the FCC's report to Congress would have required a degree of political masochism rarely displayed by large corporations. Here apparent corporate political benefits clearly outweighed corporate political risks. The contention that this grudging support of the NAB Code amendment arose independently of the substantial pressure generated by the imminence of the FCC report is not credible. In the absence of Wiley's statements at the January 9 meeting, no February Code Board meeting would even have been held. In the absence of the pressure generated by the prospect of the FCC report to Congress, and the

---

**83.** Many of the CBS witnesses now contend that they were never concerned about FCC action because they knew the FCC had no power, although they concede that they were concerned about Congress. They do not explain why they believed that the FCC would not act. In fact, the evidence reveals that fear of regulation from either source was a substantial factor in their thinking.

**84.** The specific language of the CBS proposal was not adopted. Its substance was. In addition, the hour immediately preceding the networks' first hour of programming was added to the CBS proposal. CBS took no firm position on the issue. ABC and NBC favored the addition.

**85.** The question was put to Schneider:

Q. The ultimate outcome was something more binding than ABC wanted in terms of

the regulatory mechanism of the NAB, is that correct?

A. Yes.

Adams' testimony was similar:

Q. What was the nature of the NBC feeling as to government reaction if the NBC position were seen as trying to kill the family-viewing hour proposal altogether?

A. We had taken a position, Mr. Saferstein, that with the recognition that the code authority would not be the agency for making judgments on programming, we were for a code amendment. That was a truthful position and we genuinely sought thereafter to perfect language to state that principle and that objective in the most appropriate terms suitable to the code context. Having taken that position, we did not want anybody, including the janitor, to feel that we were surreptitiously backing off a position which we had genuinely taken.

threats as to what it would contain, NBC and ABC would not have delegated their programming authority to the NAB. No other credible explanation for the shift in vote from January 28 to February 4 has been provided.[86]

31. On February 19, 1975 the Commission submitted its Report to Congress. *See Report on the Broadcast of Violent, Indecent, and Obscene Material,* 51 FCC2d 418 (1975). Significantly the Report did not do what the congressional committees had asked it to do: to determine what its powers were "in the area of program violence . . .."[87] Instead it reported that "Regulatory action to limit violent and sexually-oriented programming which is neither obscene nor indecent is less desirable than effective self-regulation, since government-imposed limitations raise sensitive First Amendment problems." 51 F.C.C.2d at 420. But the Commission carefully refrained from deciding whether those problems were merely issues which would have to be resolved in the courts or whether the First Amendment, in the judgment of the Commission, constituted a bar to regulation. Instead the Commission after reviewing the policy statements issued by the networks, and the action taken by the Code Board, and characterizing them as "commendable," *id.* at 422, concluded that, "This new commitment suggests that the broadcast industry is prepared to regulate itself in a fashion that will obviate any need for governmental regulation in this sensitive area." *Id.*

The Commission thus refused to delineate what powers, if any, it thought it had in this area.[88] By doing so, it preserved its option to threaten governmental action while simultaneously recognizing that any action it might take would involve First Amendment difficulties.

32. The Code Board action technically was only a recommendation to the NAB Television Board of Directors. Nonetheless Wasilewski had informed Wiley before and after the Code Board meeting that the recommendation of the Code Board made the likelihood of adoption by the Television Board "very great." Indeed the Commission itself reported that, "The Commission has no reason to expect that the Television Board will reject the proposal of the Television Code Review Board." The Chairman was unwilling to rely on high probabilities, however, neither was he unmindful of his commitment (made to the networks at both the November 22 and January 9 meetings) to do what he could to secure acceptance of the family viewing policy by the independents and the public broadcasters.

The first step in the effort consisted of two public speeches. The first was given to the National Association of Television Program Executives on February 10, 1975; the second to the Radio and Television Commission of the Southern Baptist Convention on February 13, 1975. The speeches paraded the now familiar theme:

A number of interested citizens and some members of Congress contend that the problem of violence on television is so serious as to warrant some remedial action by the Federal Communications Commission. While I understand and share such concern, I cannot agree that specific governmental regulation in this highly sensitive First Amendment area

86. Adams' recollection was that Traviesas became convinced at the meeting that no pre-screening would take place; however, NBC had become convinced of that at the January 9 meeting. That factor was understood long before January 28. It could not have contributed to the change of vote at the February 4 meeting. Even if it somehow played a role, it is difficult to discount the predominant influence of the FCC pressure. Surely FCC pressure had more to do with these decisions than dramatic flourishes of letters on a table in long forgotten meetings or any long range views concerning the evolution of broadcaster responsibility in the twentieth century.

87. The Commission was also asked to delineate its powers in the area of obscenity. It did announce its intent to recommend some new legislation in the area.

88. The Commission did not launch a notice of inquiry or rulemaking which, of course, would be a prerequisite for any adoption of new policy. See section IIIB2.

would be desirable *at the present time.* Instead, my view has been that the FCC—*in the discharge of its public interest responsibilities* and consistent with its authority under the Communications Act—can play a constructive role *at this point* by focusing increased industry attention on the issue and by encouraging the consideration of self-regulatory reforms. (emphasis added).

And to insure that the threat of regulatory action would not be hidden in carefully qualified language, the Chairman went on to make the connection explicit:

Recent events make it appear that our initiative has been successful and that the broadcast industry intends to regulate itself *in order to obviate the need or demand for governmental action in this area.* (emphasis added).

The passage is significant for two reasons. First it concedes that the fear of governmental action played a predominant role in the decision of the networks and the Code Board. Second, it sent a clear message to the Television Board.[89]

33. On March 24, 1975, the Chairman and members of his staff met with Herman Land, the president of INTV (the Association of Independent Television Stations) to discuss the application of the family viewing policy to the independent stations. As Land explained during the course of the meeting, the independents had a number of concerns. First, they viewed the policy as a network attack on them.[90] They could not understand a policy which permitted the networks to program "rough stuff" from 4–6 p. m. when millions of children watched television, but prohibited the independents from broadcasting similar material during the most crucial hours of their program day, *i. e.,* 7–9 p. m.[91] If any changes were to be made, Land felt the whole schedule should be looked at, not merely the two prime time hours. Moreover he was concerned about the First Amendment implications of the venture, about the difficulties of defining family viewing, and about the imposition of a network standard of propriety into a broadcasting system which emphasized diversity at the local level. Finally, of special and pressing concern, was the problem of contractual obligations already assumed by independent stations. Some stations were already committed under long term contracts to show programs which would probably not meet the Code Board's proposed requirements. If an amendment were passed which did not at least take this fact into account, some independents would be forced into violating contracts or withdrawing from the Code. Land informed Wiley that INTV would ask the T.V. Board to delay action so that INTV would have time to prepare an alternative proposal. Land stressed he did not oppose family viewing in concept but felt that it presented serious problems for independent stations which needed accommodation.

Needless to say Wiley was anxious to blunt any organized opposition to the adoption of the NAB amendment.[92] He

---

89. Again the NAB makes much of the fact that Wiley did not personally approach the members of the board. It is ironic that the NAB would forget the important role the mass media can play in the communicative process. The industry press reports the speeches of the Chairman; the industry reads the trade press; and public speeches by the Chairman can therefore serve an important persuasive function. See ¶ 11.

90. Land felt it was unfair that the independents had been left out of the discussions. This feeling was not unique to the independents. See ¶ 29.

91. The hour 7–8 was particularly important for the independents because given the practical impact of the prime time access rule they were not faced during that hour with network competition in entertainment programming. The hour 8–9 was important because many independents began movies during that period. Land also felt that the time zone policy in the midwest worked to the disadvantage of the independents.

92. Earlier Wiley had met with Wasilewski to discuss the problem created by the independents.

Q. Did Mr. Wiley indicate that he would use his efforts to persuade Mr. Land and INTV to join in the family hour proposal or to cooperate with the NAB proposal?

A. My recollection is that he was going to jawbone with them.

resorted to a familiar strategy. He told Land that he and his organization were free to do whatever they wished with respect to the NAB Code but the Chairman would report the results to Congress.[93] Wiley, however, sympathized with the contracts problem of the independents and indicated that an accommodation to the independents on that score would not "cause any concern." [94]

34. On April 8, 1975, the Television Board met in Las Vegas and adopted the recommendation of the Code Board along with an amendment in the form of a grandfather clause designed to minimize the contract problems of the independents.[95] The Board had tendered Land a special invitation to address the meeting and Land, referring to his contacts with Chairman Wiley, explained the contract difficulties faced by members of his organization.[96] The meeting was characterized by a series of proposals and counterproposals, but, as expected, the substance of the Code Board recommendation was adopted. Perhaps the most cogent analysis of the politics of the situation was presented by Jencks. In a memorandum distributed to a number of CBS executives, Jencks remarked that, "Despite the 11 to 4 [97] key vote in favor of the Family Viewing proposal it would be fair to observe that a substantial majority of the members of the Code Board [98] would, in my judgment, have voted against the proposal if they could have done so on a secret ballot. They regarded themselves as forced by circumstances to recognize a *fait accompli*."

During his deposition, Jencks elaborated: I don't know that I was really using an apt word or phrase to talk about "secret ballot" because these men are not . . . weak . . . and they are not afraid to take positions. I think what I really meant was that as an original question, if it were tabula rasa, and out of the blue, and no history to this, and no public outcry, and no Commission involvement, no Congressional committees, no network unilateral proposals—if you had asked them "Well, shall we amend the Code to incorporate Family Viewing?" that for a variety of reasons that probably a majority of them wouldn't have done so.

In other words, I think some came along really because they felt with all the fuss and feathers that had preceded this event that they really had no choice but to go along as long as the three big networks were already committed to it, as long as it was obvious that the NAB was willing to take on the responsibility and so forth.

In short, by April 8, 1975, there was to be no turning back. Wiley had worked with Wasilewski and Land to put out the only potential political fire. Once again the spectre of governmental involvement was in evidence at the meeting. Perhaps the point was best made by Television Board member A. James Ebel, who in closing his remarks about the difficulties associated

---

93. The Chairman was under no obligation to report Land's activities to Congress. The warning, however it may have been phrased, and however friendly the tone of voice in which it was delivered, constituted a threat pure and simple.

94. Land later that same day met with Wasilewski and returned to meet again with Wiley. The FCC and the NAB clearly were cooperating to solve the problems posed by the independents.

95. The Television Board also added a general clause cautioning against the exploitative use of warnings.

96. A similar presentation was made by James Terrell, the Chairman of INTV.

97. The actual vote was 12–3, but although Jencks' arithmetic faltered on this occasion, there is little reason to doubt his overall judgment. During the period from January through April he had personally approached each of the members of the Television Board on more than one occasion in an attempt to lobby for the CBS proposal and was well aware of their views.

98. In context it is clear that he is referring to the Television Board.

with Code involvement, stated that, "This will be an extremely difficult undertaking. But the problems will be simple compared to those that could be generated by Congressional mandates, FCC rules and Renewal challenges brought on by excesses in the area of violence and obscenity."

■ 35. The Commission contends that even if Chairman Wiley had been guilty of any wrongdoing, his actions were "personal" in character and should not be construed as agency action by, or on behalf of, the Commission. The position is similar to that successfully advanced by the Commission in *Illinois Citizens Committee for Broadcasting v. FCC,* 169 U.S.App.D.C. 166, 515 F.2d 397 (1975).[99] There the Commission argued that a speech by then Chairman Dean Burch represented "his personal opinion rather than any Commission action." The facts in this case demonstrate beyond question, however, that the Chairman's actions were official, not personal; and the circumstantial evidence is persuasive that the Chairman was acting on behalf of, and with the approval of, the Commission. That Chairman Wiley was acting in his official capacity cannot be questioned. He so admitted in his trial testimony: "Q. Well, whatever you did was done in your official capacity as Chairman of the Federal Communications Commission? A. Yes. Yes, it was." The admission is understandable. Wiley's chief assistant Secrest was working virtually full time on the matter. Many members of the FCC staff were heavily involved in the transactions at issue. It would be surprising indeed if the government time, money and resources so effectively marshalled in this case were all directed toward furthering the personal desires of a concerned citizen.

The evidence presented in the trial also indicates that the Chairman was not acting in his sole, albeit official capacity; rather, he was acting on behalf of the Commission. The testimony of former Commissioner Nicholas Johnson gives strong support to this conclusion:

[T]he agency really has an enormous array of things that it can do and does do in trying to regulate broadcasting.

. . . . .

[W]e would often in our formal meetings on Wednesdays consider whether we should use a rulemaking approach *or the Chairman should give a speech* or there should be some proposed legislation or perhaps a press release or notice of some kind would go out that would be short of a formal rulemaking proceeding; whether perhaps we should select a given case that is available to us to select if we want to use it as an example and do that as an alternative to a rulemaking.

And these things would be discussed by the Commissioners and sometimes you pick one particular way of going about it and sometimes another

. . . . .

Sometimes you can get the NAB Code to adopt some provision and that can be used as a way of getting the Congressional heat off your back . . .. (emphasis added).

Having identified speeches as one form of regulatory tool consciously employed by the Commission, Johnson was careful to point out that all speeches are not Commission actions and are not perceived as such:

Often ideas will be floated in speeches as a genuine effort to open up a dialogue, to suggest an idea, see what response it gets . . ..

And I think that's generally understood by the trade press and reported by them. It's understood by the industry when a speech is simply a Commissioner floating an idea to see what will happen to it and when a speech is in fact an alternative to a formal declaration of rulemaking or formal statement of policy by the Commission.

In short, Johnson's testimony indicated that the trade press and broadcast industry regularly were called upon to distinguish between speeches that were employed as reg-

**99.** As will be discussed *infra,* evidence was taken in this case concerning the Commission's role in the controversy which led to *Illinois Citizens Committee for Broadcasting.*

ulatory devices by the Commission and those which were "not part of such an orchestrated effort to bring about a regulatory response."

Of course, in this case more than a single speech was involved. Here the Chairman and his staff launched a series of meetings [100] as well as speeches, timed and orchestrated to generate press coverage and pressure. As Johnson pointed out:

> [B]ased on past experience and the way in which relations between the industry and the FCC are handled historically, and have been since, the unprecedented quality and character of this amount of activity, the persons involved, the place at which the meeting is held [101]—all would give a very somber and serious tone to the undertaking.

The Chairman is clearly not performing as a mere concerned parent, and particularly in the context of the pressure from the Appropriations Committee or the FCC to do something, and an awareness of the industry to the necessity now, finally after five years, of the FCC really taking action; the awareness from its own experience from trade press reports and from what was happening to it that this was the action that was being taken—I think this would be interpreted by the industry as a very serious matter, *and one involving official* FCC action.[102] (emphasis added).

Although Johnson could not recall a campaign of informal Commission pressure of the scale and intensity of that involved in this case because he believed there had been none, he did cite a number of specific examples of Commission use of speeches or meetings as regulatory devices. One particular example is of special importance.

Q. Can you give us an example of a time when a speech was used by the Chairman of the FCC to indirectly regulate the industry or attempt to regulate the industry?

A. Well, I remember one meeting we held where we had gotten a complaint or two from Congress involving what was then called "topless radio," which were radio call-in discussion programs dealing with matters of sexual behavior and what not on the part of the caller and the complaints had been registered about this from the public and from the Congress and there was a discussion amongst the seven Commissioners as to what to do about it and we agreed in that particular instance that we would deal with it in the form of a speech by Chairman Burch on the "topless radio" problem.

At the same time in that instance, as I recall, we were also trying to use the NAB Code and the NAB as a way of dealing with this and be able to report back to Congress that we had solved the problem through industry action.[103]

The example provided by Johnson is significant not merely as an illustration of how the Commission functions in general,[104] but

---

**100.** Many of the meetings and phone conversations involved are not discussed herein not because they are unimportant but because they would unnecessarily lengthen an already lengthy opinion.

**101.** Johnson conceded that what was said at the meetings could be a factor that would have to be evaluated. Suffice it to say that nothing said at the meetings discounts the strength of his testimony. In fact, the content of the meetings heightened the pressure.

**102.** With relatively few exceptions (which are difficult to credit), the deposition and trial testimony by network officials confirms that the industry perceived Wiley's actions to be on behalf of the Commission. It is inconceivable that the members of the Commission were not aware that Wiley's activities would be so construed.

**103.** Q: Mr. Johnson, in connection with the Commission's consideration of the "topless" radio problem, did the Commission consider the use of a Notice of Inquiry?

A. Yes. . . . We decided we'd try first to put the pressure on the NAB and use the speech as a technique as a first effort and see if that wouldn't do it.

**104.** It is also significant that Chairman Wiley was well aware of the nature and utility of the technique employed by Chairman Burch on behalf of the Commission. He was a member of the Commission that had approved the speech and the technique. He was aware then of the role such techniques can play in the regulatory

also affords evidence as to how it has operated in this case. The Dean Burch speech discussed by Johnson is the same Dean Burch speech which was at issue in *Illinois Citizens Committee for Broadcasting.* It is the same speech which the Commission there characterized as merely expressing the "personal" views of Chairman Burch. The uncontradicted testimony of this record is that the speech was given with the express approval and direction of the Commission and that the Commission knew its characterization of the speech before the court of appeals was false. During the course of litigation in *Illinois Citizens Committee,* the Commission never revealed that it had voted in closed door sessions to use Burch's speech as a regulatory device. Indeed the Commission persisted in that characterization in this case. Even in its closing brief the Commission writes that, "Like Chairman Burch's remarks, Mr. Wiley's initiative . . . was simply an unofficial expression of one Commissioner's views. . . . ." [105]

Ironically, the Commission is correct when it argues that *Illinois Citizens Committee for Broadcasting* is a case which should not be overlooked. The case calls into serious question the credibility of the Commission in general and it makes it difficult for this court to accord any respect to its position on this issue. The peculiar circumstances of this case must be considered along with the Commission's past recognition and utilization of informal undertakings by the Commission chairman as part of its regulatory arsenal.

But even if Commissioner Johnson had not testified in this case, the Commission would not prevail on this issue. The Commission had been asked to respond to the congressional committee's directives. Wiley and the FCC staff were acting. The

industry and press interpreted these actions to be on behalf of the Commission. The matter was a continuing source of attention in the industry press. It strains credulity in the extreme to suppose that the Commissioners did not regularly discuss the progress of these matters. In fact, Chairman Wiley testified on the point:

Q. Had you consulted with the other Commissioners regarding your decision to hold these meetings with the network representatives?

A. Well, I had kept the Commissioners advised. I had had a briefing for them after the November 22nd meeting, and a second one sometime around the time of the January 9th meeting just to let them know.

And, of course, I see the Commissioners very frequently. The Commission meets three or four days a week, now, and I see them from time to time and I'm sure it came up in our discussions.

The trade press carried accounts. They were quite aware of the fact that these discussions were being conducted, but this was, as far as the meetings were concerned—it was a personal initiative on my part, I will admit.

The court has no doubt that the Chairman played a leadership role with the Commission in selecting which weapons in the regulatory arsenal should be employed. Only in that sense was his conduct a personal initiative. But Wiley's testimony is consistent with the conclusion that cries out from the evidence. The Commission approved of his activities before the fact, permitted him to engage in activities which they knew would be perceived as regulatory moves by the agency, were regularly kept abreast of the developments, and provided input into the process. Any other conclu-

process and was similarly aware during the course of the transactions at issue here.

**105.** In final argument, however, the Commission argued that the court of appeals in *Illinois Citizens Committee* had made its determination despite an awareness of the facts provided in this trial by Commissioner Johnson. After

questioning from the court at final argument, the Commission has admitted that the facts surrounding the Burch speech were not part of the record in *Illinois Citizens Committee for Broadcasting.* The case sharply illustrates the inadequacy of the FCC as a forum for finding facts about its own activities. See section IB.

sion would suggest that the other Commissioners were irresponsibly uninterested in a vital issue before the agency. No member of the Commission at any time (at least as revealed in the record) gave the slightest public or private hint that Chairman Wiley was not acting on behalf of and with the support of the Commission. When the Report to Congress was issued, not one member of the Commission expressed any dissatisfaction with the course pursued by the Chairman and the staff. When agencies of government consciously permit their authority to be wielded with such great public fanfare, they can hardly complain, when it is concluded that the actions of its agents can appropriately be ascribed to them.

36. The defendants also take the position that the family viewing provisions of the NAB Code do not infringe upon independent licensee programming decisions. They maintain that "[B]y subscribing to the Code, licensees in no way surrender their broadcast responsibility or independence." The evidence does not support this assertion.

Perhaps the most specific repudiation of the defendants' position on this issue was provided by Swafford in his remarks at the February 4, 1975 Code Board meeting:

[T]he power to evaluate whether a station or a network or a program has been compliant or violative already rests with the Code authority. This is nothing new.

Each of us has, in the very act of subscribing and adhering to the concept of self-regulation, surrendered a degree of autonomy.

. . . . .

The moral sanctions of the Code authority are criticized by some as being too weak, but I think there are none in this room who would care—or dare—to disregard them, once they've been applied.

The defendants suggest that the Code is consistent with independent licensee pro-

gram decisionmaking because the licensee voluntarily subscribes to the Code and, therefore, presumably agrees with each of its provisions. But Wilson Wearn, the Joint Chairman of the NAB Television Board, testified that the members of the NAB (who now are required to subscribe to the Code as a condition of membership) do not agree with each of the provisions of the Code:

Q. Does everybody agree, everybody who is a member of the NAB, agree with the NAB Code?

A. No. Individually I think anybody, any one person, would find something they would not approve of.

The members are not permitted to violate provisions of the Code, however, merely because they, in their independent judgment, disagree. Indeed a subscriber who is found to violate the Code is advised to make a correction or lose his membership.[106] This is justified on the theory that broadcasters should acquiesce to the majority will as expressed through the Television Board. Wearn put it this way:

We try to sell them on the fact that it's a democratic process and therefore if they have some particular theory they don't like, we ask them to support the overall concept and work within the organization to try to change it around to their viewpoint if they can get the majority opinion to go along with them.

Thus, instead of promoting independent decisionmaking the NAB demands adherence by each of its members to the will of the majority whether or not they individually agree. It is no wonder that the FCC and networks in seeking to gain industry-wide acceptance would fix on the NAB as an effective vehicle.

Nor can it be denied that the NAB functions as an effective enforcement mechanism. First, it has designed and applied procedures to consider alleged violations of

---

**106.** Traviesas, for example, so testified: "If [a violation is found] against the subscriber, the subscriber will be told that either a correction [must] be made or he loses his membership to the Code." Or as Wearn testified,

Q. [I]f someone disagrees you boot them out?

A. Yes.

the Code. The procedures for enforcing family viewing were discussed at the October 6–8, 1975 meeting of the Code Board. The Board determined that if the Code Authority received a challenge from "any source" with respect to a prime time family viewing program:

1. The challenge should be referred to the originating network or station.
2. The network or station will answer the challenger in writing, sending a carbon of the response to the Code Authority Director.
3. If the challenger disagrees with the response of the network or station, the Code Authority Director, upon receipt of a request from the challenger will review the matter. If the Code Authority Director agrees with the challenger, the network or station may seek review of the issue by the Programs Standard Committee of the Board.
4. The challenger may request an appearance before the full Television Code Review Board to review the matter if the Committee's response is not satisfactory to him/her.

Moreover the Code itself provides that the Code Board has the authority to "consider, in its discretion, any appeal from any decision made by the Code Authority Director . . .." NAB, *The Television Code* 30 (18th ed. 1975).

In addition to creating a system that would allow challenges from any source to be considered by the Code Authority, the Code Authority itself undertook an extensive monitoring process. As Code Authority Director Helffrich noted in an August 25, 1975 memo, the monitoring would be "complicated by the fact that the Television Code Review Board has not established criteria designed to help determine whether or not a program, or part thereof, scheduled in the 7–9 p.m. (EST) slot conforms to the 'family viewing' concept." Rather than formulate "rigid definitions" Helffrich proposed that the members of the staff proceed by "trial-and-error." And so they did. By September 18, for example, in response

to "monitor concerns" about the extent to which language used in an ABC Movie of the Week, "Mobile Two," may have violated family viewing standards, ABC was able to convince Helffrich that the language used in the movie complied with the Code. Helffrich wrote Al Schneider that the use of the words "hell" and "damn" in the particular context were "Code-compliant" but warned that, "From the Code Board itself I estimate a majority sentiment in respect to uses of words such as "damn" and "hell" (in programs in the Prime Time Family Programming time period) as best *generally* eschewed and, when and if employed, used only with rare exceptions and strictly where appropriate." (emphasis in original).

The definition of family viewing propriety thus turned on interaction between the networks, other broadcasters, and the Code Authority with the touchstone being what Helffrich and ultimately the Code Board would think was appropriate.

That the defendant broadcasters thought in these terms is clear beyond doubt. The clearest example is contained in a memo from Swafford to Wood. The question was whether or not "All In The Family" should run during family viewing time. First, came the prognostication:

I believe Stockton Helffrich would rule that it is [acceptable for family viewing]. However, machinery is being set up which could automatically take all "family viewing decisions" by the Code Authority Director to the full Code Review Board . . . .. Knowing the makeup of that Board, knowing how they resisted this concept, knowing how they grudgingly came around to our point of view; along with the awareness that from the very beginning of our deliberations "All In The Family" was repeatedly used as shorthand for what is not family viewing . . . with all this I'm quite certain that the Board would rule against us.

Then, despite the fact that Swafford thought the moving of "All In The Family" was "unpalatable" and "goes down hard" he saw no other alternative but to move the

show. "[W]ould we—could we, really—ignore the Code? *I think that one answers itself.*" (emphasis added).

Swafford's memo strikingly demonstrates the central fact of family viewing enforcement. Instead of programming on the basis of their own *independent* judgment, broadcasters have been forced to program with a view toward what would be considered unobjectionable by the Television Code Review Board. Indeed the whole point of mobilizing the NAB Code as a vehicle was to lessen what was believed to be competitive opportunism by permitting one all powerful umpire to regulate programming decisions in prime time viewing. Widespread compliance was the goal; the goal has been achieved. The achievement of the goal, however, necessitated the delegation of programming authority to the NAB.

██ 37. The private defendants in their post trial brief insist that, "[T]he record is clear that the only possible harm suffered by plaintiffs, if it can be characterized as harm, is that the policy has caused them some irritation, has caused them to consume some time in discussions with network standards and practices people and, perhaps, to expend a bit more creativity and ingenuity in developing their product."

For two reasons, the import of this argument at this point is mysterious. First, these defendants have stipulated that the plaintiffs have suffered sufficient injury to maintain standing. Second, the damage issues have been reserved for later proceedings. The plaintiffs have introduced evidence which shows harm not to show that harm but to demonstrate the effectiveness of the NAB as a vehicle and to demonstrate the vagueness of the family viewing policy. Relying on the private defendants' stipulation, Tandem has, of course, saved its evidence of damage for the damage proceedings.

Nonetheless the record discloses significant injury to the plaintiffs. Danny Arnold, the producer of "Barney Miller" testified that his negotiations with network editors prior to the initiation of the family viewing policy could be characterized as "discussions of compromise with people of taste [107] and good faith without any outside pressures on them but generally dealing with the individual case and the individual subject at hand." Following the inception of the family viewing policy, however, the potential for reasoned compromise

> was gone, that there were pressures being applied to you because there were pressures being applied to them, and they were trying to somehow effectuate rules that nobody seemed to understand.

. . . . .

> It became tension and fear and pressure and self-censorship . . ..

Larry Gelbart, the producer of "M*A*S*H," testified that despite every effort to avoid it, in the family viewing regime, "There's a self-censorship that goes on no matter how much you are trying to bolster the other guy. When you get a call that attacks four out of ten ideas that you've submitted, you begin to see any new ideas you're getting in the light of that."

This is not to suggest that the producers habitually capitulated to these pressures. Each of the testifying producers recounted that they had initiated virtual civil wars with respect to some of the network decisions which they particularly opposed. Arnold, for example, testified to incidents in which a network had told him that because of the family viewing policy, he should not continue with a script he was working on in a particular week. Nonetheless he continued, shot the show, sent it on to New York for reconsideration, and awaited the outcome. The enormity of the gamble is easily understood: "The average cost of a show

---

107. Arnold on other occasions has not referred to the taste of network editors in such generous terms. Nonetheless it is clear from his testimony and that of Lear, Gelbart, and Burns that the nature of the relationship between the creative talent and the network editors was significantly changed to the detriment of the plaintiffs by the adoption of the family viewing policy.

on 'Barney Miller' is somewhere between $130,000 and $140,000."

Similarly Lear testified that,

I remember instances . . . where we went to the wall over things where I was handed a piece of paper that I couldn't do a show, if I did make a show it would not be paid for, it would not air.

I made the show because I believed in it . . . and then had to wait the weeks to find out if the show would ever be aired, would they ever pay for it, what was going to happen.

Gelbart, after being told that several ideas for shows were unacceptable under family viewing principles, responded by saying, "[I]f this was, in fact, how it was going to be, I couldn't continue . . .."

The networks make much of the fact that in each of the cases in which the producers "went to the wall," the networks acquiesced. From this they conclude that the plaintiffs suffered only "irritation" and "subjective chill." There was nothing at all "subjective," however, about the producers' fears that material would not be shown. They had been told by network executives in no uncertain terms that under family viewing principles the material they were working on was unacceptable. Apparently the networks suggest that the defendants should have learned the lesson that all they had to do was habitually gamble $130,000 by making "unacceptable" shows and they would be aired. Aside from the cavalier insensitivity of that position, it implies that the producers should have recognized that the networks had totally abandoned their editorial responsibilities to the producers, were prepared to cave in at each stage, and that they were always bluffing when they said "Do not make the show." It is not difficult to sympathize with Arnold's retort, "There were a lot of other areas we could have examined, but you don't think you can under the problems and the making of

shows like 'Barney Miller' that you can fight City Hall every week."

The record discloses that the producers did not fight City Hall every week. Significant self-censorship was evident. Characters were not developed, themes were not explored, language was deleted—all in response to network adherence to family viewing principles.[108] To denigrate this phenomenon as mere "irritation" or "subjective chill" bespeaks a reckless indifference to the fact that the family viewing policy significantly changed the process of television editing. It transformed network editors from independent decisionmakers into conduits of FCC and NAB policy. Instead of deciding what should and should not be broadcast, they decided what material would evoke criticism from other networks and NAB functionaries. In fact, at one early and hysterical point one CBS executive told producers that they should limit the material in their shows to that which would avoid embarrassing the most "uptight parent that could be imagined."

Although the record reveals that the standards eased as the season continued (perhaps in part because of the filing of this lawsuit) there is no credible evidence that the networks are at the present time any less dependent on NAB authority. Rather, the delegation of their authority persisted through the period following the adoption of the family viewing policy.

The plaintiffs' injuries, however, are not confined to the fact that their material was excluded from the air because of government[109] censorship. The record also discloses significant economic injury to the plaintiffs. First, it is clear that the frenzied character of the editing process increased the plaintiffs' production costs. The writing of television scripts, the evidence reveals, is an ongoing process. Revisions are constantly being made throughout a production week—in the middle of re-

**108.** Moreover there was testimony that in the producers' judgment the quality of the shows was damaged. This testimony is consistent with the fact that if the networks had exercised their independent judgment, the producers would have been permitted to proceed.

**109.** The state action question is discussed in section III *infra*.

hearsals, after a show is taped and shot again. Network representatives are present through the week. When disputes develop, delays occur; and, as Arnold put it:

> [W]e operate on a very, very tight schedule . . . . We have very little time. Most of my time on "Barney Miller" is spent writing and the longer you wait for material, the longer rehearsals are delayed and the longer rehearsals are delayed, the longer the shooting schedule is delayed, and when you start shooting into overtime it becomes terribly expensive.

Arnold testified that family viewing disputes caused him to be "writing the last sequence of a show . . . while we're taping and having to shoot 'till 3:00, 4:00, 5:00 o'clock in the morning . . . ."—all the while "paying overtime . . . to personnel engaged in the production process." Gelbart put it crisply, "It's costly for a cast to wait and not be filmed while you run to the phone and find out children aren't supposed to know what virgins are." [110]

In addition to economic impact in terms of production costs, the evidence is persuasive that the syndication value of "All In The Family" has been significantly diminished by the defendants' conduct. Despite the defendants' protestations to the contrary, "All In The Family" was rescheduled out of the family viewing time period because of the family viewing policy. [111] As discussed earlier, "All In The Family" had become a symbol of network good faith in applying the family viewing concept. Shortly after NAB adoption of the family viewing policy the Wall Street Journal headlined this query, "Will Archie Bunker Be Nicer Or Later?" Subsequently Arthur Taylor wrote that, "There is no question that if we leave All In The Family in its present time slot, the criticism will be loud. This is particularly true because our competition seems to want to make this issue a

'test case.'" Taylor was so opposed to moving the show that he suggested that instead of moving the show, "Our response will have to lie in the area of content change . . . ." Ultimately Lear was contacted to see if he would agree to such changes in the show. Predictably Lear was not prepared to cooperate with such measures to mollify CBS's concerns about objections from competitors. CBS was therefore forced to move the show in order to comply with its pledge to adhere to NAB perceptions of the meaning of the family viewing policy.

Nonetheless the private defendants contend, based primarily on the testimony of CBS's Robert Wood, that "All In The Family" was moved in an effort principally to strengthen the Monday night schedule. Lear and Perenchio (Lear's colleague in Tandem Productions) testified, however, that Wood had in separate telephone calls told them that unless Lear would agree to change "All In The Family" to conform to family viewing principles that the show would have to be moved. Nothing was mentioned about shoring up Monday night. Wood's response to this testimony is to contradict it. He stated in his deposition that in his telephone call he had told Perenchio that the show "was being moved because I thought it would play better on Monday night." He similarly described his conversation with Lear. Woods' testimony is not merely inconsistent with that of Perenchio and Lear; it is also contradicted by that of Arthur Taylor and that of a wholly impartial witness—Deane Johnson, an attorney who had done legal work for CBS for decades and for Tandem for a number of years. Taylor testified that it had been decided that Lear should be contacted and that Wood had contacted both Lear and Perenchio; Wood asked for agreement to change "All In The Family"; that Lear refused. Johnson testified that Wood had asked him to call Lear and Perenchio to discuss the

---

**110.** The particular incident apparently referred to involved the use of the word "virgin" in an entirely non-sexual context, *i. e.,* a character was described as a virgin in terms of military service.

**111.** The factual issue involving "All In The Family" is also relevant to the matters discussed in ¶ 36.

problem; the message he was to give was that either the show was to be changed or it would be moved.

■ In short, Wood's recitation of these events is inconsistent with the weight of the evidence. The "shoring up Monday night" explanation was developed precisely because CBS did not want to damage the syndication value of the show. In the syndication market, shows are sold to independent stations after they have completed their run on the network. Largely because of the prime time access rule, the most valuable time for the independents is the first hour of prime time. If "All In The Family" is a show which cannot be shown during the family viewing period, it could not be used in the independents' most lucrative market. Its value hence diminishes. Although the amount of damage is to be

determined in later proceedings, the evidence produced at this stage is sufficient to show injury to plaintiffs Tandem Productions and Lear. The evidence discloses that CBS's explanation for the move of "All In The Family" is not to be credited and that a stigma has attached to "All In The Family" which has affected its present value in the syndication market.[112] In view of the enormous sums involved in the syndication market, it is clear that the damage involved is potentially large. Contrary to the defendants' protestations, this is not a "comic-opera" lawsuit. The plaintiffs have been injured by the defendants' conduct.

### III. LEGAL LIABILITY ISSUES

"It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state."[113] *Hudgens*

---

**112.** Certainly Lear and Tandem had no legal obligation to mitigate the damage by promoting a false explanation of why the show had been moved.

In an apparent effort to rectify the damage, the private defendants write in their post trial brief that,

[D]efendants are unable to understand why this is still an issue in the case as we believe all private parties agree with the following principles:

(i) Topical themes, when presented with taste and discretion, are suitable for broadcast within the family viewing period.

(ii) Accordingly, there is no inherent obstacle to a broadcaster presenting "All In The Family" within the family viewing period.

(iii) Scheduling of "All In The Family" programs outside the family viewing period during the 1975–76 season should not be deemed to classify those programs as appropriate or inappropriate for family viewing.

This half concession may or may not have significant impact. It states that there is no *inherent* obstacle to a presentation of "All In The Family" within the family viewing period. The question that a buyer in the syndication market would need to have answered is whether that statement includes prior episodes, and whether and to what extent prior episodes would have to be edited. The concession simply does not say whether past shows of "All In The Family" are appropriate or inappropriate for general family viewing. In the final analysis, all the statement really says is that the show in some form could be shown in prime time. If the concession said that the NAB and the networks agree that all prior episodes of "All In The Family" could be shown in family

viewing time, presumably—but not necessarily—the syndication value of the show would be restored. Apparently the defendants believe that some changes would have to be made. Indeed the flaw of the current system is that the defendants would presume to dictate the kind of changes which would be required.

The defendants' professed lack of understanding of the continued viability of this issue should not mislead, however. The concession, whatever its effect, was quietly (but publicly) revealed for the first time in the post trial brief. Joining in this "statement of principles" was a network whose NAB representative consistently stated that if CBS would not move the "goddamn" "All In The Family," it would not move the "goddamn" "Rookies." Having recklessly created the issue, the defendants should not be surprised that it is not easily buried. Finally, on September 30, the court was informed by a letter from CBS counsel that a particular episode of "All In The Family" was scheduled during family viewing time (its regular time having been preempted by the second of the 1976 presidential debates). The effect that this may have on mitigating damages will have to be litigated. The action of CBS in so programming one episode of "All In The Family" neither serves to moot the controversy on the damage issue, nor to erase the facts surrounding the scheduling of "All In The Family" in the 1974–75 season.

**113.** The First Amendment is limited by its terms to congressional abridgements of free speech, but in this respect the case law has given the Amendment a sweep broader than its terms. *See New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). The same result could have been

*v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). The most difficult First Amendment questions presented by this case revolve around that "commonplace." It is obvious that the government can only act through its agents, but its agents may or may not be government employees. The difficulty is to determine when action, apparently private in character, can fairly be attributed to the government. The set of concepts normally employed to solve questions such as these cluster under the rubric of "state action." Predictably since the interrelations between private and governmental action are so various and so complicated and because the questions of agency and responsibility so often turn on questions of fact and degree, no test has been formulated which can avoid the necessity for the application of judgment and the weighing of values in variegated factual contexts. The Supreme Court has thus recognized that "to fashion and apply a precise formula for recognition of state responsibility . . . is an 'impossible task' which 'This Court has never attempted.'" *Burton v. Wilmington Park Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

Although it is impossible to devise a precise formula to solve all state action problems, it is not impossible to formulate rules which cover commonly recurring factual situations, nor is it impossible to formulate the principles which should guide decisions in difficult cases. An ever growing body of case law and commentary has begun to bring a greater measure of predictability to this tangled area. But a series of respected commentators have suggested that the whole concept of state action requires repair. State action has been denigrated as "nothing but a catch-phrase" [114]—"a slogan from 1883." [115] It has been characterized as unnecessary baggage [116] and consigned to virtual oblivion. [117] Although much of the criticism was generated by a concern that the state action doctrine might serve as a legal device to immunize racial discrimination (a concern vitiated by the passage of civil rights legislation, by the subsequent discovery of 42 U.S.C. §§ 1981 and 1982, and by the course of judicial decisions), the essential theme was that the courts, instead of looking for state action, should balance the respective interests of the parties involved and ask in view of that balancing exercise whether the conduct complained of was so private in character that it should be deemed to fall outside the strictures of the Fourteenth Amendment. The attractiveness of this approach is that it would offer a forum for those parties aggrieved by the actions of powerful but non-governmental institutions. Nonetheless it is apparent that the adoption of such an approach would strike at the heart of basic constitutional principles. The recognition of that fact has helped to clarify the underlying values protected by the state action concept,[118] values which are helpful in determining how to

achieved through the Fifth Amendment Due Process Clause. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**114.** Black, "Foreword: 'State Action,' Equal Protection, and California's Proposition 14," 81 *Harv.L.Rev.* 69, 88 (1967).

**115.** *Id.* at 95.

**116.** *See, e. g.,* Henkin, "*Shelley v. Kraemer:* Notes for a Revised Opinion," 110 *U.Pa.L.Rev.* 473 (1962); Horowitz, "The Misleading Search for 'State Action' Under the Fourteenth Amendment," 30 *So.Cal.L.Rev.* 208 (1957); Quinn, "State Action: A Pathology and a Proposed Cure," 64 *Calif.L.Rev.* 146 (1976); Van Alstyne & Karst, "State Action," 14 *Stan.L. Rev.* 3 (1961).

**117.** *See, e. g.,* Silard, "A Constitutional Forecast: Demise of the 'State Action' Limit on the Equal Protection Guarantee," 66 *Colum.L.Rev.* 855 (1966); Williams, "The Twilight of State Action," 41 *Texas L.Rev.* 346 (1963).

**118.** *See generally* Burke & Reber, "State Action, Congressional Power and Creditors' Rights: An Essay on the Fourteenth Amendment" (Pt. 1), 46 *So.Cal.L.Rev.* 1003 (1973); Lewis, "The Sit-In Cases: Great Expectations," 1963 *Supreme Court Review* 101; Comment, "State Action: Theories for Applying Constitutional Restrictions to Private Activity," 74 *Colum.L.Rev.* 656 (1974).

decide difficult cases such as these. These values are most quickly exposed if one reflects on the consequences which would flow if the state action idea were supplanted by the notion that individual invasion of individual rights is proscribed by the Constitution. Under such a theory, private wrongdoing would be instantly referable to the Constitution. The Supreme Court would become "an appellate common-law court for the nation." Lewis, "The Sit-In Cases: Great Expectations," 1963 *Supreme Court Review* 101, 129. Such a development would be exceedingly strange under a Constitution founded upon the principles of individual freedom, federalism, and separation of powers. The state action concept stands for the principle that individuals, in the absence of valid government regulation, are free to be ornery in their private lives; that in the absence of powers delegated to the federal government, state governments, within constitutional limits, have the primary responsibility to regulate private wrongdoing; and that to the extent the federal government does have power to regulate private conduct, that power is legislative and not judicial. Thus the state action concept counsels that government invasions of constitutional liberties are to be prevented without unnecessarily imposing limitations on private autonomy.

■ Here the plaintiffs' complaints, insofar as they refer to the FCC, its Commissioners, and Chairman Wiley, clearly implicate government conduct. The First Amendment issue becomes whether that conduct abridges freedom of speech, and if so, what remedies are appropriate? Insofar as the private defendants are concerned the issues are threefold. Is their conduct properly characterized as government conduct? If so, does their conduct violate the First Amendment? And if that is the case, what remedies are appropriate? Since, as will become clear, the standards for answering these questions vary as a result of the different balance of interests involved in the application of state action principles, the plaintiffs' complaints against the two sets of defendants to some extent require separate discussion.

### A. *The Private Defendants.*

The liability of the private defendants turns on four questions. First, does broadcaster adoption of the family viewing policy constitute a violation of the First Amendment even in the absence of government encouragement or pressure? Second, assuming it does not, does the presence of government encouragement without more vary the result? Third, assuming it does not, does broadcaster adoption of the family viewing policy violate the First Amendment when the decision to do so is substantially motivated by a desire to defuse the consciously exploited threat of government regulation? Fourth, as an entirely separate matter, does a government-network-NAB agreement to compromise licensee program decisionmaking violate the First Amendment?

As will be discussed in detail *infra,* the answers to the first two questions are no, whether or not broadcaster action in either context is considered to be governmental; the answers to the last two questions are yes. Analysis of the first two questions, however, sheds light on the degree of private autonomy afforded *to* broadcasters and expected *of* them which in turn assists analysis both of the state action question and the question of appropriate remedies. In short, broadcasters are free to adopt the family viewing policy even if the source of the idea is governmental, and even if government officials have encouraged the policy, provided that their adoption of the policy is based on their independent judgment that the particular programming policy is best suited to promote the public interest. Broadcasters retain this freedom whether or not their actions are considered to be governmental.[119] They are not free,

---

119. There is no necessity to decide, therefore, whether or not broadcaster action *per se* is the equivalent of government action. The question of whether government encouragement changes the picture is discussed in section

IIIA2 *infra* both because it clarifies factors necessary to the discussion in parts IIIA3, IIIB, and part IV, and because the conclusion that the state action finding is unimportant with respect to the second issue involves a much

however, to program on any basis other than their own independent judgment of what constitutes good programming, and they have no right to interfere with the independent judgment of other broadcasters.

### 1. *Broadcaster Freedom to Adopt Family Viewing.*

It is helpful to inquire first as to the First Amendment consequences which would flow if the networks had each adopted the family viewing policy without any input from government officials. Clearly, if a broadcaster were prohibited from adopting such a policy in the absence of government input, network adoption of the family viewing policy in the circumstances of this case would be impermissible *a fortiori.*

The analytical starting point must be the Supreme Court's holding in *CBS v. Democratic National Committee, supra,* 412 U.S.

94, 93 S.Ct. 2080, 36 L.Ed.2d 772. There the plaintiff Committee sought a declaration that a flat ban imposed by broadcasters against editorial advertising was in violation of the First Amendment and the Communications Act of 1934. Although the Court did not decide the question of whether or not broadcaster action was the equivalent of state action for First Amendment purposes,[120] it held that even "assuming governmental action," *id.* at 121, 93 S.Ct. 2080, neither the First Amendment nor the Communications Act was violated by broadcaster refusals to carry editorial advertisements. In so holding, the Court reaffirmed the constitutionality of the Federal Communications Act of 1934. *See, e. g., National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). Supreme Court sanction, then, has again been given to a system in which the government excludes everyone from access to the media unless the approval of governmentally ap-

closer question. The court feels that the efficient administration of justice will be furthered if the record contains its view that an alternative ground supports its decision. Moreover, the court must note that if its holding in part IIIA2 is not correct, the plaintiffs are entitled to far greater relief against the government defendants (and possibly against the private defendants) than is provided in part V.

**120.** The Chief Justice, and Justices Rehnquist, Stewart and Douglas found no state action; Justices Brennan and Marshall opined that state action was present; Justices Blackmun and Powell explicitly refrained from reaching the issue; Justice White (without suggesting that the conduct of broadcasters was often or always government action, *id.* at 146, 93 S.Ct. 2080) was unwilling to accept the idea that "statutory and regulatory recognition of broadcaster freedom and discretion to make up their own programs and to choose their method of compliance with the Fairness Doctrine," *id.* at 147, 93 S.Ct. at 2109, was insufficient to make out a case for state action. He found the contrary position to be "at least arguable, and strongly so . . . ." *Id.* at 146, 93 S.Ct. at 2108. The fair reading of his remarks is that while he took no position, he strongly inclined to the view that state action was present in the circumstances of the case but was prepared to draw distinctions in other cases not yet before the Court. Inexplicably the defendants here have consistently misread the *CBS* case at almost every level. They contend that the case holds that broadcaster action is not the equivalent of government action; it does not reach

the question. At best, there is a basis for guessing how the Court would decide the question if it had to be reached. The defendants contend with Justice Stewart that if broadcaster action were found to be the equivalent of government action, they "would be obligated to grant the demands of all citizens to be heard over the air, subject only to reasonable regulations as to 'time, place and manner.'" *Id.* at 139, 93 S.Ct. at 2105. But this view was rejected by five members of the Court in part IV of the opinion and by Justices Brennan and Marshall as well. *Id.* at 181 n.12, 93 S.Ct. 2080. Finally the defendants imply that *CBS* stands for the idea that a court can never order a television network to broadcast specific material which, in the broadcaster's judgment, it should not have carried. In *Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371, the Court did precisely that and nothing in *CBS* detracts in any way from *Red Lion.* If any doubts about the continuing validity of *Red Lion* may reasonably be entertained, they arise not from *CBS* but from the failure of the Court to discuss the case in *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). One suspects that the failure to discuss *Red Lion* in *Miami Herald* arose from an internal disagreement over rationale coupled with a desire to avoid a fractured series of opinions on an issue not necessary to the resolution of the case. In any event, the 8–0 holding of the Court in *Red Lion* is still the law.

pointed caretakers (*i. e.*, the licensees), is first secured.[121] Moreover the discretion afforded to these licensees is purposely broad. As the Court stated in *CBS*, "Congress intended to permit private broadcasting to develop with the widest journalistic freedom consistent with its public obligations." *Id.* at 110, 93 S.Ct. at 2090.

Thus government is authorized to do something in the broadcasting public forum that it could not do elsewhere: appoint an agent not only with broad discretion to determine who shall and who shall not get access to a vital public medium (compare, *e. g.*, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Saia v. New York*, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)) but also with the sanctioned power to make such decisions on the basis of the content and quality of the material (compare, *e. g.*, *Hudgens v. NLRB, supra*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196; *Police Department v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). Perhaps the most striking example of the constitutional inability of the government to accomplish this in other forums is contained in the case of *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). In that case, the defendants were the directors of the Chattanooga Municipal Auditorium, a municipal theatre. The directors had been appointed by the mayor and confirmed by the city's board of commissioners.[122] The directors operated the auditorium pursuant to a dedication that its "purpose will be devoted for cultural advancement, and for clean, healthful, entertainment which will make for the upbuilding of a better citizenship." *Id.* at 549 n.4, 95 S.Ct. at 1242. Pursuant to these standards the directors refused Southeastern's application to present the rock musical "Hair" in another theatre run by the directors pursuant to a city lease. Subsequently Southeastern sought a permanent injunction entitling it to use the municipal auditorium. The injunction was denied on the ground that the material was obscene.

The Supreme Court condemned the directors' action: "We hold that respondents' rejection of petitioner's application to use this public forum accomplished a prior restraint under a system lacking in constitutionally required minimal procedural safeguards." *Id.* at 552, 95 S.Ct. at 1243. In ringing terms, the Court stated that "[T]he danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Id.* at 553, 95 S.Ct. at 1244. And although the Court did not reach the question of the particular standards applied to determine the obscenity *vel non* of "Hair" (because the failure to provide for a prompt judicial hearing was defective in and of itself), the Court made it clear that the inquiry at the judicial hearing was to be whether or not "Hair" was constitutionally protected speech and whether or not respondents could fit their action within "one of the narrowly defined exceptions to the prohibition against prior restraints." *Id.* at 559, 95 S.Ct. at 1247.

Yet the Court in *CBS*, by assuming the existence of government action, held that the government could appoint licensees who could apply subjective judgments in the "public interest" to decide who shall and shall not get access to television without any provision for a prompt judicial hearing. Reconciling *Southeastern* and *CBS* requires no great effort, however. The principle is stated in *Southeastern* itself: "Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Id.* at 557, 95 S.Ct. at 1246, *citing Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) and *Red Lion Broadcasting Co. v. FCC, supra*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371. Compare *National Association of Independent Television Producers*

---

**121.** *Red Lion Broadcasting Co. v. FCC, supra*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 is the exception which proves the rule.

**122.** The chairman of the board was also the commissioner of public utilities, grounds, and buildings.

*and Distributors v. FCC,* 516 F.2d 526, 537 (2d Cir. 1975).

The special problems presented by the broadcasting medium are now well known and well understood. If the government did not control access to the public airwaves, their use as a public medium would be destroyed. If access to the medium were granted on a first come first served basis, the quality of programming would be haphazard. If a government body, uninsulated from the political process, were given the power of individual ad hoc decisionmaking as to programming, the potential for abuse would be manifest. Thus the Congress in the Federal Communications Act wisely,[123] within the constitutional limits, decided to grant broad programming discretion to private licensees, limiting that discretion by rules and regulations primarily designed to assure broad diversity in programming consonant with the broad interests of a diverse society.

In *CBS* the Court effectively holds that the government can make some types of editorial decisions when the particular circumstances make it necessary for it to do so. Viewed in perspective this conclusion is not remarkable. The government must act as an editor in a wide variety of contexts, making decisions on the basis of content as to what should or should not be included. One need only contemplate the operations of public libraries, public school newspapers and law reviews, state university radio and television stations, the Government Printing Office, indeed even the public schools themselves. *See generally* Canby, "The First Amendment and the State as Editor: Implications for Public Broadcasting," 52 *Texas L.Rev.* 1123 (1974).

 Although it is clear that the proper operations of government necessarily involve it in editorial functions, it is crucial to recognize the safeguards involved in the system of broadcasting which make "government" editing in that sphere (again accepting the assumption of *CBS* pt. IV)

constitutionally acceptable. The goal of the system is to assure that the "paramount" right of viewers and listeners "to receive suitable access to social, political, esthetic, moral and other ideas and experiences" be safeguarded. *CBS v. Democratic National Committee, supra,* 412 U.S. at 102, 93 S.Ct. 2080; *Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 390, 89 S.Ct. 1794. Crucial to the attainment of that goal was the development of a system which promoted maximum diversity. Part of that goal has been promoted by FCC regulations but the key to its attainment is the effectuation of decentralized control of access to the nation's airwaves. Thus as the Court recognized in *Red Lion,* "It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, *rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee.*" *Id.* at 390, 89 S.Ct. at 1806 (emphasis added). *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Mt. Mansfield Television, Inc. v. FCC, supra,* 442 F.2d at 477–78; *Clarksburg Publishing Co. v. FCC,* 96 U.S. App.D.C. 211, 225 F.2d 511, 518 (1955). Independent decisionmaking by local licensees acting in the capacity of public trustees, then, is not only the cornerstone of the Federal Communications Act, but also the constitutional foundation of the broadcasting system. *See generally National Association of Independent Television Producers and Distributors v. FCC, supra,* 516 F.2d at 538; *Brandywine-Main Line Radio, Inc. v. FCC,* 153 U.S.App.D.C. 305, 473 F.2d 16, 59 (1972), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973). *See also Bamberger Broadcasting Service, Inc.,* 3 P & F Radio Reg. 914, 925 (1946).

The importance of independent judgments by local licensees has been affirmed again and again by the FCC. In its *Network Programming Inquiry,* 25 Fed.Reg. 7291, 7295 (1960), the Commission proclaimed that,

---

123. *But see* B. Owen, *Economics and Freedom of Expression* 87–141 (1975); Note, "Reconciling *Red Lion* and *Tornillo*: A Consistent Theory of Media Regulation," 28 *Stan.L.Rev.* 563 (1976).

Broadcasting licensees must assume responsibility for all material which is broadcast through their facilities. This includes all programs . . . which they present to the public . . .. This duty is personal to the licensee and may not be delegated. He is obligated to bring his positive responsibility affirmatively to bear upon all who have a hand in providing broadcasting matter to transmission through his facilities *so as to assure the discharge of his duty to provide acceptable program schedules* consonant with operating in the public interest *in his community* . . .. This again, is a duty personal to the licensee and may not be avoided by delegation of the responsibility to others. (emphasis added).

Again, in its *Fairness Report Regarding Handling of Public Issues*, the Commission reaffirmed that the individual licensee's responsibility for selection of programming material, " 'can neither be delegated by the licensee *to any network or other person or group, or be unduly fettered by contractual arrangements* restricting the licensee in his free exercise of his independent judgments.' " 39 Fed.Reg. 26372, 26375 (1974), *quoting* FCC, *Report on Editorializing*, 13 F.C.C. 1246, 1248 (1949) (emphasis added).

It was precisely because of these principles that the Commission enacted the Chain Broadcasting Regulations which were particularly designed to prevent network control over local licensees' decisionmaking as to programming. In affirming the validity of those regulations the Supreme Court specifically affirmed the Commission's conclusion that, "A licensee is not fulfilling his obligations to operate in the public interest, and is not operating in accordance with the express requirements of the Communications Act, if he agrees to accept programs on any basis other than *his own* reasonable decision that the programs are satisfactory." *National Broadcasting Co. v. United*

*States*, 319 U.S. 190, 206, 63 S.Ct. 997, 1005, 87 L.Ed. 1344 (1943) (emphasis added).

■■■ The right and the duty to make independent and final decisions as to who shall and who shall not get access to the media resides not with the networks (except in their capacity as owners of local stations), not with the NAB, not with the FCC, not with the screen writers, director or actors, not with Norman Lear or Tandem Productions and not with this or any other court. The constitutionality of the broadcasting system depends on the conclusion that the right and duty to make these decisions reside in hundreds of different licensees.

■■■■ This principle controls both the state action and substantive First Amendment questions of this case. First, is it constitutional (even assuming state action) for the networks in their capacity as station owners (*i. e.*, licensees) [124] to adopt a family viewing policy and to independently apply it? The answer must clearly be yes. Surely if the decision to refuse editorial advertisements is within the range of editorial discretion afforded to broadcasters, then an individual decision to adopt a policy such as family viewing must be similarly safeguarded. By adoption of the family viewing policy, a licensee commits itself to reserve two hours of the evening for family shows at a time when most families are likely to be watching. The question of what the needs of the community are at particular times is peculiarly the province of the licensee. If the licensee should determine that an audience is likely to be composed of children and adults at particular hours, nothing in the First Amendment prohibits it from programming accordingly. Nor is it the province of the court or the Commission to second guess good faith judgments in applying such a policy. Broadcasters daily are forced to make ad hoc subjective decisions as to what should

---

**124.** The networks have conceded throughout that their public interest responsibilities extend to their networking activities as well as to their local station responsibilities. Since the local stations are affiliates, the networks *qua* net-

works could be viewed as extensions of the local stations burdened with licensee duties at least insofar as their activities relate to their local stations. Programming would clearly fall within this category of duties.

and should not be broadcast. Those excluded from the airwaves call this censorship. Those permitted to participate call it visionary editorial decisionmaking. But such decisions are inherent to the broadcasting function and constitutionally protected whether or not state action is present. Therefore, independent adoption of and application of a family viewing policy by a licensee does not violate the First Amendment.

### 2. Government Influence.

The plaintiffs contend, however, that if the source of the idea for the policy adopted comes from the government or if the broadcaster's conduct was "influenced in any way" by government suggestions, the First Amendment has been violated. At oral argument, the plaintiffs went so far as to state that it was unnecessary to show causation at all. As applied to the broadcaster defendants, the argument is meritless. Even without referring to the cases said to support this sweeping proposition, it should be apparent from the implications of the argument that it proves too much. If the plaintiffs' position were correct, a licensee which heard a good idea from a governmental source could not adopt it even if, in its independent judgment, the programming suggestion was worthwhile. In short, licensee discretion to develop its own programming would be narrowed if government sources endorsed it. The FCC in section 326 of the Communications Act is specifically prohibited from interfering with licensee discretion in programming. It certainly would be a novel development if the government could achieve the desired results by endorsing programming ideas rather than prohibiting them.

The plaintiffs' position, nonetheless, is that there is a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro-*

*politan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). Most of the cases relied upon by the plaintiffs, however, are distinguishable upon two bases: first, the government had encouraged or supported racial discrimination or other tortious conduct; second, the finding of liability primarily affected the government and not the private parties. The policies underlying the state action concept (*i. e.,* those which bear upon the determination that the nexus is sufficiently close) dictate that these distinctions are crucial. As Judge Friendly writing for the Second Circuit explained in *Wahba v. New York University,* 492 F.2d 96, 102 (1974), the "determination of government action . . . *hinges on the weighing of a number of variables, principally the degree of government involvement, the offensiveness of the conduct, and the value of preserving a private sector free from the constitutional requirements applicable to government institutions.*" [125] (emphasis added). *See also Bond v. Dentzer,* 494 F.2d 302, 312 (2d Cir. 1974).

In keeping with these principles (though usually not articulating them) the courts have been quick to characterize resulting conduct as governmental when the government has been somehow involved with racial discrimination or other offensive conduct. A growing number of circuits openly express the view that the degree of involvement required for a showing of *significant* state involvement is less when racial discrimination is involved. *See, e. g., Granfield v. Catholic University of America,* 174 U.S.App.D.C. 183, 530 F.2d 1035, 1046 n.29, *cert denied,* —— U.S. ——, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *Greco v. Orange Memorial Hospital Corp.,* 513 F.2d 873, 879 (5th Cir. 1975); *Turner v. Impala Motors,* 503 F.2d 607, 611 (6th Cir. 1974); *Jackson v. Statler Foundation,* 496 F.2d 623, 628–29 (2d Cir. 1974); *Fletcher v. Rhode Island Hospital Trust National Bank,* 496 F.2d 927, 931 (1st Cir.), *cert. denied,* 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974); *Adams v.*

**125.** For an excellent discussion of these and other variables sometimes involved, see Note, "State Action: Theories For Applying Constitu- tional Restrictions to Private Activity," 74 *Colum.L.Rev.* 656 (1974).

*Southern California First National Bank,* 492 F.2d 324, 334–35 (9th Cir. 1973), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974); *cf. Lucas v. Wisconsin Electric Power Co.,* 466 F.2d 638, 656 (7th Cir. 1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973).

Nor is the tendency to find state action when particularly offensive conduct is involved confined to racial discrimination cases. As the Second Circuit recently held in *Weise v. Syracuse University,* 522 F.2d 397 (2d Cir. 1975), a less exacting state action standard is appropriate when the state gives aid to a school which practices sex discrimination in its faculty personnel policies. In short, it is one thing for a state to offer support to institutions which practice racial discrimination or sex discrimination and quite another for the state to offer aid to hospitals which happen to have decided not to perform abortions, to schools whose disciplinary procedures would not meet constitutional requirements if practiced by government institutions, or to other institutions whose personnel procedures do not measure up to those required of government. Again a growing number of circuits have recognized "the importance of preserving a private sector free from the constitutional requirements applicable to government institutions" as a factor in determining the presence of governmental action. *See, e. g., Berrios v. Inter American University,* 535 F.2d 1330, 1333 (1st Cir. 1976); *Greco v. Orange Memorial Hospital Corp., supra,* 513 F.2d at 879; *New York City Jaycees, Inc. v. United States Jaycees, Inc.,* 512 F.2d 856, 860 (2d Cir. 1975); *Ward v. St. Anthony Hospital,* 476 F.2d 671, 675 (10th Cir. 1973); *Chicago Joint Board Amalgamated Clothing Workers of America v. Chicago Tribune Co.,* 435 F.2d 470, 474 (7th Cir. 1970). These courts are not engaged in unprincipled result-oriented jurisprudence. Rather they further the state action concept. They warn government to steer clear of offering support for practices which offend national policy while reaffirming the importance of individual autonomy, federalism, and separation of powers.

Thus, *Norwood v. Harrison,* 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) offers no support for the plaintiffs' position against the private defendants. In *Norwood,* the Court struck down a government program which gave free textbooks to students attending racially segregated private schools. The Court ruled that "[T]he Constitution does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school." *Id.* at 466, 93 S.Ct. at 2811. Significantly the Court did not rule on the question of whether or not the schools receiving such aid were themselves liable for a constitutional violation. Indeed the Court stated that, "This case does not raise any question as to the right of citizens to maintain private schools with admissions limited to students of particular national origins, race, or religion . . . ."[126] *Id.* at 457, 93 S.Ct. at 2807. Thus the relief in *Norwood* was to terminate the impermissible aid, not to order the private schools to change their admissions policies. *Cf. Golden v. Biscayne Bay Yacht Club,* 530 F.2d 16, 21 (5th Cir. 1976) (en banc), *cert. denied,* —— U.S. ——, 97 S.Ct. 186, 50 L.Ed.2d 152 (1976) (dictum). The question of causal relationship between the government aid and the segregationist policies was not regarded as crucial. Significant government aid to a segregation academy was not to be tolerated whether or not a precise causal relationship existed.

Similar considerations apply to the sit-in cases relied on by the plaintiffs, such as *Lombard v. Louisiana,* 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 (1963). In *Lombard,* the defendants were charged with violating a criminal trespass statute. The convictions were found to violate the equal protection

---

**126.** The Court, of course, has since ruled that 42 U.S.C. § 1981 prohibits private schools from discriminating. *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). This is a far cry from holding that the Constitution prohibits such discrimination or that the receipt of some state aid converts otherwise private entities into government institutions for all purposes.

clause. The Court found state action because of speeches by the New Orleans superintendent of police and the mayor of New Orleans which had condemned sit-in demonstrations. The Court interpreted these statements to be official commands and thus ruled that they were to be treated as if an ordinance had been passed. The state contended that the crucial question was one of causation—did the speeches cause the restaurant owner to discriminate or would he have so acted independently of the existence of the speeches? Relying on *Peterson v. City of Greenville*, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963), a case in which a city ordinance commanding restaurant segregation was in existence, the Court ruled that the demonstration of a causal relationship was unnecessary. As the Court put it in *Peterson,*

> When a state agency passes a law compelling persons to discriminate against other persons because of race, and the State's criminal processes are employed in a way which enforces the discrimination mandated by that law, such a palpable violation of the Fourteenth Amendment cannot be saved by attempting to separate the mental urges of the demonstrators. *Id.* at 248, 83 S.Ct. at 1121.

But it is important to recognize that this rule applied insofar as state action was assigned to the government, not to the restaurant owner. The distinction was specifically underlined in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970):

> At what point . . . a State's involvement in the refusal [to serve people in a restaurant because of race] becomes sufficient to make the private refusal to serve a violation of the Fourteenth Amendment, is far from clear under our case law. If a State had a law requiring

a private person to refuse service because of race, it is clear beyond dispute that the law would violate the Fourteenth Amendment and could be declared invalid and enjoined from enforcement. Nor can a State enforce such a law requiring discrimination through either convictions of proprietors who refuse to discriminate, or trespass prosecutions of patrons who, after being denied service pursuant to such a law, refuse to honor a request to leave the premises.

> The question most relevant for this case, however, is a slightly different one. It is whether the decision of an owner of a restaurant to discriminate on the basis of race under the compulsion of state law offends the Fourteenth Amendment.

The Court concluded that,

> Without deciding whether less substantial involvement of a State might satisfy the state action requirement of the Fourteenth Amendment, we conclude that petitioner would show an abridgement of her equal protection right, if she proves that Kress refused her service *because* of a state-enforced custom of segregating the races in public restaurants. *Id.* at 171, 90 S.Ct. at 1615. (emphasis added).

Thus by requiring causation as a prerequisite of the imposition of liability against private defendants the Court settled on a two-level approach in finding state action. Less stringent standards were applied to test the significance of government involvement against government defendants than against private defendants.

The Court's approach was consistent with the state action concern for preventing government involvement in wrongdoing while preserving private autonomy.[127] *See also Wright v. City of Brighton, Alabama,* 441 F.2d 447, 449–50 (5th Cir.), *cert. denied,*

---

**127.** This, of course, does not mean that the sit-in cases did not have an impact on Southern restaurant owners' ability to discriminate. They were deprived of the ability to use the criminal trespass laws and thus could not call the police to oust black people from their restaurants. Their only remaining effective remedy was self help, a remedy which many of them may have been reluctant to use. The potential

for violence in circumstances in which this remedy would have been used supports Professor Black's observation that, "It seems inconceivable that society could live with an asymmetry . . . which reversed Negroes' convictions as sit-inners while allowing proprietors to throw them out . . .." Black, *supra,* 81 *Harv.L.Rev.* at 95.

404 U.S. 915, 92 S.Ct. 228, 30 L.Ed.2d 190 (1971); *Pitts v. Department of Revenue for State of Wisconsin,* 333 F.Supp. 662, 665–66 (E.D.Wis.1971); *Green v. Connally,* 330 F.Supp. 1150, 1166 (D.D.C.1971). It is in no wise authority for the idea that causation standards may be relaxed or eliminated when deciding whether there is a sufficient nexus between state and private conduct so as to fairly hold private parties liable for conduct which, in the absence of permissible contrary legislation, they would otherwise be constitutionally permitted to perform.[128]

Nor do any of the cases cited by the plaintiffs warrant the conclusion that mere encouragement even accompanied by causation is invariably sufficient to fix a state action label on the private defendants' conduct. The strongest cases for this position are *United States v. Davis,* 482 F.2d 893 (9th Cir. 1973)[129] and *Scott v. Eversole Mortuary,* 522 F.2d 1110 (9th Cir. 1975).

**128.** More difficult to distinguish in this connection is *Coleman v. Wagner College,* 429 F.2d 1120 (2d Cir. 1970). There twenty-four students sued to obtain a court order directing a private college to reinstate twenty-four college students who had been expelled without a hearing allegedly for racially discriminatory reasons. Plaintiffs contended that the state action requirement had been fulfilled by virtue of the state's issuance of regulations purportedly "intended to coerce colleges to adopt disciplinary codes embodying a 'hardline' attitude toward student protestors." *Id.* at 1125. The court held that if the students could demonstrate on remand that such was the intent they would prevail. The attitudes of the college administrators apparently were thought to be relevant only to a determination of the intent of the state. In short, the court did not impose any causation requirement. The court·held that if the state had " 'undertaken to set policy for the control of demonstrations in all private universities' " it "should be held responsible for the implementation of this policy." *Id.* So understood, *Coleman* simply stands for the proposition that if a state removes an activity from the sphere of private choice, implementation of that policy is state action for all purposes. The theory is that the state intended that college disciplinary policies be state policies rather·than private policies. Any interests in private autonomy had been legislatively removed. The same, however, could be said of the state action in *Adickes.* The difference is that in *Coleman* the implementation of the regulation, not the regulation itself, was constitutionally infirm; in *Adickes* the state action itself was constitutionally invalid. In *Coleman,* no injunctive relief could lie against the state to settle the question. The private-state conduct was inextricably bound up whether or not causation was present. In *Adickes* injunctive relief could lie against the state and thus the state action and private action were potentially segregable. Although the distinction is difficult on the facts of these two cases, it serves to illustrate the point that sometimes the state conduct is a *fait accompli* and relief, if there is to be any, must be directed against the private defendant. *See Smith v. Holiday Inns of America, Inc.,* 336 F.2d 630 (6th Cir. 1964). Compare *Golden v. Biscayne Bay Yacht Club, su-*

*pra,* 530 F.2d at 21–22. Finally, it should be observed as discussed *infra* that a broadcaster's interest in personal autonomy is constitutionally *protected* while the interests of the private university in *Coleman* were, in the absence of state regulation, merely constitutionally *permitted.*

**129.** Most of the cases cited by the plaintiffs do not involve governmental encouragement of specific policies. Indeed they are cases in which the government took no position on the policy. State action was found because the state involvement with the "private party" was so pervasive as to make the state a "partner" or "joint venturer" in the enterprise. *See Burton v. Wilmington Park Authority, supra,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45; *Ginn v. Matthews,* 533 F.2d 477 (9th Cir. 1976); *Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483 (9th Cir. 1974); *Associated Students, Inc. v. NCAA,* 493 F.2d 1251 (9th Cir. 1974); *Holodnak v. Avco Corp.,* 514 F.2d 285 (2d Cir.), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975); *McQueen v. Druker,* 438 F.2d 781 (1st Cir. 1971). Similarly, *Lavoie v. Bigwood,* 457 F.2d 7 (1st Cir. 1972), is a case in which state action was premised not on state encouragement of the specific policy but on the conferral by the state of monopoly status on the private party. *Cf. Fortin v. Darlington Little League,* 514 F.2d 344, 347 (1st Cir. 1975). *But cf. Jackson v. Metropolitan Edison Co., supra,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477. The rule of *Lavoie,* if applied here, would require the conclusion that all broadcaster programming decisionmaking was state action, the question left open in *CBS.* The plaintiffs have specifically declined to take that position and since they have it is hard to see what relevance *Burton*-type cases or *Lavoie*-type cases have to the plaintiffs' "encouragement" thesis.

*Adickes v. S. H. Kress & Co., supra,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, is a case in which the private defendant was alleged to have entered into a conspiracy with the state agent. That aspect of the case has no relevance to the encouragement theory. To encourage someone to do something does not

In *Davis,* the defendant in a criminal case sought to exclude evidence on the ground that it had been procured as the result of an illegal search and seizure by a TWA airline employee. The defendant argued that the search was accompanied by sufficient government involvement to make the TWA employee's actions those of the state; the Ninth Circuit agreed. The court stated that mere encouragement by the state would suffice to support a finding of state action:

> [E]ven if governmental involvement at some point in the period could be characterized accurately as mere "encouragement," or as "peripheral, or . . . one of several cooperative forces leading to the [alleged] constitutional violation," . . . that involvement would nevertheless be "significant" for purposes of the Fourth Amendment. Constitutional limitations on governmental action would be severely undercut if the government were allowed to actively encourage conduct by "private" persons or entities that is prohibited to the government itself. *Id.* at 904.

Significantly *Davis* is a case in which the question is what standards are to be applied to determine the existence of state action against the government in an exclusionary rule context, not a case in which the question of private defendants' liability is at issue. Thus the Ninth Circuit did not impose any causation requirement, *i. e.,* there was no necessity for the defendant to show that the airline had followed its search and seizure policy because of government encouragement.

In *Davis,* the court simply ruled that the government could not evade Fourth Amendment requirements by encouraging private parties to gather evidence for them without meeting constitutionally required safeguards. In doing so, the court, while not outlawing the private conduct, at least indirectly limited private autonomy. Compare note 127. Surely airlines would wish to provide maximum deterrence against the commission of criminal conduct on their premises (here the defendant was in violation of a federal prohibition against carrying concealed weapons on aircraft (49 U.S.C. § 1472(*1*)), but inasmuch as the government had encouraged such conduct, the options available to achieve maximum deterrence had been circumscribed. Ironically, if the government had kept quiet, the airlines might well have developed similar standards without sufficient governmental involvement to justify the application of Fourth Amendment standards. Thus the holding in *Davis,* however narrowly, does impinge on private autonomy. Nonetheless, the interests in private autonomy in the instant case are markedly different. The airline's "right" to invade the privacy of others surely does not rank high in the constellation of constitutional values. The basic distinction is that *Davis* "was concerned with a transportation utility that itself derives no protection from the First Amendment," *CBS v. Democratic National Committee, supra,* 412 U.S. at 120, 93 S.Ct. at 2095 (plurality opinion). Here the interests in private autonomy are of central First Amendment concern not only to the broadcaster, but to the general public.

Similar considerations apply to the case of *Scott v. Eversole Mortuary, supra,* 522 F.2d 1110. There the plaintiff sued for damages against a mortuary which had refused to provide funeral services to persons of American Indian descent. An attempt to overcome the state action hurdle was based upon the fact that the county had contracted for morgue services and pursuant to that contract such service had been performed with respect to the decedents. In dealing with the plaintiff's claim that

necessarily make the acts of the persuaded the acts of an agent or co-conspirator. The encourager may bear responsibility, but the person encouraged is not necessarily a partner or agent. Indeed the point is emphasized in *Adickes,* for as discussed previously, the Court, in discussing the other (substantive) count of the complaint, ruled that private response caused by compulsion was state action but did not reach the question of whether or not encouragement by the state was sufficient to make the private party liable.

there was an interdependent relationship between the county and the mortuary, the court stated:

We have described the degree of causal connection sufficient for state action in *Ouzts v. Maryland Nat'l Ins. Co.*, 505 F.2d 547 (9th Cir. 1974) (en banc), [*cert. denied,* 421 U.S. 949, 95 S.Ct. 1681, 44 L.Ed.2d 103 (1975)]. After citing the Supreme Court cases that had found state action, we said:

Although the nature of state action found in each of these cases differs with the facts of the case, they all share a common thread. In each, the Supreme Court found that there was some state involvement which directly or indirectly promoted the challenged conduct. Similarly, where the Court, could find no affirmative causal link between state legislation or policy and the challenged conduct, it declined to find the state action necessary to invoke the fourteenth amendment. . .

. . . We also noted that the state did not "foster" the type of misconduct that resulted. *Id.* at 1115 n.7.

Even though the language was unnecessary to the decision in *Scott* and to the holding in the case upon which it relies (*Ouzts*), both cases adhere to the view that a private defendant can be found liable for misconduct if the state in a regulatory context (or in a situation involving extensive private-state contacts) promotes or fosters the challenged conduct. Nonetheless both *Scott* and *Ouzts* involve highly offensive conduct (racial discrimination and illegal arrest) in which the interests in private autonomy and justifiable interests in being insulated from judicial scrutiny are correspondingly low. Their rationale is not to be applied willy nilly to a context in which the interests involved are so radically different.

 But even if governmental encouragement were sufficient to make out a state action showing in this context, there would be no First Amendment violation. As discussed previously, the First Amendment is not concerned with what broadcast-

ers decide to program; it rather requires that the decision as to what should be broadcast be independently arrived at by the licensee. If the licensee has in good faith adopted a policy which it reasonably believes to conform with the public interest and applicable regulations and if it has adopted it not because of government pressure, but because it believes it to be wise policy, the First Amendment not only permits the decision, but secures it from judicial restraint.

3. *Government Pressure.*

 As discussed, in section II, however, it is clear that the adoption of the family viewing policy was caused substantially by government pressure. The adoption of the policy was not the kind of independent decision required by the First Amendment. Instead the networks served in a surrogate role in achieving the implementation of government policy. The defendants, however, are apparently saying that even assuming this state of facts (which they deny), they cannot be held liable. The position of the defendants is most clearly stated by the FCC in its post trial brief: "In order . . . for governmental action to be encompassed by the strictures of the First Amendment, the action at issue must be one by Congress in enacting a law abridging freedom of speech, or *official* action by an empowered department, agency or official taken pursuant to federal law. In the instant case, however, the injuries complained of by plaintiffs are not derived from such binding regulatory action." Similarly, the private defendants in their post trial brief purport to find significance in the fact that the plaintiffs rely upon cases which either deal with "indirect *effects* of *official* state acts" or "cases in which conspiracies between private parties and state officers [culminate] in *official* state action."

The short answer to this whole line of argument is that Chairman Wiley admitted at trial that all of his actions throughout the campaign were made in his official capacity as Chairman of the FCC. But the analysis of the defendants is founded on a basic but common misunderstanding of the

concept of state action. Justice Frankfurter, concurring in *Terry v. Adams,* 345 U.S. 461, 473, 73 S.Ct. 809, 815, 97 L.Ed. 1152 (1953), spoke to the same error in a Fifteenth Amendment context:

> The application of the prohibition of the Fifteenth Amendment to "any State" is translated by legal jargon to read "State action." This phrase gives rise to a false direction in that it implies some impressive machinery or deliberative conduct normally associated with what orators call a sovereign state. The vital requirement is State responsibility—that somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme by which colored citizens are denied voting rights merely because they are colored.

Understandably, therefore, the defendants have a difficult time squaring their theory with the cases. For example, they explain the conspiracy count in *Adickes v. S. H. Kress & Co., supra,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, by distorting it. They claim that the necessary "official" action arose when the police subjected the plaintiff to false arrest for vagrancy for the purpose of harassing her. The Court, however, made plain that an arrest was not necessary for the plaintiff's theory to succeed and indicated that the actions of the officers did not have to be officially authorized:

> Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store, *or* to cause her subsequent arrest because she was a white person in the company of Negroes.

> The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful . . .. *Id.* at 152, 90 S.Ct. at 1605, (emphasis added).

Nor is the theory enunciated in *Adickes* confined to conspiracy cases. In *Lombard v. Louisiana, supra,* 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338 the Court found state action not in a law passed by the state or in a regulation promulgated by an administrative body, but instead in speeches of city officials. These speeches were regarded as coercive in character; consequently the Court held that, "[T]he city must be treated exactly as if it had an ordinance prohibiting such conduct." [130] *Id.* at 273, 83 S.Ct. at 1125. Similarly in *United States v. Davis, supra,* 482 F.2d 893, the search at issue had been conducted in the absence of any formal regulation by the Department of Transportation. As the court pointed out, "Although 'prepared to require it absolutely by rule,' the Department of Transportation continued for a time to employ informal means to obtain the cooperation of air carriers." *Id.* at 900. Even though the search was conducted prior to any formal regulation [131] the Ninth Circuit had no difficulty in finding "significant involvement." No sort of "official" binding action was thought to be a prerequisite.

The case law is clear that the concern of the courts is with substance and not form. Such a focus in the First Amendment area

---

**130.** Although the level of proof necessary to show government action may differ as applied to private defendants, clearly the *kind* of government action sufficient to meet constitutional requirements does not vary from defendant to defendant.

**131.** The defendants attempt to explain *Davis* by pointing to what they label a "Presidential Directive." This impressive phrase together with its capital letters cannot obscure the fact that this executive action was directed to the Department of Transportation and did nor apply to the airlines themselves. No official action by way of regulation to bind the airlines had been taken to implement the "directive" at the time of the search.

is especially appropriate. "Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). Nothing whatever turns upon whether governmental abridgments of First Amendment rights are achieved through formal regulation or backroom bludgeoning.

Here the Chairman threatened the networks at the very least with actions that would impose severe economic risks and burdens. By indicating that a policy statement might be issued on the matter, the Chairman impliedly threatened the networks with the burden of a full-fledged administrative proceeding together with necessary appeals therefrom. Moreover since a policy statement would outline responsibilities of licensees, the networks' fifteen stations could be held accountable in the licensing process for their adherence to the policy. In addition, the Chairman's use of the "public interest" standard as the rubric with which to clothe his proposals and his continual references to the "public trustee" status of the broadcasters again subtly but unmistakably indicated that the FCC could employ formal regulatory mechanisms to burden the networks if they did not go along. That the networks might have successfully resisted the government actions is no call for the conclusion that the burdens were absent. The economic hardships involved in "success" and the risks involved in possible failure were sufficiently onerous that the defendants here "voluntarily" deprived themselves of a flexibility which they would not otherwise have relinquished. The parallels to *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) are unmistakable.

There the Rhode Island Commission to Encourage Morality in Youth issued notices to Max Silverstein & Sons, a book distributor, which informed the company that in the judgment of the Commission certain books were inappropriate for display or sale to children. The notice warned that if it distributed the materials, the Commission, in conformity with its obligations, would recommend an obscenity prosecution to the attorney general. Copies of the notices were distributed to the police as well. As luck would have it, some of the books contained in the notices might have met the obscenity definition; others definitely would not. The distributor, unwilling to assume the financial and mental burdens of the *possible* prosecution which would have followed if the attorney general had agreed with the judgment of the Commission, declined to distribute any book listed in a Commission notice. Four publishers of paperback books who relied on Max Silverstein & Sons for distribution brought an action to enjoin the issuance of the Commission's notices. The defendants in *Bantam Books* argued that since they themselves were without power to apply formal legal sanctions (since they were only able to recommend prosecution—an act which anyone could perform), they could not appropriately be charged with abridging speech. To this argument the Court produced a stiff response:

> But though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation— the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed "objectionable" and succeeded in its aim. We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief. *Id.* at 67, 83 S.Ct. at 637.

Here the Commission deliberately set about to suppress material it considered to be objectionable and succeeded in its aim. The distributors bowed to the informal scheme of censorship and those who seek to market their products have brought suit. As the Court said in *Bantam Books,* "The distributor . . . is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights. The publisher has the greater eco-

nomic stake, because suppression of a particular book prevents him from recouping his investment in publishing it. Unless he is permitted to sue, infringements of freedom of the press may too often go unremedied." *Id.* at 65 n.6, 83 S.Ct. at 636.

■ The private defendants contend that the principles of *Bantam Books* dictate that only the government can be held liable. They note that the distributor was not a defendant in that case. Implicitly, at least, they argue that it would be unfair to hold private parties responsible for what they were compelled to do and further suggest that injunctive relief against them would violate the First Amendment. This argument, however, confuses the question of remedies with the question of liability. The Court in *Adickes* specifically held that a private party could be held liable for performing discriminatory acts under compulsion of state law. The Court, however, specifically left open the question of what kind of relief would be available if a violation were shown. 398 U.S. at 174 n.44, 90 S.Ct. 1598. That question as applied to this case (see discussion at section IV, *infra*) is entirely separate from the question of liability. Nor in the circumstances of this case can there be any such thing as a "good faith" or "unfairness" defense. The networks were fully aware that they have a First Amendment and statutory duty to program based exclusively on the basis of their independent judgment. They have a duty as public trustees and fiduciaries to resist government intrusions into the programming domain. When their corporate profits have been threatened by Commission actions, the networks have not hesitated to go to battle. Their responsibility to resist government intimidation was no less present here. *Adickes* counsels that a determination of liability against them is properly founded.

*4. Agreement to Compromise Independent Programming of Licensees.*

■ Additionally, each of the defendants is liable for a First Amendment violation with respect to the NAB adoption of the family viewing policy. As discussed earlier, the purpose of using the NAB Code was to undermine independent licensee decisionmaking, to transform the system of decentralized decisionmaking as to programming into a system where one board would have the power to control the early evening programming of most television stations in the United States. Clearly this joint attempt to monopolize the nation's airwaves is in direct conflict with the central philosophy of the First Amendment and the Communications Act as discussed in section IIIA1. An illustration, however, might be useful. In 1941, the Commission issued its Chain Broadcasting Regulations. One of the regulations was designed to prevent licensees from entering into network contracts which allowed them to reject network programs only if they could "support" the "contention" that what they had done "was more in the public interest" than carrying the network program. *NBC v. United States, supra,* 319 U.S. at 204, 63 S.Ct. 997. The Commission ruled, and the Supreme Court agreed that such contracts violated the licensee's duty to independently program. "'It is the station, not the network, which is licensed to serve the public interest. The licensee has the duty of determining what programs shall be broadcast over his station's facilities, and cannot lawfully delegate this duty or transfer the control of his station directly to the network . . . .'" *Id.* at 205, 63 S.Ct. at 1004. *Cf. Mt. Mansfield Television, Inc. v. FCC, supra,* 442 F.2d at 475–78. Here the FCC and the networks sought to control licensees' programming not through network-licensee contracts but through the medium of the NAB. The principle is the same: licensees may not delegate their programming authority "to any network or other person or group . . . ." 39 Fed. Reg. at 26375. By engaging in a concerted plan to cause industry-wide delegation of programming authority, the defendants undermined the decentralized character of the system of broadcasting, achieved monopolistic control over American television, and thus imperiled not only the rights of the

plaintiffs but also the "paramount" rights of viewers and listeners.[132]

■■■ The defendants suggest, however, that their conduct is immunized by a line of cases which cause them to conclude that "no one can doubt citizens have the right to engage in concerted action designed to influence legislative or regulatory actions." Indeed no one does doubt the right of citizens, regardless of motive, to engage in publicity campaigns to influence legislative and/or executive action (*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)), to personally contact executive officials in an effort to influence policy (*United Mineworkers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)), or, in the absence of sham, to use the processes of the courts and the agencies to eliminate competition (*California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)). No one doubts the right of broadcasters to gather together to form a trade association which has a goal of lobbying on behalf of the industry, nor the right of broadcasters to share ideas about programming, nor the right of the NAB to promote what it believes to be high standards by adopting a code. What is in "doubt" is the "right" of the NAB to influence the legislature or the FCC by interfering with the public's right to independent program decisionmakers. The fact that some means to induce legislative or executive action or inaction are constitutionally protected does not mean that all means to influence conduct or policymakers is similarly sanctioned. The message of *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1425, 89 L.Ed. 2013 (1945) applies here:

> Surely a command that the government itself shall not impede the free flow of ideas does not afford non-governmental combinations a refuge if they impose restraints upon that constitutionally guaranteed freedom. Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution, but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests.

■■■ In short, the NAB has no constitutional right to set up a network board to censor and regulate American television. *See generally,* Brenner, "The Limits of Broadcast Self-Regulation Under the First Amendment," 27 *Stan.L.Rev.* 1527, *reprinted with revisions,* 28 *Fed.Comm.B.J.* 1 (1975). Even when station managers are willing to abdicate their responsibilities by delegating their programming authority in exchange for membership in the NAB (with the convenient advantages of access to lobbying and informational services together with whatever prestige attaches to membership), the First Amendment requirement of diversity in decisionmaking does not protect such tie-in arrangements.[133]

Nor is it necessary to reach the plaintiffs' contention that network-NAB domination of the airwaves constitutes the usurpation of and implicit delegation by government of a function exclusively reserved to itself (*i. e.,* regulation of broadcasting) and thus is state action for First Amendment purposes. *See, e. g., Jackson v. Metropolitan Edison*

---

**132.** The standing of the plaintiffs to raise the rights of viewers and listeners cannot be doubted. Although their viewing habits are not precisely delineated in the record, the court concludes from their occupations that at least some of them are television viewers. Even if they were not, they would have the right to raise the rights of others. *See Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *cf. Office of Communication of United Church of Christ v. FCC,* 123 U.S.App.D.C. 328, 359 F.2d 994 (1966).

**133.** Nor is there any merit to the networks' contention that their contracts with some of the plaintiffs protect their "right" to program on the basis involved here. The contracts do not constitute waivers of the plaintiffs' right to contest First Amendment violations. No language of the contracts can fairly bear such a construction, and such contracts, in any event, would violate public policy.

*Co., supra,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (no government function found but doctrine still viable); *Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Terry v. Adams, supra,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944).

As the District of Columbia Court of Appeals stated in *National Association of Theatre Owners v. FCC,* 136 U.S.App.D.C. 352, 420 F.2d 194, 207 (1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970): "In seeking to provide the broadcasting media with the *diversity demanded by the first amendment* . . . the Commission must avoid the perils of both inaction and overzealousness—of abdication which would allow those possessing the most economic power to dictate what may be heard, and of censorship which would allow the government to control the ideas communicated to the public." (emphasis added). Here there is not mere inaction; the Commission itself has participated in an unprecedented joint venture, a transaction in which it has joined with the most powerful forces in broadcasting to permit a national board to dictate what may be heard, to implement a policy developed and conceived by government.

The potential for abuse from broadcaster involvement with the NAB has been judicially observed before. Indeed the FCC's reluctance to intervene has been directly criticized: "[I]t is difficult to understand its apparent certainty of belief that it is powerless to protect against possible abuses resulting from broadcaster involvement with the NAB." *Mark v. FCC,* 468 F.2d 266, 268 (1st Cir. 1972).[134] Here the FCC not only failed to prevent deprivations of First Amendment rights,[135] it actively intervened to bring them about. Broadcasters who join forces with government officials to bring about industry-wide adherence to a government plan to suppress offensive materials in the early evening hours cannot rightly complain when their actions are characterized as state action.

And there is no merit to the idea that the broadcasters have a right to deter legislation by programming to prevent it or by compromising other broadcasters' independent judgments. Taylor testified that:

Now, certainly, the whole aspect of Congressional pressure was part of that motivation. . . . [O]ne must be concerned, as every businessman is in America today of what the Congress may do. And the fact of the matter is that the best way . . . to prevent Congressional action which may take a form that is extremely disruptive or it may be very, very salutory, is that when you think you have a problem and you're worried about that problem, to try to get to some kind of correction before that correction is fostered upon us. [sic]

Most of the trouble in American business in the last five years could have been avoided if in fact that kind of policy had been followed. And that's how this thing came about.[136]

---

**134.** The defendants claim that *Mark* upheld NAB regulation of the airwaves. There a television licensee had adopted a flat ban on carrying programs designed to "foster belief in astrology." The petitioner sought a declaratory ruling that similar policies enunciated in the Television Code and Radio Code could not be adopted by licensees as their own policy. The court merely ruled that even if broadcaster action were considered to be government action, the policy in question could be adopted by a broadcaster. The petitioner did not challenge the role of the NAB; rather she confined her argument to the substance of the policy. For example, in her "Complaint and Request for Declaratory Relief" before the Commission, the point was clearly made: "Petitioner does not question a broadcaster's right . . . to for-

mulate or to *adopt valid policies, separately or, as in the case of the Code, in concert with others,* governing the acceptability of broadcast matter." Appellate Record Appendix at 13 (emphasis added). Thus the issue of the NAB role was not before the court.

**135.** The private defendants' citation to antitrust cases are, of course, beside the point. *See American Fed'n of Television & Radio Artists v. NAB,* 407 F.Supp. 900 (S.D.N.Y.1976); *American Brands, Inc. v. NAB,* 308 F.Supp. 1166 (D.D.C.1969).

**136.** The defendants suggest that if their action was prompted by fear of Congress, rather than by fear of the FCC, a finding of state action would be inappropriate. That contention is

■ The answer to this whole line of thought was crisply supplied in Chief Justice Burger's plurality opinion in *CBS:* "A licensee must balance what it might prefer to do as a private entrepreneur with what it is required to do as a 'public trustee.'" 412 U.S. at 118, 93 S.Ct. at 2094. Adoption of the family viewing policy in order to avoid government reaction and delegation of programming authority to the NAB may have been good "business," but it was not consistent with the broadcaster's status as public trustee. NAB counsel tells the court that we would live in a better world if the NAB could control access to the nation's airwaves. Counsel may be right, but the First Amendment has committed us to a different course, a course which reflects the wisdom of Judge Learned Hand: "For myself it would be most irksome to be ruled by a bevy of Platonic Guardians, even if I knew how to choose them, which I assuredly do not." *The Bill of Rights* 73 (1958).

B. *The Government Defendants.*

1. *First Amendment.*

Although the First Amendment principles discussed *supra* apply to the government defendants *a fortiori*, considerations affecting the scope of declaratory relief warrant discussion of the fact that less stringent standards triggering First Amendment liability are appropriately applied to the government defendants. Here, considerations of private autonomy cut in the opposite direction. The more that government is permitted to interfere in programming by way of pressure, threats, and intimidation, the less independent broadcasters will be or appear to be. If broadcasters face liability for responding to government pressure (or risk it by appearing to do so), it is critical that inappropriate government pressure be terminated.

At the outset, therefore, it is important to establish why the FCC has been able to apply pressure effectively. The root of the power is the uncertainty of the relicensing process and the vagueness of the standards which govern it. Significantly, the Commission has not disclaimed any power to use the licensing process to curb abuses in this area. Indeed in its brief currently on file before the Seventh Circuit Court of Appeals in *The Polite Society, Inc. v. FCC*, 541 F.2d 283, the Commission intimated that it was without power to formulate rules regulating the portrayal of violence, but specifically maintained that, "[T]he Commission may evaluate past programming to determine if the licensee has met the obligation to serve the public interest, but *otherwise* the Commission will not interfere with licensee programming discretion." Government Brief at 20 (emphasis added). Moreover, the Commission continued, "The consideration of past programming in connection with grant of license renewal has received judicial acceptance . . . *and is not considered censorship.* This is consistent with the reasoning that 'no one has a First

hypothetical since fear of FCC reaction was a proximate cause of the broadcaster conduct. But even if Taylor's professed viewpoint had been dominant, it is hard to see why the distinction should be important, particularly in a context where FCC government agents have acted, fostered, and exploited the basis for the fear. This is not a case in which broadcasters reacted to predictions of government reaction in the absence of government threats. In any event, broadcasters are required to program as they think best independent of fears of government action and without compromising other broadcasters' independence. Uncompromising independence is the minimum required of public trustees.

Thus, the question does not hinge upon the relative rights of Congress and agencies to explore the area at issue (nor upon the Speech and Debate Clause consideration which would preclude any liability of members of Congress for statements made in hearings); the question insofar as broadcasters' liability is concerned turns on their failure to respect the requirement of independent programming. It may be, however, that judicial inability (in view of the Speech and Debate Clause) to prevent legislative threats of unconstitutional actions would warrant more demanding standards of proof that broadcasters failed to independently program than would ordinarily be employed. Otherwise the existence of a congressional threat could handcuff a broadcaster who but for the threat would have adopted the recommended policy. In this case, however, regardless of what standards are applicable, it is clear that each of the networks failed to exercise independent judgment.

Amendment right to a license . . .'; to deny a station license because 'the public interest' requires it 'is not a denial of free speech.'" *Id.* at 20 n.17 (citations omitted) (emphasis added).

Thus when Chairman Wiley spoke of the "public interest" responsibilities of broadcasters during 1974–75 in connection with adult programming in early evening hours, when he talked of putting questions on the license renewal form, when he spoke of policy statements (which are, of course, enforced in the license renewal process), he credibly threatened the use of the ultimate regulatory tool. Broadcasters have always taken the position that the FCC cannot constitutionally employ the licensing process in the manner suggested by the Commission, but it is understandable that they would not want to put the issue to the test by making their license the vehicle for the test case. Thus as Commissioner Johnson testified, the Commission has extraordinary bargaining power which gives it the ability to do what the First Amendment and section 326 prohibits—censor television.

The Commission, of course, enjoys expansive power under the public interest standard. As the Supreme Court has often recognized, the standard is "a broad one, a power 'not niggardly but expansive,' . . . whose validity we have long upheld." *Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 380, 89 S.Ct. at 1801. On the other hand, as the Commission itself has observed, "[W]hile the Commission's statutory authority is indeed broad, it is certainly not unlimited. Broadcasting is plainly a medium which is entitled to First Amendment protection." *Children's Television Report and Policy Statement,* 50 F.C.C.2d 1, 3 (1974). In the absence of carefully defined categories of speech falling outside First Amendment protections, FCC regulation of program content has been permitted only insofar as it has served to promote greater diversity in the broadcasting medium. *See, e. g., Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371; *National Association of Independent Television Producers & Distribu-*

*tors v. FCC, supra,* 516 F.2d at 630–38; *Citizens Committee to Save WEFM v. FCC,* 165 U.S.App.D.C. 185, 506 F.2d 246, 268 (1974) (on rehearing en banc); *Brandywine-Main Line Radio, Inc. v. FCC, supra,* 473 F.2d at 57–58; *Mt. Mansfield Television, Inc. v. FCC, supra,* 442 F.2d 470; *National Association of Theatre Owners v. FCC, supra,* 420 F.2d at 208.

Although the public interest standard has permitted the Commission to regulate (through the licensing process or via direct regulations), no roving power to screen out inappropriate material has been tendered. In *Banzhaf v. FCC,* 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), *cert. denied,* 394 U.S. 1012, 89 S.Ct. 1628, 23 L.Ed.2d 39 (1969), for example, the District of Columbia Court of Appeals reviewed the FCC's authority to require radio and television stations carrying cigarette advertising to devote significant broadcast time to presenting the case against cigarette smoking. The court ruled that the public interest standard was broad enough to encompass such regulation. Specifically, the court ruled public health values were encompassed within the public interest rubric. Significantly, the court held that neither the public interest nor the public health labels could be used as talismans to sweep aside protected freedoms and warned that

> [W]e are not prepared to say that the Commission is authorized to condemn every broadcast which might, without arbitrariness or caprice, be thought to pose some danger to the public health. Even the relatively precise concept of the public health is murky at the fringes, and in some cases what is concededly optimal health may be a less important public value than other conflicting interests. Finally, the Commission itself has no special expertise to make it the appropriate arbiter of controversies over whether particular broadcasting is dangerous to health. *Id.* at 1097.

Nonetheless, the Commission's action was upheld in *Banzhaf* because of the compelling evidence that cigarette smoking was dangerous to health, because of the margin-

al validity of the claim that the communication involved was protected speech, and because of the fact that the regulation would provide the public with more information rather than less information about cigarette smoking (*but cf. Capital Broadcasting Co. v. Mitchell*, 333 F.Supp. 582 (D.D.C.1971), *aff'd*, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1972) (congressional ban of cigarette advertising on any medium of electronic communication does not violate First Amendment rights)). The care with which the court in *Banzhaf* scrutinized a Commission measure which threatened to chill literally dangerous speech lends no support to the idea that the Commission may use the "public interest" standard to justify prohibiting anything so vague as "inappropriate" speech. As the *Banzhaf* court put it, "[W]e emphasize that our cautious approval of this particular decision does not license the Commission to scan the airwaves for offensive material with no more discriminating a lens than the 'public interest' or even the 'public health.'" 405 F.2d at 1099.

Similarly in *Anti-Defamation League of B'Nai B'Rith v. FCC*, 131 U.S.App.D.C. 146, 403 F.2d 169 (1968), *cert. denied*, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969), then Circuit Judge Burger writing for the District of Columbia Circuit strongly rebuffed a claim that the existence of "recurrent bigoted appeals to anti-Semetic prejudice" on a broadcast station required the Commission to deny license renewal. Quite to the contrary, the court reaffirmed that "Congress had withheld from the Commission any power to censor broadcasts" and reminded that " 'The term censorship, however, as commonly understood connotes *any* examination of thought or expression in order to prevent publication of "objectionable" material.' " *Id.* at 171, *quoting Farmers Educational and Cooperative Union of America v. FCC*, 360 U.S. 525, 527, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959). Moreover it endorsed Commissioner Loevinger's views as unanswerable, " 'For the F.C.C. to promulgate rules regarding permissible and impermissible speech relating to religion would be . . . an egregious interference with free speech in broadcasting

. . ..' " 403 F.2d at 171. Thus the court ruled that the Commission has no power under the public interest standard to use the relicensing process as a vehicle to rid the airwaves of offensive material. *Cf. Straus Communications, Inc. v. FCC*, 174 U.S.App.D.C. 149, 530 F.2d 1001, 1008–09 (1976) (Commission limited to use of bad faith standard in reviewing actions of licensee charged with violation of personal attack rule).

The Commission itself has recognized these principles. In its *En Banc Programming Inquiry*, 44 F.C.C. 2303, 2309–10 (1960), the Commission demonstrated its clear understanding:

In view of the fact that a broadcaster is required to program his station in the public interest, convenience and necessity, it follows despite the limitations of the First Amendment and section 326 of the Act, that his freedom to program is not absolute. The Commission does not conceive that it is barred by the Constitution or by statute from exercising any responsibility with respect to programming. It does conceive that the manner or extent of the exercise of such responsibility can introduce constitutional or statutory questions. *It readily concedes that it is precluded from examining a program for taste or content, unless the recognized exceptions to censorship apply*: for example, obscenity . . . programs inciting to riots . . . etc. (emphasis added).

Similarly, the Commission has recognized that these principles apply in the licensing process: "[P]rovocative programming . . . may offend some listeners. But this does not mean that those offended have the right, through the Commission's licensing power, to rule such programming off the airwaves." *In re Applications of Pacifica Foundation*, FCC 64–43, No. 45386 at 3–5, *quoted in Robinson v. FCC*, 118 U.S. App.D.C. 144, 334 F.2d 534, 538–39, *cert. denied*, 379 U.S. 843, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964) (Wright, J., concurring). Thus the Commission has pledged that it "will not—indeed cannot—insist that licensees aban-

don program material because it is offensive to some or even a substantial number of listeners." *Sonderling Broadcasting Corp.*, 27 P & F Radio Reg.2d 1508, 1517 (1973).

 In this case, the Commission violated its pledge. Acting through Chairman Wiley, it declared that broadcasters had to reduce substantially the broadcasting of violence and adult material in the early evening hours. If such action were not forthcoming, regulatory actions up to and including the relicensing process were threatened. Understandably concerned about the existence of its power to do anything, the Commission resorted to informal coercion. Believing that it could not develop a record sufficient to support regulatory action, it threatened such action anyway. This lawless conduct cannot be tolerated if broadcasters are to enjoy meaningful First Amendment freedoms.

Significantly the government defendants have made no attempt to defend the proposition that the Commission has the power to force broadcasters to adopt the family viewing policy. Equally significant is the absence of a concession that it is without such power.[137] It is precisely this sort of ambiguity that has given the Chairman such bargaining power with the broadcasting industry.

This court will not rule that the Commission could not develop constitutional regulations (properly supported in a record compiled pursuant to the procedures and protections of the APA) which deal with the questions of violence or of programming for children in the early evening hours. It may be, for example, that a record could be compiled that would demonstrate that particular types of programming are so demonstrably injurious to the public health that their entitlement to First Amendment protection in the broadcasting medium could

properly be questioned. It may be that the rights of children to diversity of programming have been so severely ignored by broadcasters that affirmative requirements that broadcasters meet their needs in the times when children most frequently watch television could be constitutionally supported in a properly prepared administrative record.[138]

Here, however, the government defendants have made no attempt to suggest that the government policy is supported by evidence sufficient to permit the court to conclude that exceptions to First Amendment principles justify government regulation. Indeed the record in this case unmistakably demonstrates that the policy as enacted is so vague that no one can adequately define it. The policy has come to mean that "[W]e don't know what 'inappropriate' means but the NAB Board will know it when they see it." Clearly this is not the "precision of regulation" we have come to recognize as the "touchstone" of First Amendment freedoms. *See NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Shuttlesworth v. Birmingham, supra*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162. Compare *Southeastern Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016 (5th Cir. 1972).

 Moreover this court holds that unless the Commission enacts valid regulations giving fair notice to licensees of what is expected, the Commission has no authority to use the licensing process to control the depiction of violence or the presentation of adult material on television. In *Banzhaf*, the court observed that

[I]f the Commission must explain its view of the public interest when it denies or revokes a license, it may surely give advance notice of its views by way of an official ruling which is subject to judicial review. Indeed, in some cases fairness to

---

**137.** Instead the Commission carefully concedes that the exercise of such a power would be questionable.

**138.** *See Children's Television Report and Policy Statement*, 50 F.C.C.2d 1, 8 (1974). One indication of the fact that the family viewing policy is

in large part a public relations gimmick is that its operation is confined to the early evening hours despite the fact that children "form a substantial segment of the audience on *weekday afternoons* and early evenings *as well as on weekends*." *Id.* (emphasis added).

the stations may require some advance warning of their responsibilities. 405 F.2d at 1095.

The licensing process cannot be used as a vehicle to spring new rules on licensees. This principle is necessary not merely out of fairness to stations but also to protect the paramount rights of the viewing public. As the court stated in *Citizens Communications Center v. FCC, supra,* 447 F.2d at 1214, "The suggestion that the possibility of non-renewal, however remote, might chill uninhibited, robust and wide-open speech cannot be taken lightly."

The suggestion was not taken lightly by the broadcasters in this case. If the public interest against improper government intrusion into programming is to be safeguarded, any suggestion that the Commission has power through the licensing process to screen out "offensive" material with no more discriminating a lens than the public interest must be and is categorically rejected.

This is not to say that the Commission is powerless to prevent abuses. Evidence was presented in this case that some broadcasters have programmed violence not because they believe it is in the public interest but because it is in the financial interest of the licensee. Indeed evidence was introduced that if there were no NAB to govern the airwaves, many broadcasters would deliberately program for profits, rather than for the public interest. Quite obviously if a broadcaster deliberately programs in a manner which it believes is inconsistent with the public interest, the Commission has power to take action. *Cf.* F. Friendly, *The Good Guys, The Bad Guys, and the First Amendment* 231–33 (1975). The public is entitled to independent broadcaster determinations of what programming is in the public interest and to programming made on that basis. When broadcasters deviate from their own independent determinations of what is in the public interest, they violate their fiduciary responsibilities. Thus the Commission has the right and the duty to prevent and control deliberate deviations from the requirement of independent

programming. In the absence of valid regulation, however, it has no right to interfere with those decisions.

But this court is not prepared to hold that the Commission acts beyond its power when it merely brings to the attention of broadcasters considerations which they may wish independently to consider in their programming. In fact, the Commission is required to "generally encourage the larger and more effective use of radio in the public interest," (47 U.S.C. § 303(g)), and, although the terms "larger" and "more effective" connote encouragement of greater diversity, it seems entirely consistent with the goals of the Act to permit the Commission to offer *suggestions* when it believes it has information or ideas which broadcasters may wish to consider in making their independent determinations as to what will and will not be in conformance with the public interest. If the First Amendment means anything, however, the Commission has no right to accompany its suggestions with vague or explicit threats of regulatory action should broadcasters consider and reject them. The Commission has no right whatsoever to demand or to secure commitments from broadcasters that its suggestions be accepted. It has no right to launch orchestrated campaigns to pressure broadcasters to do what they do not wish to do. Particularly when Commissioners make recommendations in areas where formal regulation would be questionable, it is vital that any suggestion of pressure or the appearance of pressure be scrupulously avoided. Plaintiffs contend that "suggestions" emanating from the Commission automatically exert improper pressure because of the delicacy of the regulatory system. The answer to this problem is not to outlaw suggestions but to relieve the ambiguities of the system—to make it clear not only that the Commission cannot use the licensing system to combat material it believes to be offensive but also that government threats to use regulatory tools if programming suggestions are not adopted violate the First Amendment.

■ The existence of the threats, and the attempted securing of commitments coupled with the promise to publicize non-compliance in this case constituted *per se* violations of the First Amendment. It is not necessary to "separate the mental urges" (*Peterson v. City of Greenville, supra*, 373 U.S. at 248, 83 S.Ct. 1119) of the broadcasters to recognize that such actions compromise broadcaster freedom. As the plaintiffs point out, an appropriate analogy can be drawn to federal labor law with respect to union elections. The law requires that employers conduct themselves in a manner so as not to disturb "the laboratory conditions necessary for a fair election." *NLRB v. Gissell Packing Co., Inc.*, 395 U.S. 575, 612, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969). Here too the FCC must comport itself so as not to distort the "laboratory conditions" required if genuine licensee independence in making program decisions is to be achieved. Here the Commission compromised licensee independence in two ways: first, it pressured the networks to adopt the family viewing policy; second, it participated in a conspiracy to usurp licensee independence through the vehicle of the NAB. Those activities violated the First Amendment.

### 2. *Administrative Procedure Act.*

The Administrative Procedure Act was designed "to settle and regulate the field of Federal administrative law and procedure" by setting forth "legal guides" outlining "minimum basic essentials" required of agencies. S.Rep.No.752, 79th Cong. 1st Sess. 1, 7 (1945). Its central purpose was "to afford parties affected by administrative powers a means of knowing what their rights are and how they may be protected." *Id.* at 7. The minimum procedures required of agencies exercising quasi-legislative powers are set forth in 5 U.S.C. § 553. Subject to specifically delineated exceptions clearly inapplicable here, an agency which intends to formulate new public policy must publish general notice of proposed rulemaking in the Federal Register, must afford an opportunity for interested persons to participate in the rulemaking through the submission of written comments, and must adopt a general statement of the basis for and purpose of rules subsequently adopted.

■ The purpose of 5 U.S.C. § 553 is obvious. It recognizes that interested members of the public and the regulated industry have the right to participate in the policymaking process and assumes that the quality of policy decisions will be improved if public input is considered before decisions are made. *Texaco, Inc. v. FPC*, 412 F.2d 740, 744 (3d Cir. 1969). As Justice Douglas once put it, "Agencies discover that they are not always repositories of ultimate wisdom; they learn from the suggestions of outsiders and often benefit from that advice. . . . Public airing of problems through rule making makes the bureaucracy more responsive to public needs and is an important brake on the growth of absolutism in the regime that now governs all of us." *NLRB v. Wyman-Gordon*, 394 U.S. 759, 777–78, 89 S.Ct. 1426, 1436, 22 L.Ed.2d 709 (1968) (dissenting).

The record in this case reflects a total disregard of the procedural protections afforded by the APA. Without providing public notice and without affording any opportunity for interested parties to be heard, the Commission, acting through its Chairman, negotiated with powerful industry forces to form new policy for television, new policy which affects millions of lives. The Commission dictated and negotiated this new policy wholly outside the procedures of the Act. Through it all the Chairman insisted that he was speaking for the public:

A. . . . I was speaking for public opinion in this regard that there was—concerning the tremendous problem there was in the society because after all, *my job is to regulate in the public interest.* . . .

Q. [By the Court] You know, there is a great movement afoot and the pressures are getting bigger and bigger from what I sense of this trial that there [are] an awful lot of parents who completely disagree with the approach the networks have taken, and

who don't have a voice and who can't present to the Chairman of the FCC . . . their point of view . . . ..

They want a voice, they want to be heard and you foreclosed them from being heard.

A. No, your Honor. *I was speaking for them; that's the thing.* (emphasis added).

The issue, of course, is not whether the Commission accurately gauged public opinion. The point is that Congress has decided that respect for agency actions will be enhanced if the public opportunity to participate in the decisionmaking process is not cavalierly denied and that the surest method of determining the public interest is to permit the public to be heard through an orderly process.

Here, ironically, the government and the networks, both acting as public trustees, negotiated public policy while refusing to comply with procedural safeguards designed to protect the public they serve. If this process is considered acceptable administrative procedure, the Act's provisions will become meaningless. The government could sit down at a table with the regulated industry, negotiate policy, delegate to the industry the power to enforce the policy, mouth empty words of congratulation about self-regulation, issue cynical denials of government responsibility, and avoid the Act entirely. Such procedures would permit government and industry to seal out the public from the decisionmaking process and to frustrate judicial scrutiny. *Cf. Buckeye Power, Inc. v. EPA,* 481 F.2d 162, 171 (6th Cir. 1973); *Automotive Parts & Accessories Association, Inc. v. Boyd,* 132 U.S.App.D.C. 200, 407 F.2d 330, 338 (1968).

Understandably the FCC can point to no authority which authorizes such activities.[139] In *NLRB v. Wyman-Gordon Co., supra,* 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709, the Supreme Court discussed the proper role of agencies in formulating policy. Although its members were divided on many issues there presented, these remarks of the plurality express the unanimous view of the Court:

> There is no warrant in law for the Board to replace the statutory scheme with a rule-making procedure of its own invention. Apart from the fact that the device fashioned by the Board does not comply with statutory command, it obviously falls short of the substance of the requirements of the Administrative Procedure Act. *Id.* at 764, 89 S.Ct. at 1429.

*Cf. Mobil Oil Corp. v. FCC,* 157 U.S.App. D.C. 235, 483 F.2d 1238, 1253 (1973).

The courts have told the Commission before that if it seeks to impose a new duty on its licensees, "its action should be subject to the public debate and scrutiny of rule-making proceedings." *Yale Broadcasting Co. v. FCC, supra,* 478 F.2d at 599, *citing Citizens Communications Center v. FCC, supra,* 447 F.2d at 1204 n.5. And the courts have specifically condemned attempts to circumvent statutory requirements through closed-door negotiations. In *Moss v. CAB,* 139 U.S.App.D.C. 150, 430 F.2d 891 (1970), the CAB held several ex parte meetings with airline officials concerning rate increase proposals. No other interested parties were permitted to participate. After the meetings, the CAB issued an order calling for oral argument on the question of whether new rates about to go into effect should be suspended. Eight days after oral argument the Board suspended the proposed rates on file and authored a fare formula which would be acceptable. The carriers proceeded to file fare formulas which followed the CAB's "suggestion." There the Board, "in order to insulate itself from responsibility for these rates, relie[d] upon the fact that it never in so many words 'ordered' the carriers to file the rates

---

**139.** *Illinois Citizens Committee for Broadcasting v. FCC, supra,* 515 F.2d 397, proceeded on the assumption that the Commission's involvement was confined to the personal expression of views of one commissioner. Clearly mere personal expressions of viewpoint cannot be equated with agency action. As discussed earlier in section II, the Commission concealed the true facts of its involvement in that case from the court of appeals and its professions of noninvolvement here are not credible.

now being charged. According to the Board, as long as the Board only 'suggest[ed]' and [did] not order the future rates, the rates remain carrier-made." *Id.* at 898. The court wholly rejected this contention:

> Even a cursory reading of the order makes it clear that the Board told the carriers what rates to file; it set forth a step-by-step formula requiring major changes in rate-making practices and in rates which it expected the carriers to adopt. And the Board concededly took this action after closed sessions with carrier representatives, without statutory public hearings and, according to petitioners, without reference to the rate-making standards of the statute.

> If, as the Board argues, the rates resulting from the procedure are carrier-made, rather than agency-made, the public would not only be fenced out of its role in rate-making, but judicial review of the Board's actions would be severely limited. *Id.* at 899–900.

The Commission apparently would distinguish *Moss* on the ground that in this case the full Commission did not meet with the regulated industry; instead the Commission again resorts to characterizations of "individual action" by a single commissioner and "self regulation." But the "label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." *Lewis-Mota v. Secretary of Labor,* 469 F.2d 478, 481–82 (2d Cir. 1972), *citing CBS v. United States,* 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); *Citizens Communications Center v. FCC, supra,* 447 F.2d at 1204 n.5; *Nader v. Butterfield,* 373 F.Supp. 1175, 1178 (D.D.C.1974).

■ Here the agency in fact sought to interfere and did interfere with broadcaster decisionmaking; it sought to create and did create new policy governing the conduct of most licensees and agreed to use the NAB as the vehicle to enforce it. Putting aside the fact that these government actions violated the First Amendment, it is clear that the procedural protections of the APA were improperly ignored.

## IV. REMEDIAL ISSUES

The court's approach to the question of determining proper remedies in this case has been guided by three principles: (1) individual licensees should be free to program as they see fit without judicial interference; (2) neither the FCC nor the NAB should be permitted to interfere with independent licensee decisionmaking; (3) the court should adopt a coercive remedy, *i. e.,* an injunction, only if there were a serious danger that the defendants would ignore the implications of declaratory relief. *Cf. Rizzo v. Goode,* 423 U.S. 362, 380, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Douglas v. City of Jeanette,* 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

### A. Relief with Respect to the Networks' Adoption of Family Viewing and CBS's Scheduling of "All In The Family."

The plaintiffs seek a declaration that the family viewing policy was adopted by each of the networks as the impermissible product of government action—*i. e.,* that the adoption of the family viewing policy by each of the networks violated the First Amendment. They are clearly entitled to that relief. The limited scope of that relief, however, needs emphasis. The networks are free to continue or to discontinue the family viewing policy. The decision is to be based on their independent conception of the public interest. It is regrettable that no fully satisfactory relief can be formulated in these circumstances. The government has foisted a policy on the networks. The networks have publicly committed themselves to that policy; and have put themselves in a public relations position where any departure from the policy would produce considerable controversy. One would like to think that the networks would evaluate the programming policy independent of corporate pressures such as these, but the record in this case reveals that such independence is unlikely. This is not to suggest that the family viewing policy is not a desirable one. Rather it is to say that the

policy should be evaluated by broadcasters on its merits. The court is painfully aware that it cannot erase all the effects of the FCC's illegal campaign. However, any attempt by this court to dictate that the networks not program in consonance with the family viewing policy would violate the very precepts which the FCC has ignored in this case. If the First Amendment has any meaning at all, it is that broadcasters, not FCC officials or judges, have the authority to make programming decisions. Prior restraints on freedom of expression become no less offensive when imposed by judicial order instead of by executive intimidation. *Nebraska Press Association v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

Tandem, however, would have this court issue an order directing CBS to move "All In The Family" back into the family viewing time period. The relief is said to be justified because, as the court has found, CBS originally moved the show out of the family viewing period, not because it believed that the show would be inappropriate at that time but because it was anxious to comply with probable NAB perceptions of the meaning of family viewing. To direct that the show be shown during family viewing hours, it is claimed, would restore the status quo ante. That a court could issue such an order is said to be supported by the fact that " 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' " *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976), *quoting Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Although broadcasters can on some occasions be compelled to broadcast material they do not wish to show at all (*see, e. g., Red Lion Broadcasting Co. v. FCC, supra*, 395 U.S. 367, 89 S.Ct. 1794,

23 L.Ed.2d 371), Tandem's request for relief on these lines must be denied. The court cannot restore the status quo. Program scheduling decisions involve many variables, not the least of which is the nature of the programs on the programming network and the nature of their appeal to audiences vis-á-vis the programs of other networks. Changing lineups each season, therefore, are the rule. The scheduling considerations in 1976, therefore, cannot be equated with those prevailing in the fall of 1975. If only the plaintiff's rights vis-á-vis CBS's were at issue, the balance of equity would tip to the plaintiff. But the rights of viewers are at stake,[140] and they are entitled to independent broadcaster decisions. The evidence does not disclose why CBS programmed "All In The Family" on Wednesday at 9:00 in the fall of 1976. The court cannot assume that the decision would have been different in the absence of NAB pressure. Beyond declaring CBS's duty to make independent decisions, the court will not go.

B. *Relief with Respect to the NAB and the Networks' Duty to Independently Program.*

First, the plaintiffs seek a declaration that the NAB's adoption of the family viewing policy violated the First Amendment and seek to restrain enforcement of the rule by the NAB. The court will confine itself to a declaration that NAB adoption of the rule involved First Amendment violations by each of the defendants and a declaration that NAB enforcement of the family viewing policy violates the First Amendment. The scope of the declaration deserves some elaboration. The NAB has the right to adopt as a part of its code anything that it wishes, but it has no First Amendment right to interfere with the rights of the public to independent broadcaster decisionmaking. Again the court is aware that the results of the FCC campaign to adopt the family viewing policy cannot be erased. The court must permit the networks to continue with the policy because

---

**140.** Clearly the broadcasters have standing to raise the rights of the viewing public. See note 132 *supra*.

the interests in "private" autonomy are so great. But the NAB right to interfere with licensee decisionmaking, if any such right does exist, ranks low. Any attempt by the NAB to enforce the family viewing policy would be so impermissively tainted by the government's conduct that it could no longer (if that ever were the case) be labelled private action for First Amendment purposes.

The court emphasizes that nothing in its declaration implies that broadcasters are precluded from enunciating codes of conduct, including codes which contain the family viewing policy. Nothing in its declaration speaks to the question of whether or not NAB enforcement of a code *per se* is government action for First Amendment purposes. Nor does anything in this opinion address the question of whether or not NAB enforcement of any other section of the Code amounts to a First Amendment violation.[141] Finally, the court does not believe that an injunction is necessary to restrain the NAB from taking any measures to enforce the family viewing policy. The court has plainly declared such enforcement to be illegal. The court is confident that the NAB will respect that declaration.

■ Second, the plaintiffs seek a declaration that the networks are required to program on the basis of their own judgment rather than that of the NAB. Again the court will so declare, but the scope of the declaration requires discussion. The networks are free to consider the views of others in making their decisions. They, thus, may consider the views of other broadcasters as enunciated in the NAB Code. They may not delegate their authority to the NAB, however. They cannot contract with the NAB to respect the family viewing policy, let alone the family viewing policy as interpreted by the NAB.

The private defendants contend that such relief would stop "broadcasters from jointly or individually broadcasting as they see fit." That is fifty per cent correct. Broad-

casters have no right to jointly rule the airwaves. Their right is to make individual licensee decisions. The court hopes to stop joint rule of the airwaves so that the individual licensee rule can be restored. Once again, however, the scope of the relief is confined to the family viewing policy of the NAB.

C. *First Amendment Relief Against Government Defendants.*

1. The plaintiffs are entitled to a declaration that the government defendants violated the First Amendment by issuing threats of government action should industry not adopt the family viewing policy or the equivalent thereof. This declaration does not imply that the FCC cannot make suggestions for broadcasters to consider. It does make clear that more than suggestions were involved in this case.

■ 2. The plaintiffs are entitled to a declaration that the FCC may not enforce the family viewing policy and in the absence of valid statutes or regulations, may not use the licensing process to prevent programming which it regards as offensive. This declaration does not prevent the FCC from acting against "offensive" material which is already validly prohibited. For example, by statute broadcasters are prohibited from presenting obscene material. 18 U.S.C. § 1464. Nothing in the declaration implies that the FCC may not act in the licensing process to combat such abuses.

The FCC contends, however, that the declaration is unnecessary because, in its words, "At the oral argument on the defendants' motions to dismiss, counsel for the Government advised the Court that the FCC never had and has no intention of ever enforcing the family viewing amendment to the NAB Television Code which is neither a rule nor a policy of the FCC." This advice was inaccurate. On April 6, 1975, the same day that the government made its opening statement in this case, the Commission filed twenty-five additional copies of its brief

---

141. Different considerations *might* apply, for example, to the regulation of commercials by the NAB.

with the Seventh Circuit in the case of *The Polite Society, Inc. v. FCC,* No. 75–2044. The court denied review on September 2, 1976. 541 F.2d 283. In its brief there, the Commission contended that it had adopted a formal policy of industry self regulation [142] (Government Brief at 9, 19) and further stated that:

> In response to this expression of Congressional concern over excessive violence on television, the Commission emphasized that in relying on industry self-regulation to reduce the level of violence *it expected to see concrete results or further governmental intervention, to the extent constitutionally permissible, would be necessary.* (emphasis added)

In its brief, the Commission did not define "concrete results" or specify the kind of "governmental intervention" it would countenance; the only form of regulation specified as a viable possibility is the taking of action during the licensing process. Clearly the *Polite Society* brief filed by the Commission on April 6 is directly at odds with its counsel's representations here that the FCC never had "any intention of enforcing" the family viewing policy. When this court called this matter to the attention of the government, it sought to "clarify" its brief in the Seventh Circuit. In its clarification the government stated that the Report to Congress contains "no language to indicate that the Commission plans either to maintain any self-regulatory efforts of the industry or to intervene should the industry's program be viewed by anyone as unsuccessful or insufficient." This is an accurate description of the Report to Congress; it is not, however, an unequivocal disavowal of an intention to monitor or to intervene. Much more significant, however, the Com-

mission did not withdraw the language in its *Polite Society* brief which indicated that the Commission would control violence through the licensing process. In addition to the language discussed *supra* in section IIIB1, the Commission stated that if the public interest were not served by its inaction, the Seventh Circuit should assume that the Commission would " 'act in accordance with its statutory obligations.' " (emphasis added). Government Brief at 14. Thus the Commission implies that some form of intervention might be obligatory. Even if the Commission, however, had clearly and without equivocation withdrawn its threats, the law is clear that threats tactically withdrawn in the midst of litigation do not remove the basis for controversy.

Moreover, the government defendants have not confined their enforcement and monitoring actions to legal briefs. Chairman Wiley at several points in his testimony before a subcommittee of the House Committee on Appropriations indicated that the Commission intended to monitor the family viewing policy. For example, in response to a question from Representative Miller, the Chairman said,

> As I mentioned, we will have to determine whether or not they are serious about their *obligations* in this regard, whether they mean what they said. Necessarily, there is going to be some subjectivity in that and also competitive considerations which could erode this concept. I am at least going to wait and see and determine whether or not they mean business.

Mr. Miller: In other words, you will be watching this closely?

Mr. Wiley: *We will be watching it closely within the limits of our jurisdiction.*[143]

---

142. If that characterization means anything other than that the Commission decided to take no formal action, it is inconsistent with the Commission's earlier representations to this court.

143. It is unclear what the Chairman meant by "within the limits of our jurisdiction." The answer, however, was clearly intended to inform Representative Miller that the Commission would be monitoring the policy and that

some monitoring was within the limits of the Commission's jurisdiction. At another point, the Chairman represented that although the Commission had considered public hearings as an option, it had temporarily rejected the idea: "[B]ecause . . . the industry did not meet with me and did take the initiatives along the lines that I spelled out in my report, the so-called family viewing concept, I think the Commission's view is that we would like to see whether or not the family viewing hour and the

*Appropriations Hearings, supra,* at 455 (emphasis added).

The plaintiffs' fears of FCC enforcement are not "speculative" or "frivolous" as the government claims. To the contrary, clear expressions of FCC intentions cannot be erased in the midst of litigation by strategic withdrawals obviously designed to make a live controversy appear moot.

██ Nonetheless the court will not enjoin the Commission from enforcing the family viewing policy or the commitments associated with it. If the Commission attempts to enforce this policy through the relicensing process, those aggrieved will have means to redress the grievance in the courts. Moreover this court does not believe that the Commission will soon venture again on a lawless course.

### D. *Administrative Procedure Act Relief Against the FCC.*

The plaintiffs are entitled to a declaration that the government defendants[144] violated the Administrative Procedure Act by imposing policy on the industry without resort to the protections afforded by that Act. The plaintiffs would have the court go further and declare that any programming suggestions emanating from the FCC would violate the APA and the First Amendment. As previously discussed, the court must decline to do so. However, official FCC endorsements of and recommendations for change in industry policy must comply with APA procedures. The plaintiffs would have the court regulate ex parte contacts between the Commission and the broadcasters. Such a task is essentially legislative in character and the court does not propose to become a continuing overseer of FCC-broadcaster communications.[145] The court, however, was impressed with the testimony of former Commissioner Johnson that the nature and setting of the "summit" meetings brought enormous pressure to bear on the industry. Without choosing actively to regulate future FCC conduct in this area, the court notes that such summit meetings are extraordinary, unnecessary to achieve an objective of merely making suggestions, sure to generate undue pressure and to create an appearance of impropriety, and strongly indicative of an FCC intent to compromise broadcaster decisionmaking. Moreover FCC suggestions unaccompanied by clear and unequivocal denials of an intent to regulate take on the appearance of threats. The Commission and its representatives must avoid the appearance of impropriety if respect for its processes is to be maintained. Once again, the court will decline the plaintiffs' invitation to issue a code of conduct for the FCC. Should the FCC once again attempt to evade APA strictures, the courts will be open to those aggrieved.

### E. *Damages.*

Tandem, but not Writers Guild, asks for damages. The damages requested are apparently[146] confined to a reduction of earn-

---

new commitment to reduce excessive and gratuitous violence and sex which the industry has made in connection with that will prove to be effective in stemming the tide of this kind of material." *Id.* at 405.

**144.** At oral argument, the plaintiffs indicated that they sought such relief against the private defendants, but their original complaints charge only the government defendants with APA violations. The private defendants have relied on the complaint to the point that they have not even briefed the APA issues.

**145.** On August 31, 1976 Congress sent the "Sunshine" bill to the President for his signature. The bill as passed by Congress prohibits ex parte communications between agency officials and outsiders affected by pending agency business. *See* XXXIV Congressional Quarterly 2425–27 (Sept. 4, 1976). The bill was signed by President Ford on September 13, 1976.

**146.** It is unclear whether Tandem seeks compensation for the intangible losses associated with the deprivation of First Amendment rights. If it did, serious questions would be presented. Millions of Americans have suffered the same intangible loss. If all could collect, the television industry would be severely damaged. It is one thing to compensate for measurable financial loss; "burn[ing] the house to roast the pig" (*Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 526, 1 L.Ed.2d 412 (1957) (Frankfurter, J., concurring)) is quite another. As mentioned previously, intelligent limitations of damages to further other important public policies are not unknown. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

ing potential and fair market value resulting from the exclusion of "All In The Family" from the early prime time hours. Of principal concern to Tandem is the loss of value in the syndication market which is alleged to be "the most important source of revenue for a successful entertainment series originally broadcast by one of the networks."

### 1. *Private Defendants.*

 The fact that the First Amendment gives rise to a cause of action for damages is explored in section IC3. The private defendants (or at least CBS [147]) argue that even if the First Amendment affords a damage remedy for aggrieved plaintiffs against federal officials, it will not permit such a remedy against broadcasters who are part of the press protected by the First Amendment. This argument, of course, is purely semantic. If the press has acted as press it is protected from liability. If the press has acted as surrogates for the government, no immunity is conferred. Membership in the press immunizes broadcasters for their editorial decisions; it confers no license to join with government in violating individual rights. *Cf. Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 81 L.Ed. 953 (1937).

More to the point the private defendants argue that "the rationale of 'state action' in the broadcasting area if it is *ever* to be recognized . . . must be that the broadcasters were coerced against their will into doing what the FCC wanted. A damage award assumes culpability; 'state action' assumes the broadcasters were victims." The culpability of the private defendants cannot be so easily minimized. Their argument erroneously assumes that the defendants were without free will. To be sure, the FCC imposed burdens upon the exercise by the broadcasters of First Amendment rights. The broadcasters had the right and the duty to make independent decisions. Instead of doing so, they took the easy road and capitulated to FCC pressure. No one doubts that the networks could have resisted if they had chosen to do so. They are not quivering or powerless institutions. Instead they freely chose to abdicate the burdens of independent decisionmaking. Moreover the networks willingly entered into a partnership with the FCC for competitive reasons to use the medium of the NAB in order to interfere with the independent judgments of other licensees. As the Supreme Court recently said in a related context, "[T]here may be cases in which the State's participation in a decision is so dominant that it would be unfair to hold a private party responsible for his conduct implementing it [but] this record discloses no such unfairness." *Cantor v. Detroit Edison Co.,* —— U.S. ——, 96 S.Ct. 3110, 3119, 49 L.Ed.2d 1141 (1976). *Cf. Willaims v. Hot Shoppes, Inc.,* 110 U.S. App.D.C. 358, 293 F.2d 835, 847 (1961), *cert. denied,* 370 U.S. 925, 82 S.Ct. 1562, 8 L.Ed.2d 505 (1962) (Bazelon and Edgerton, JJ., dissenting).

### 2. *Government Defendants.*

 Although Tandem asks for damages against the government defendants, it cannot escape the doctrine of sovereign immunity insofar as it seeks damages against the defendants in their official capacities nor the requirement of personal jurisdiction insofar as it addresses its damages claim against the government defendants in their personal capacities. As the Court explained in *Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963), "the general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury . . .'" Clearly, to the extent the defendants are sued for damages in their official capacity, the judgment would expend itself on

---

**147.** CBS filed a trial brief in which it developed its position on the issue. The other defendants did not formally join in the brief, and the court is unclear as to their positions. In any event, the court does not believe the other defendants have waived the issue. Some confusion as to when to raise the argument may have arisen because the damages portion of the case has been bifurcated. The court assumes that the private defendants join in the CBS approach.

the public treasury. The question is whether or not an exception to the doctrine is applicable. Tandem argues that cases such as *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) and *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), have qualified the doctrine of sovereign immunity. In fact, those cases have nothing to do with the doctrine of sovereign immunity. Those cases speak to the question of what standards should be applied in circumstances in which government officials are sued for damages in their personal capacity for activities arising out of their conduct in office. They rule that government officials sued in their personal capacity do not enjoy absolute immunity for their conduct but rather are afforded the benefit of a qualified immunity the scope of which depends upon the nature of the office involved, the degree of discretion associated with it, and the factual circumstances of the alleged violation. They are designed to balance the plaintiffs' right to compensation and the associated need to curb government abuses against the public policy interest in encouraging the "vigorous and effective administration" of government uninhibited by the fear of financially crippling damage suits. The cases simply do not speak to the question of when plaintiffs can lay claims to the public treasury.

Nor does 28 U.S.C. § 1391(e) change the situation. That section provides in part that "A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may . . . be brought in any judicial district in which . . . the plaintiff resides if no real property is involved in the action." To the extent that the plaintiffs base their action against the defendants in their official capacity, the doctrine of sovereign immunity remains available. *Lowen-*

*stein v. Rooney,* 401 F.Supp. 952, 962 (E.D. N.Y.1975); *Environmental Defense Fund v. Corps of Engineers,* 325 F.Supp. 728, 732 (E.D.Ark.1971). On the other hand, the plaintiffs do not purport to seek to recover damages against the defendants personally. Even if they did so, section 1391(e) would be inapplicable. The section has not been interpreted in a way which would expose officials to lawsuits affecting their personal finances in every federal court of the country. *See Davis v. Federal Deposit Insurance Corp.,* 369 F.Supp. 277 (D.Colo.1974); *Paley v. Wolk,* 262 F.Supp. 640 (N.D.Ill. 1965).

### F. Attorneys' Fees.

In *Hall v. Cole,* 412 U.S. 1, 4, 93 S.Ct. 1943, 1945, 36 L.Ed.2d 702 (1973) the United States Supreme Court reaffirmed the historic authority of equity courts to award attorneys' fees when the interests of justice so required:

> Although the traditional American rule ordinarily disfavors the allowance of attorneys' fees in the absence of statutory or contractual authorization, federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require. Indeed, the power to award such fees "is part of the original authority of the chancellor to do equity in a particular situation," . . . and federal courts do not hesitate to exercise this inherent equitable power whenever "overriding considerations indicate the need for such a recovery."

If the court thought that it still had the authority to make ad hoc determinations that attorneys' fees could be awarded when "the interests of justice so require" or "whenever 'overriding considerations indicate the need for such recovery,'" it would not hesitate to shift the costs of the attorneys' fees involved in the plaintiffs' suit against the FCC to the network defendants.[148] Every equitable considera-

---

148. By this ruling, the court does not mean to preclude the possibility that Tandem could recover from the private defendants as part of its damages attorneys' fees incurred in its action against the FCC. *See, e. g., Prentice v. North American Title Guar. Corp.,* 59 Cal.2d 618, 620, 30 Cal.Rptr. 821, 381 P.2d 645 (1963); *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz,* 57 Cal. App.3d 104, 112, 128 Cal.Rptr. 901 (1976). This question will be determined when the trial on the amount of damages sustained is held.

tion favors the plaintiffs. The networks collectively have been given fifteen of the most valuable licenses in the country. These licenses are extraordinarily valuable. From their use, the networks generate substantial profits. The licenses are given to the networks without charge. All that is asked of the networks is that they secure the public interest, act as public trustees, and recognize their fiduciary responsibilities. Since the networks have shirked their responsibilities, the plaintiffs have been forced at great expense to bring a lawsuit against the FCC. The Writers Guild plaintiffs, although not without economic interests in the outcome, did not exaggerate when they observed during opening argument that for them there was no "pot of gold" waiting at the end of the lawsuit. This was a lawsuit brought primarily to vindicate important First Amendment principles.

Important equitable considerations point to the fact that the networks should bear that portion of the legal expenses brought to combat FCC intervention. If the attorneys' fees are not shifted, (1) the networks will have enjoyed the benefit of the plaintiffs' attorneys' efforts without having to bear the costs; (2) the networks will be rewarded for shirking their duty rather than punished; had they resisted FCC intervention, they would have borne the costs of attorneys' fees; (3) the plaintiffs will not be rewarded for their initiative in vindicating important constitutional and statutory rights but instead will be economically punished; (4) future plaintiffs may be unwilling to assume the economic burden, and First Amendment freedom in the nation's most powerful medium will be correspondingly jeopardized.

Nonetheless, it appears that the Supreme Court has foreclosed federal equity courts from awarding attorneys' fees when they determine that the interests of justice so require. In *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the Court stated that the federal courts are without "au-

thority" "to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." *Id.* at 260, 95 S.Ct. at 1623. Instead the Court spoke of "limited" exceptions to the general rule that attorneys' fees are not to be awarded to the prevailing party. *Id.* at 257–60, 95 S.Ct. 1612. Thus the Court in *Alyeska* appears to have limited judicial authority to award attorneys' fees to traditional judicially created exceptions and to congressionally authorized departures. The plaintiffs contend that an award of attorneys' fees against the private defendants can be justified under one of the traditional exceptions to the rule should they prevail in "any portion" of the case. The exception upon which they rely is labeled the "common benefit" theory.

The common benefit theory "involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.'" *Hall v. Cole, supra*, 412 U.S. at 5, 93 S.Ct. at 1946 *quoting Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 393–94, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Although it is difficult to see how the lawsuit against the networks or the NAB has conferred a substantial benefit on the private defendants, it is clear that the lawsuit against the FCC has done so. The plaintiffs contended that the FCC's extra-jurisdictional campaigns to pressure broadcasters into making program changes were illegal, and the FCC disagreed. By prevailing the plaintiffs have won a declaration that the FCC is without authority to engage in such campaigns. Clearly this benefits the networks.

■ The difficulty with fitting this situation into the common benefit theory is that the primary beneficiaries are the viewing public at large. There is no way to formulate an award that will operate to spread the costs proportionately among the beneficiaries. Thus this case is unlike *Mills*

*v. Electric Auto-Lite Co., supra,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593, and *Hall v. Cole, supra,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702. In *Mills,* the plaintiffs were shareholders bringing a derivative suit which benefitted all the shareholders of the corporation. By taxing the defendant corporation with attorneys' fees, all of the benefitting shareholders shared the costs. In *Hall,* the plaintiff union members sued the union and benefitted all the members of the union by the lawsuit. By taxing the defendant union with attorneys' fees, all of the benefitting union members shared the costs. Here if the networks are taxed with attorneys' fees, the costs would be spread among network shareholders, not among the members of the benefitting public.

The plaintiffs seek to avoid the argument by suggesting that the benefit to the plaintiffs and the public are derivative in character. They maintain that the benefits to the public flow because the private broadcasters have been restored to their prior state of freedom in determining the control of television programming and conclude from this that the primary benefits from the plaintiffs' victory accrue to the private defendants. This argument, however, mistakes the medium through which the benefits are derived for the real beneficiaries. The benefits to the public, of course, depend on broadcaster freedom, but the paramount rights at stake are those of the viewing public. The benefits to them are no less real because they came through benefitting institutions. Even if the plaintiffs' argument were correct, the primary beneficiaries would be all licensees, not the private defendants, and the court does not have jurisdiction to distribute the costs proportionately among the class of all licensees. Unfortunately, as in *Alyeska,* application of the " 'common benefit' exception which spreads the cost of litigation to those persons benefiting from it would 'stretch it totally outside its basic rationale. . . .' " 421 U.S. at 245, 95 S.Ct. at 1616. The court is without discretion to award attorneys' fees in this case.

## V. ORDER

A judgment shall be entered as follows: It is ordered, adjudged and decreed that:

1. Each of the plaintiffs' requests for injunctive relief is denied.

2. The plaintiffs' action under section 326 of the Communications Act of 1934 does not state a claim upon which relief can be granted.

3. The adoption of the family viewing policy by each of the networks constituted a violation of the First Amendment. The networks are free to continue or discontinue the policy or any variant of the policy provided that such programming decisions are made independent of concern for government reaction.

4. The adoption of the family viewing policy by the NAB involved a First Amendment violation by each of the defendants.

5. NAB attempts to enforce the family viewing policy in any way would violate the First Amendment.

6. The networks are required to independently program and may not without violating the First Amendment enter into agreements with the NAB which condition their membership on adherence to the family viewing policy or enter into any other agreements which delegate their programming authority over family viewing matters to the NAB. Their delegation of authority in this case violated the First Amendment.

7. Each of the government defendants violated the First Amendment by issuing threats of government action (through Chairman Wiley) should industry not adopt the family viewing policy or the equivalent thereof.

8. FCC enforcement of the family viewing policy (or of commitments associated with the policy) through the licensing process would violate the First Amendment.

9. Each of the government defendants has violated the Administrative Procedure Act.

10. The private defendants are liable for any financial damages which Tandem has suffered resulting from the adoption of the family viewing policy.

11. The plaintiffs' request for attorneys' fees is denied.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the court finds that there is no just reason for delay and directs that a final judgment shall be entered in accordance with Rules 58 and 79(a) in CV 75-3641-F. In the event that this judgment is determined not to be final, pursuant to 28 U.S.C. § 1292(b) the court declares that this opinion involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation in this case.

Pursuant to 28 U.S.C. § 1292(b) the court declares that this opinion involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation in CV 75-3710-F.

IT IS FURTHER ORDERED that the clerk forthwith serve copies of this opinion and order by United States mail upon counsel for the parties appearing in this action.

Dated this 4th day of November, 1976.